Daniel A. Frishberg
*Pro se*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.,*[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered.) |
| | ) | |
| DANIEL FRISHBERG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adv. Pro. No. 22-01179 (MG) |
| v. | ) | |
| | ) | |
| CELSIUS NETWORK LLC; | ) | |
| CELSIUS KEYFI LLC; | ) | |
| CELSIUS LENDING LLC; | ) | |
| CELSIUS MINING LLC; | ) | |
| CELSIUS NETWORK INC.; | ) | |
| CELSIUS NETWORK LIMITED; | ) | |
| CELSIUS NETWORKS LENDING LLC; | ) | |
| And CELSIUS US HOLDING LLC | ) | |
| | ) | |
| Defendants[2]. | ) | |
| | ) | |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

[2] The GK8 Debtors/all GK8 entities are also defendants, I did not include them in the header/summons since I do not believe that doing so would be proper, as they have a separate bankruptcy. Please interpret this as is proper

# TABLE OF AUTHORITIES

## CASES

*See Pearlman v. Reliance Ins. Co*., 371 U.S. 132, 135-36 (1962).

*Moody v. Amoco Oil Co*., 734 F.2d 1200, 1213 (7th Cir. 1984).

*In re Roblin Indus., Inc.*, 78 F.3d 30, 39-41 (2d Cir. 1996) (quoting *In re Tolona Pizza Products Corp.,* 3 F.3d 1029 (7th Cir.1993).

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V*., 651 F.3d 329 (2d Cir. 2011).

*Owens v. Taliban*, 2022 WL 1090618, at *2 (S.D.N.Y. Apr. 11, 2022).

*TAGC Mgmt., LLC v. Lehman,* 842 F. Supp. 2d 575, 586 (S.D.N.Y. 2012).

*Musket Corp. v. PDVSA Petroleo S.A*., 512 F.Supp.2d 155, 160 (S.D.N.Y.2007).

*Katz Agency, Inc. v. The Evening News Association*, 514 F.Supp. 423, 429 (S.D.N.Y.1981)).

*Moran v. Arcano*, No. 89 Civ. 6717(CSH), 1990 WL 96761, at *2 (S.D.N.Y. July 3, 1990).

*Bally Total Fitness*, 402 B.R. at 624.

*In re Motors Liquidation,* 2010 WL 4630327..

*In re New York Classic Motors, LLC,* 2021 WL 2285440, at *5 (Bankr. S.D.N.Y. June 4, 2021).

*In re Rodgers*, 333 F.3d 64 (2d Cir. 2003).

*Lyon v. Contech Constr. Prods., Inc. (In re Computrex, Inc.)*, 403 F.3d 807 (6th Cir. 2005).

*In re Munroe*, 183 B.R. 667 (Bankr. D.R.I. 1995).

*JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*, 69 A.D.3d 802, 803, 893 N.Y.S.2d 237 (2d Dep't 2010).

*Furia v. Furia*, 116 A.D.2d 694, 498 N.Y.S.2d 12, 13 (2d Dep't 1986).

*Golden v. Guardian (In re Lenox Healthcare, Inc.)*, 343 B.R. 96, 100 (Bankr. D. Del. 2006).

*In re S.W. Bach & Co.*, 435 B.R. 866, 878 (Bankr. S.D.N.Y. 2010)..

*MCZ, Inc. v. Andrus Res., Inc. (In re MCZ, Inc.)*, 82 B.R. 40, 42 (Bankr. S.D. Tex. 1987).

*In re Columbia Pac. Mortg., Inc.*, 20 B.R. 259, 262–64 (Bankr. W.D. Wash. 1981).

*In re Apollo Air Passenger Computer Reservation Sys. (CRS)*, 720 F. Supp. 1068, 1076 (S.D.N.Y. 1989).

*In re Timbers of Inwood Forest,* 484 U.S. 365, 375-76 (1988))).

*In re Thomas*, No. 14-11738 (MG), 2017 WL 123746, at *2 (Bankr. S.D.N.Y. Jan. 5, 2017)

*In re Ehrenfeld,* 2020 WL 5758819, at *3 (S.D.N.Y. Sept. 28, 2020).

*Khan v. Citibank*, No. CV PX 16-3121, 2017 WL 2311185.

*In re Richmond*, 513 B.R. 34, 41 (Bankr. E.D.N.Y. 2014).

*In re Drexel Burnham Lambert Grp., Inc.*, 142 B.R. 633, 637 (S.D.N.Y. 1992).

*In re Mizuno*, 288 B.R. 45, 49–50 (Bankr. E.D.N.Y. 2002).

*In re Residential Cap., LLC*, 2015 WL 1281960, at *3 (Bankr. S.D.N.Y. Mar. 18, 2015).

*In re Schick*, 234 B.R. 337, 343 (Bankr. S.D.N.Y. 1999).

*In re First Cent. Fin. Corp.*, 377 F.3d 209, 212 (2d Cir. 2004).

*In re Grubb & Ellis Co*., No. 12-10685 MG, 2012 WL 1036071, at *6 (Bankr. S.D.N.Y. Mar. 27, 2012) (Glenn, J.), aff'd, 523 B.R. 423 (S.D.N.Y. 2014) .

*Simonds v. Simonds*, 380 N.E.2d 189, 194 (NY 1978).

*In re Enron Corp*., 292 B.R. 752, 762 (Bankr. S.D.N.Y. 2003).

*Orlander v. Staples, Inc*., 802 F.3d 289, 294 (2d Cir. 2015)

*Johnson v. Nextel Commc'ns, Inc*., 660 F.3d 131, 142 (2d Cir. 2011).

*Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co*., N.A., 773 F.3d 110, 114 (2d Cir. 2014).

*See Jacobson v. Sassower,* 66 N.Y.2d 991, 993 (1985).

*See Register.com*, 356 F.3d at 403.

*Maverick Tube Corp*., 595 F.3d at 466.

*Greenfield*, 98 N.Y. 2d.

*Butko v. Ciccozzi*, 2021 WL 1608481.

*In re 48th St. Steakhouse, Inc.*, 835 F.2d 427, 430 (2d Cir. 1987).

*Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 37 (S.D.N.Y. 2015).

*See Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994).

*Baldwin County Welcome Center v. Brown.*

*Rabin v. Dep't of State.*

*Haines v. Kerner[3],* 404 U.S. 519, 521 (1972)

*Henry Platsky, Plaintiff-appellant, v. Central Intelligence Agency.*

*Conley v. Gibson*, 355 U.S. 41,45 46 (1957).

*Hoodho v. Holder,* 558 F.3d 184, 191 (2d Cir. 2009).

*United States v. Whiting Pools, Inc*., 462 U.S. 198, 205 n.10 (1983)

*In re Flanagan*, 503 F.3d 171, 180 (2d Cir.2007).

I*n re Columbia Gas Systems, Inc*., 997 F.2d 1039, 1059 (3d Cir.1993)).

*In re Edison Bros., Inc*., 243 B.R. 231, 235 (Bankr. D. Del. 2000) .

## **INTERPRETATION OF THIS ADVERSARY PROCEEDING**

As I am a *Pro Se* filer, and I do not understand the law as well as a lawyer would, I ask

that you do as The Supreme Court Of The United States[4] said: "a *pro se* complaint, 'however

---

[3] The Debtors, in a reply to the appellants (in the district court) stated that I quoted Rabin, instead of
Haines. I also hereby incorporate relevant quotes that support my request from Rabin.
[4] To be referred to as "SCOTUS" from henceforth.

inartful pleaded,' must be held to 'less stringent standards than formal pleadings drafted by lawyers' and can only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' Id., at 520 521, quoting *Conley v. Gibson*, 355 U.S. 41,45 46 (1957)." Rule 8 provides that "'pleadings shall be so construed as to do substantial justice." As SCOTUS stated:"We frequently have stated that *pro se* pleadings are to be given a liberal construction. *Baldwin County Welcome Center v. Brown.*'" SCOTUS also noted that *pro se* plaintiffs should be afforded "special solicitude." *Haines v. Kerner*[5], 404 U.S.  519, 521 (1972) . Your Honor has the ability "liberally" construe my requests. I ask that if anything is in the wrong format, or cites the wrong federal code, etc, that Your Honor allows me to fix it, instead of dismissing this Adversary Proceeding. As SCOTUS said: "The district judge should have explain[ed] the correct form to the *pro se* plaintiff so that Owens could have amended his pleadings accordingly. Instead of simply dismissing the complaints for naming federal agencies as the defendants, it would have been appropriate for the district judge to explain the correct form to the pro se plaintiff so that Platsky could have amended his pleadings accordingly see *Henry Platsky, Plaintiff-appellant, v. Central Intelligence Agency*". And as Your Honor noted previously, courts protect pro se plaintiff's from inadvertently giving up their rights. "*See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (citing *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir.1983) ("This policy of liberally construing pro se submissions is driven by the understanding that "[i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training.")."

---

[5] The Debtors, in a reply to the appellants (in the district court) stated that I quoted Rabin, instead of Haines. I also hereby incorporate relevant quotes that support my request from Rabin.

## COMPLAINT FOR DECLARATORY JUDGMENT

I, Daniel A. Frishberg, ("Mr. Frishberg", "I", "Me" and "Plaintiff"), bring this complaint

against the debtors[6] and debtors in possession (collectively, the "Debtors", "They", "Them",

"Celsius" and "Defendants") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"),

and allege and state the following:

## FIRST CLAIM FOR RELIEF

## (Declaratory Judgment Pursuant to Bankruptcy Rule 7001(9) That Certain

## Property is Not Property of the Estate)

Mr. Frishberg has filed this lawsuit for the declaratory relief set forth herein requesting

that the Court find that his assets are **not** property of the Debtors' estates, as defined under

section 541 of the Bankruptcy Code.

Section 541(d) of the Bankruptcy Code provides, in relevant part:

"(d) Property in which the debtor holds, as of the commencement of the case, **only legal title**

**and not an equitable interest**[7] . . . becomes property of the estate under subsection (a)(1) or (2)

---

[6] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax
identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC
(8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius
Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius
Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is
121 River Street, PH05, Hoboken, New Jersey 07030.
[7] Emphasis added.

of this section only to the extent of the debtor's legal title to such property, but not to the extent

of any equitable interest in such property that the debtor does not hold. 11 U.S.C. § 541(d)".

Mr. Frishberg reserves any and all rights, including, but not limited to intervening in any

part of case 22-10964 that he has an interest in, objection to items on agendas, etc.

Mr. Frishberg repeats and realleges each of the foregoing paragraphs as if fully set forth

herein. As well as in **Exhibit A**: *Daniel A Frishberg's Declaration In Support of Daniel A.*

*Frishberg's Adversary Proceeding*.

Nothing in the contract addresses what would happen if Mr. Frishberg requested to close

his account when there was a limitation on withdrawals. Nothing in the contract addressed

anything (relevant[8]) about what would happen in the event of a breach of contract. Just like how

(according to the Debtors) the contract does not address "Withhold" accounts, it does not address

a lot of things. But the lack of it being specifically addressed, does not suddenly mean that

Celsius is able to do whatever it wants. Like it stated about "Withhold" accounts: "The Withhold

Accounts were not part of Celsius' service offerings, and the Debtors have no contractual claim

to title to the cryptocurrency in Withhold Accounts." Logically, the same must apply here.

Contrary to what the Debtors state about how since the assets transferred to "Withhold" accounts

were there because of the actions of customers, Mr. Frishberg's assets in his account were there

---

[8] "We hereby agree that, to the extent permitted by applicable law, in the event that Celsius breaches its obligation under these Terms, you may set off assets or amounts we owe you with respect to your Celsius Account, against your Obligations. If the law restricts your ability to take, transfer, or setoff our obligations to you, or if they are protected from attachment, levy, or legal process, we waive those conditions and limits to the full extent that we may do so by contract, and we authorize you to apply our obligations to you to your Obligations." Other than this, and unfortunately I do not have any of their assets/money in my possession, so I am unable to offset it.

*solely* because of the actions of the Debtors, since they refused to comply with the terms of the contract that they themselves wrote.

## <u>SUMMARY OF ACTION</u>

Celsius suddenly limited withdrawals/swaps and transfers on June 13th, 2022. **It should be noted that they did not announce any form of a limitation on account closures**. On July 5th, 2022, Mr. Frishberg told Celsius to close his "<u>Earn</u>" account immediately and to <u>not pay him any more interest from that moment forward, as was his right under the TOS</u>. Instead, they *ignored* Mr. Frishberg, and responded that they cannot do that, because of their announcement in regards to the "<u>Pause</u>" on withdrawals (even though Mr. Frishberg instructed them to close his "<u>Earn</u>" account, and the "<u>Pause</u>" <u>had no mention of a restriction on closure of accounts</u>). Celsius *blatantly* **violated** the terms of the contract and decided to pick and choose what parts of the contract they want to apply, which is **not** how contracts, or contract law, works.

Such an *egregious* **material breach** of contract cannot be allowed to stand. Celsius also, (a second time) **materially breached** the contract by depositing the next interest (after they were specifically instructed to not do so) payment on July 11th, 2022.

Celsius claims[9] that Mr. Frishberg's deposits were in an "<u>Earn</u>" account prepetition. That is simply not true, however, based upon the clear and unambiguous contract terms, which allowed me to close my account. Three days after I instructed Celsius to close my account, title transferred to me. When Celsius **materially breached** the contract (on July 5th, 2022), *any and*

---

[9] https://cases.stretto.com/public/x191/11749/PLEADINGS/1174908262280000000155.pdf

*all* legal authority and **title** that Celsius had to hold onto my assets vanished. Mr. Frishberg's

contractual arrangement with Celsius was terminated, totally and completely, and assuming the

contract was not breached, save *de minimus* survivability sections that are **unrelated and**

**irrelevant** to the "Earn" contract.

When Celsius filed for Chapter 11 Bankruptcy protection, they did **not** hold the **title** to

the assets, while they did *hold the assets* themselves since they refused to release them, in

violation of their own terms of service, they did not have a legal right to hold them.

The Debtors have numerous times either outright claimed, or suggested that I am a

"Earn" account holder. Not so. Even if the "Earn" order is upheld on appeal (to which Mr.

Frishberg is an appellant), then that would have no impact on Mr. Frishberg, his claim, and his

case/Adversary Proceeding. As stated previously, Mr. Frishberg does not, have a "Earn" account.

Under Bankruptcy 11 U.S. Code § 541(d), Mr. Frishberg's Celsius deposits are **not** a part

of the bankruptcy estate. Mr. Frishberg is simply requesting a declaratory judgment that his coins

belong to him, as they have since at least three days after he requested to close his account, and a

return of his assets or, alternatively, the return of the value of his assets that the estate holds. This

courts Earn Order[10] (which does not apply to Mr. Frishberg since he does not have a "Earn"

account anymore, and has been incorrectly classified as "Earn") converts his 541(d) ownership

claim, into a unsecured claim for damages, which tramples on his rights by making what should

---

[10] (The "Earn Order")

**not** be property of the estate, property of the estate. Which is why Mr. Frishberg is one of the appellants[11] appealing the Earn Order.

When the contract was **materially breached**, <u>Mr. Frishberg's and the Debtors' contractual relationship ended</u>, and the Debtors did **not** gain Chapter 11 bankruptcy protections <u>until *after* the **breach of contract**.</u>. The assets were not contractually a part of the estate, or property of Celsius, as of the petition date.

The Earn Order cannot constitute a ruling on whether Mr. Frishberg's coins are property of the Debtors estates. My claim form is *presumptively* correct; Debtors first have the burden to prove that the coins were properly "<u>Earn</u>" deposits at all contractually. Then, at most, only after the Debtor meets their burden, there is a "rebuttable presumption" that the coins are property of the Estates; a presumption which I will seek to rebut.

A ruling going any further than this based on the Earn order would go beyond the relief requested by the Debtors.[12] It is both outside the scope of the Motion they filed, *and* would have been **required** to be brought as an Adversary Proceeding.  One reason that the Earn order is being appealed is that it appears that it is being treated in these cases as if it is a final order with the weight of a Declaratory Judgement issued from an Adversary Proceeding to dismiss ownership claims and relegate what would be ownership claims to the claims resolution process,

---

[11] ECF Docket 1894 (the "<u>Appeal</u>")

[12] The Debtors stated in the *Debtors' Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course and (III) Granting Related Relief* stated that the "the narrowed findings and requested relief do not require a final determination of property rights." Now, they are trying to use it as "law of the case" to dismiss the Shanks Adversary Proceeding.

*but* **without any of the statutory protections** afforded with a Adversary Proceeding. The Earn

Decision, however, was **not** an Adversary Proceeding as required under FRBP 7001 for a final

declaratory judgment that reflects an "interest in property."

The court[13] should order the Debtor/bankruptcy estate to transfer Mr. Frishberg the USD[14]

value of the assets (plus interest and other gains) at the time the check is written and be paid out

to Mr. Frishberg, alternatively, if this court finds that Mr. Frishberg's property was subject to

conversion, he requests that the Debtors either return the USD value at the time of conversion, or

the coins in kind (whichever is greater). Additionally, another 5% premium should be paid out

due to the volatility of cryptocurrencies and to account for fees associated with repurchasing the

cryptocurrencies. The court could also simply declare Mr. Frishberg's assets not property of the

estate and release them to him at a later date (along with other interest[15]/airdrops that the assets

have generated since July 5th, 2022), along with compensation for all additional damages dealt

to Mr. Frishberg, including, but not limited to, expenses such as filing fees, transportation, etc.

less any "interest," "yield," or "earnings" that were added on July 11th, 2022 (since the contract

was materially breached beforehand, causing the Debtor to lose title[16] to the assets.)

The Debtors are also unable to claim that they did not transfer the funds to avoid a

*potential* preferential transfer claim, because preferential transfers <u>do not apply to Mr. Frishberg</u>.

According to the debtors themselves: "section 547(c)(9) of the Bankruptcy Code <u>prohibits a</u>

<u>debtor</u> from <u>seeking to avoid a</u> *potential* preferential transfer to a particular transferee if the

---

[13] For more information see *Request For Relief*.
[14] Assuming that an in kind payment is not possible.

[15] Such as the interest made from staking. I am not asking for the rates that Celsius paid. I am asking for whatever I could have earned on those assets, if Celsius did not illegally deny me possession of my own property.
[16] Assuming they had title, which still has not been conclusively determined. All rights reserved.

**"aggregate value of all property" at issue is less than $7,575** (the "Statutory Cap[17]")", this clearly counts as a **judicial admission**.

# THE PARTIES

1. The Plaintiff is Daniel Anatoly Frishberg represented by himself.

2. The Defendants are the Debtors in the above-captioned Chapter 11 Cases, they are represented by *Kirkland and Ellis*. The Debtors' names and addresses are set forth in their voluntary petitions filed with this Court. The corporate organization of the Debtors[18], as well as their jurisdictions of formation, are set forth in Exhibit A to the *Declaration of Alex Mashinsky, Chief Executive Officer[19] of Celsius Network LLC, In Support of Chapter 11 Petitions and First Day Motions*, filed on July 14, 2022 [Docket No. 23] (the "First Day Declaration").

# JURISDICTION AND VENUE

1. This adversary proceeding arises in and relates to the Chapter 11 Cases pending before the U.S. Bankruptcy Court[20] for the Southern District of New York (the "Court") under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code").

---

[17] The statutory minimum has increased since the latest Bankruptcy Code amendments and is currently $7,575 as of April 1, 2022. See April 1 Increase of Federal Bankruptcy Exemptions, Other Dollar Amounts, National Consumer Law Center, Inc., March 22, 2021

[18] The GK8 Debtors/all GK8 entities are also defendants, I did not include them in the header/summons since I do not believe that doing so would be proper, as they have a separate bankruptcy. Please interpret this as is proper.

[19] At the time he was the CEO.

[20] It is *currently* pending before this court. This Adversary Proceeding should be transferred to the District court, *if* Mr. Frishberg requests it, as Mr. Frishberg reserves the right to *not* consent to the judgment of this court.

2.  The Court *purportedly* has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. The adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (G[21]) and (O).

3.  Venue is *allegedly* proper[22] pursuant to 28 U.S.C. §§ 1408 and 1409.

4.  The statutory predicates for the relief requested herein are sections 105(a) and 541 of the Bankruptcy Code and Bankruptcy Rules 7001(1) and 7001(9).

## Account Closure Was Undisputed

Chris Ferraro, in his depositions, does not dispute that I closed my account–and he does not dispute that all I had to do to close my account was to email a request to customer service, which is exactly what I did.

Oren Blonstein, in his deposition clearly laid out the requirements for closing a account, Mr. Frishberg asked "Q[23]: "Does that, in your opinion, state that [to] e-mail Celsius support is sufficient to terminate your account?". Mr. Blonstein literally said: "A: I mean, the first sentence says, "If you want to terminate your Celsius account with Celsius, you may do so by notifying

---

[21] This is only included if it is necessary to do so.

[22] *Supposedly* proper, it does not seem proper to me since they were in fact banned from operating in New York State. Although the issue is not being raised at this time, it **does not appear** that the Debtors' assertion (and basically everyone's) that venue is proper in this District under 28 U.S.C. §§1408 and 1409 is correct since Celsius' principal place of business is located in Hoboken, New Jersey (Motion, at ¶ 3); and all of the Debtors are Delaware entities (*see Voluntary Petition of Celsius US Holding LLC*, Case 22-10971, ECF Doc. #1, Exhibit "A" (p. 19) which is identifying that each of the seven Debtors are Delaware entities).

[23] Q are questions asked by Mr. Frishberg, and A are questions answered by Mr. Blonstein.

Celsius at support@celsius.network."'" After Mr. Frishberg followed up with "Q: Correct. Is that

what is required to terminate your account?" Mr. Blonstein clearly and unambiguously replied

with: "A: That's what -- I mean, that's what that sentence says, yes." To avoid any potential for

ambiguity Mr. Frishberg followed up once again: "So that is what is required to terminate your

account, correct; yes or no?" Mr. Blonstein agreed that all that is required to close an account,

and terminate the account, is to email Celsius: "A: I'm reading the same thing that you are

referring to. That's what it says, yes. I agree." To prevent the Debtors from ever being able to

argue that Mr. Frishberg did not have the right to close his account, Mr. Frishberg followed up

with: "Q: Okay. So it does say, yes, to terminate your account you have to e-mail Celsius,

support@celsius.network, correct?" Mr. Blonstein confirmed with *finality* "That is what it says,

yes."


## Automatic Stay

Mr. Frishberg recognizes that even bare possession, in *some* circumstances, *may* trigger

the automatic stay under section 362(a) of the Bankruptcy Code. *In re 48th St. Steakhouse, Inc.*,

835 F.2d 427, 430 (2d Cir. 1987); however in *Butko v. Ciccozzi*, 2021 WL 1608481, at *10 & n.6

(W.D. Pa. Apr. 26, 2021) (compiling cases finding that **some colorable legal right,** in *addition* to

bare possession, is **required** in order to obtain the benefit of the automatic stay[24]). Even if the

automatic stay is invoked by Celsius' mere possession of Mr. Frishberg's coins, relief from the

stay, is warranted under sections 362(d)(1) and 362(d)(2) of the Bankruptcy Code, and the court

**SHOULD LIFT THE STAY**, at least on a partial basis (only if necessary).

---

24 Emphasis added

## Judicial Admissions

Statements made in this case are binding on Celsius as judicial admissions. Judicial admissions "are formal concessions in the **pleadings in the case** . . . that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Hoodho v. Holder,* 558 F.3d 184, 191 (2d Cir. 2009)[25]. Statements other than pleadings, **including those made by attorneys in briefs[26]**, also bind the client as judicial admissions. *See Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994). "When a party makes a judicial admission, that party 'normally is bound [by that admission] **throughout the course of the proceeding**.' " *Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 37 (S.D.N.Y. 2015) (alteration in original; citation omitted).

## Preliminary Statement

Mr. Frishberg wants to clarify the following:

1.      Mr. Frishberg is not an "investor[27]" in Celsius. He invested *into* cryptocurrencies which he then *deposited* to Celsius. He is a *depositor, not an investor*. The Debtors have made representations in court that depositors such as Mr. Frishberg knew the risks when they signed the contract, that is blatantly false.

2.      Mr. Frishberg is not a stakeholder[28] in Celsius; he is currently (wrongly) classified as a creditor. He should not have an "<u>Earn</u>" account as of July 5th, 2022; he (as is allowed under the contract) instructed Celsius to close it. Any interest/earnings/yield that the Debtors deposited into

---

[25] Mr. Frishberg would like to thank Custody and Withhold for their amazing case law/some arguments, all the credit of those arguments goes to them.
[26] Emphasis added.

[27] https://cases.stretto.com/public/x191/11749/PLEADINGS/1174908252280000000049.pdf
"Like Frishberg's, these complaints allege claims based on customers' inability to withdraw their investments following the Pause."
[28] https://cases.stretto.com/public/x191/11749/PLEADINGS/1174909012280000000126.pdf
Was referred to as a "stakeholder" in this order.

his "Earn" account after that date should be removed, as it is a **material breach** of the contract

for it to be deposited. The fact that Celsius did not close it has no relevance[29] to his status as a

(supposed) creditor because, under the contract, ***all*** Mr. Frishberg had to do was email Celsius

his desire to close the account (as is standard in the industry). All Celsius had to/should have

done was to close the "Earn" account, which would allow Mr. Frishberg's assets to be withdrawn

to a external wallet the "Pause" notwithstanding, since the closure of the account **terminates** the

entire contract[30], including the terms that allow Celsius to limit withdrawals. To the extent that

Celsius is holding onto the coins, they were being held in express or constructive trust and are

**not property of the estate**. The Debtors also had no contractual authority to hold onto my assets

(after the termination of the Terms of Use) thereby the Debtors **material breach of contract**

caused **Mr. Frishberg significant harm, meeting the 4th and final criteria of what**

**constitutes a breach of contract under New York State law.**

3.       Celsius's refusal to close the "Earn" account constituted a clear **material breach** of

contract. Celsius's refusal has significantly harmed Mr. Frishberg and caused him to be classified

(wrongly) as an unsecured creditor, causing significant financial hardship. Celsius's actions have

---

[29] The contract is what matters (assuming it is enforceable/not void, all rights reserved). The Debtors claim that "Custody" is entitled to a return of 100% of their assets, since that is what the contract says, despite the fact that at the time of the Pause, ~64% of assets owed to "Custody" were in the "Custody" wallet. And as of the petition (according to the Debtors/UCC), ~94% of the assets owed to "Custody" were in the "Custody" wallet, and yet the Debtors contend that since the contract says that "Custody" is entitled to a full return of assets, despite the fact that there was a partial commingling, is a judicial admission by the Debtors that the contract takes precedence over what actually occurred (according to them anyways). Mr. Frishberg does not at this time take a position on "Custody", and whether it is valid, and will operate under the assumption that it is, but he reserves all rights, including changing his position at any time.

[30] Some "Survival" terms in Section 35 are would still be in effect after the termination of the contract (assuming it was not breached, like it was),

also caused Mr. Frishberg to take significant amounts of time to reclaim his assets through this

court. Celsius's actions have also caused Mr. Frishberg undue stress and anxiety.

4.      Mr. Frishberg attempted to mitigate[31] the damages from Celsius's material breach of

contract by contacting them numerous times before bankruptcy (at least 10 times by email and

four times by phone), and dozens of times after the bankruptcy filing, including corresponding

with the Debtors' legal counsel/support team.

5.      At this time, Mr. Frishberg still maintains that his assets are not in "Earn" and have not

been in "Earn" since July 5th, 2022, when either his account was closed, and the Terms of

Service (bar a few irrelevant survival terms) terminated, or, if the court finds that that the account

was not closed, than Celsius materially breached the contract, and Mr. Frishberg voided it. In

either scenario, the assets are not property of the estate, whether they are being held by the

Debtors in express trust, or constructive trust. Mr. Frishberg reserves all rights, including but not

limited to amending this Adversary Proceeding based on the outcome of the Earn Order Appeal.

6.      The "Pause" **does not apply** to Mr. Frishberg, since the request to close the account

caused "**the termination of these [in reference to the TOU] Terms**". Celsius did not have, nor

do they currently have, any legal or factual argument to refuse Mr. Frishberg access to his own

property.


        Mr. Frishberg would like to clarify something else. He is seeking a Declaratory Judgment

that the coins are not property of the estate under 11 U.S.C. § 541, and compensation[32] for the

damages Celsius/the Debtors have caused to him. He is not seeking an unsecured claim for a

---

[31] *M. Golodetz Exp. Corp. v. S/S Lake Anja*, 751 F.2d 1103, 1112 (2d Cir. 1985) ("The venerable rule that
requires a plaintiff to mitigate his damages has been explained by the principle that 'damages which the
plaintiff might have avoided with reasonable effort ... are ... not caused by the defendant's wrong ... and,
therefore, are not to be charged against him'.") (quoting 2 Williston on Contracts § 1353 at 274 (1962)).
[32] See *Request For Relief* for more information.

breach of contract, as that is not proper, that would take assets that should have not been property of the estate, and in effect turn them into property of the estate. *If* it is necessary, the automatic stay can be lifted for this narrow purpose. Mr. Frishberg also is not, as the Debtors have attempted to make seem, seeking any punitive damages.

Mr. Frishberg would like to state, for the record, that his claim is not a core matter. This Adversary Proceeding *should* be tried in the District court (if he requests it) with a jury trial[33], and that he reserves the right to not consent to the judgment of this court[34], and does not consent to this court issuing a final ruling on any non-core matters, and this complain should **not** be dismissed via summary judgment or otherwise without a hearing on his individual case, because Mr. Frishberg's claims have merit and should be heard.

# **The Material Breach Of Contract**

## **The Contract Was Clear and Unambiguous About Account Closures**

The court should rule that the Terms Of Use clearly and **unambiguously** stated that Mr. Frishberg had the right to close his account, and as soon as it was closed, all of the terms of the contract, with the exception of some irrelevant "Survival" terms, terminated. If the contract is found to be **unambiguous**, it **must** be interpreted in Mr. Frishberg's favor, because the contract *clearly* states that he has the right to close his account at <u>any time by simply emailing Celsius</u>

---

[33] To be clear, Mr. Frishberg is requesting a jury trial.
[34] "This court" refers to the Bankruptcy court that this case is currently pending before.

(which he did numerous times). Mr. Blonstein also agreed that Mr. Frishberg had a right to close his account, and that it terminated the Terms of Use after he closed his account.

Nothing in the contract mentioned any (relevant) limitations on account closures, specifically in the section[35] about account closures, it *clearly* and **unambiguously** states that the TOU **terminates** when the account is closed. The **only** requirement to close the account **that is listed in the contract** is for Mr. Frishberg to email them (which he did numerous times, and also called them). As the Debtors love to say[36] "When a contract's terms are **unambiguous**, courts **must** apply them as written. *In re Enron Corp.*, 292 B.R. 752, 762 (Bankr. S.D.N.Y. 2003) ("If the contract language is 'unambiguous,' this Court must enforce the plain, ordinary, and common meaning of those terms as a matter of law without reference to extrinsic evidence.")." Since there is no written limitation on account closures, "this court must enforce" the contract as written. As stated[37] by the Custody Ad Hoc: "A contract is **unambiguous** "*if* the language it uses has a '**definite and precise meaning, unattended by danger of misconception** in the purport of the [agreement] itself, and concerning which there is **no** *reasonable* basis for a difference of opinion." *Greenfield*, 98 N.Y. 2d[38].

---

[35] "B. Your Right to Close Your Celsius Account
**If you want to terminate your Celsius Account with Celsius, you may do so by notifying Celsius at support@celsius.network**. Once your Celsius Account is closed, you agree: (a) to continue to be bound by these Terms, as required by Section 35 below (Survival) (b) to immediately stop using the Services, (c) that we reserve the right (but have no obligation) to delete all of your information and Celsius Account data stored on our servers, and (d) that we shall not be liable to you or any third party for termination of access to the Services or for deletion of your information or Celsius Account data. You acknowledge that any legal obligations you may have under any other agreement with Celsius or its Affiliates (including any Loan Agreement or agreement governing lending or investing in Celsius or its Affiliates) will not be affected in any way **by the termination of these Terms** and any such *other* agreement between you and Celsius will continue to be in effect in accordance with its terms." (Emphasis added)

[36] Emphasis added.
[37] Stretto Doc 1292 Filed by Togut, Segal & Segal pgs 16 & 17, emphasis added.
[38] at 569 (citations omitted).

## **If the Contract (including the sections around account closure) is Ambiguous, It Must Be Construed in Mr. Frishberg's Favor**

In the case, if the contract *is* **ambiguous**, it **must** also be interpreted in *Mr. Frishberg's* favor (since it clearly states in Section 19, subsection B, that one can close their account simply by emailing Celsius), as New York courts construe issues of ambiguity **against** the **drafting party**— here, the Debtors. *Jacobson v. Sassower*, 66 N.Y.2d 991, 993 (1985) ("**[I]n cases of doubt or ambiguity,** a contract **must** be construed most **strongly** *against* the party who prepared it, and favorably to a party who had **no voice in the selection of its language[39].**"). The reason for this rule is that the party who is drafting the contract is presumably weighing the contract in its favor, and *heavily*.

As also stated[40] by the Custody Ad Hoc: *Maverick Tube Corp.*, 595 F.3d at 466: "An **ambiguity** exists where the terms of the contract *could* suggest **more than one** meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business[41]."

Thus, "if the agreement on its face is *reasonably* susceptible of only one meaning, a court is **not** free to alter the contract to *reflect its personal notions of fairness and equity*" *Greenfield*, 98 N.Y. 2d[42]. Since New York courts construe issues of ambiguity against the **drafting party**— here, the Debtors. *Jacobson v. Sassower*, 66 N.Y.2d 991, 993 (1985) ("**[I]n cases of doubt or**

---

[39] Emphasis added.
[40] Stretto Doc 1292 Filed by Togut, Segal & Segal pgs 16 & 17, emphasis added.
[41] (internal quotation marks and citations omitted)
[42] At 569-70. (citations omitted). Emphasis added.

**ambiguity,** a contract **must** be construed most strongly *against* the party who prepared it, and favorably to a party who had **no voice in the selection of its language**[43].").

The reason for this rule is that the party who is drafting the contract is *presumably* weighing the contract in its favor, and heavily. The Debtors are likely going to argue (as they have in the past) that the limitation on withdrawals allowed them to refuse to close my account, but that argument in itself is **ambiguous** since nowhere in the contract did it say that the closure of my account could be prevented due to a limitation on withdrawal. The matter of fact is that the Debtor's oral argument at my Lift Stay Motion hearing on September 1st, 2022 was filled with **ambiguity**.

It could be (wrongly) interpreted that the Debtor's ability to restrict withdrawals also allows them the power to prevent me from closing my account (but that argument is lacking in any form of support within the four corners of the contract, which clearly states that only a few *de minimus* sections of the contract survive, post account-closure request), as stated in *Maverick Tube Corp.*, 595 F.3d at 466: "An **ambiguity** exists where the terms of the contract *could suggest* **more than one** meaning."

The matter of fact is that a consumer of reasonable intelligence can interpret the contract in numerous ways as, in numerous sections, it refers to the coins deposited to Celsius as "yours"

---

[43] Emphasis added.

and states[44] that: "<u>You may terminate any loan</u>[45] <u>to Celsius</u> **at any time**, and request that <u>Celsius</u>

<u>return the</u> **borrowed** <u>Eligible Digital Assets and deliver any</u> Rewards accrued from the Earn

Service, by <u>transferring such Eligible Digital Assets and Rewards to your external Virtual</u>

<u>Wallet.</u>" Section 19, Subsection B states that all that is required to close an account is to email

Celsius's customer support, which Mr. Frishberg did. As such, it was interpreted by him (and Mr.

Blonstein) as allowing him to close his account at any time, as is the industry standard. It also

states[46]: "You will **lend your** Eligible Digital Assets to Celsius and grant Celsius **all rights and**

**title** to such Digital Assets, for Celsius to use in its sole discretion while using the Earn Service."

How can someone both lend *and* give/transfer/gift (which is a taxable event) something at the

same time? The contract is full of **ambiguity**.


        To quote the Debtors[47]: "Modern contracts often involve a fundamentally different

process, where consumers' <u>participation is limited to deciding if they will, in fact, participate</u>.

*See Register.com*, 356 F.3d at 403." The Debtors effectively stated that the contract was weighted

in their favor, as Mr. Frishberg had no ability to negotiate. As the Debtors said: "Traditionally,

mutual assent was conceptualized as the culmination of a bargaining process, with an emphasis

on <u>both parties' intent to be bound</u> following an active negotiation of terms." To once again

quote the Debtors[48]: "The exemplary contract is one between <u>parties of relatively equal</u>

<u>bargaining power</u>, and achieved through a <u>negotiation process that reflects this power balance</u>.)

(citing E. Allan Farnsworth, Contracts § 4.26 (4th ed. 2004))." Quite clearly that did **not** happen

---

[44] Emphasis added.
[45] Mr. Frishberg still maintains that the Terms of Service overall are ambiguous, and the matter is pending appeal. If the Earn Order is upheld at all of the various levels of the appeals process, then Mr. Frishberg reserves the right to amend

[46] Emphasis added.
[47] Emphasis added.
[48] https://cases.stretto.com/public/x191/11749/PLEADINGS/1174911112280000000043.pdf

here (as a *take it or leave it* deal, between a individual and a multi-billion dollar corporation is about as unequal as you can get), so the contract **must** be construed most favorably to *Mr. Frishberg*, who had *no* say in writing the contract or *any* ability to negotiate, and most strongly *against* the *Debtors*, who wrote it. *See Jacobson v. Sassower*, 66 N.Y.2d 991, 993 (1985) ("**[I]n cases of doubt or ambiguity,** a contract **must** be construed most strongly *against* the party who prepared it, and <u>favorably to a party</u> who had **no voice in the selection of its language**[49].") It is not *Mr. Frishberg's* fault that Celsius's contract is self-contradictory and doesn't cover some issues like account closures after they stop withdrawals; it is *their* fault, as they are the ones who wrote it. The Debtors even stated in their court filing that "each iteration of the Terms of Use was an **at-will contract,**" which suggests that Mr. Frishberg has the right to close his account per the contract at any time.

The contract is packed full of various conflicting, **ambiguous** sections and as such, it **must** be interpreted in Mr. Frishberg's favor. This court **must** rule that his assets should have been withdrawn to a external wallet (or transferred to "<u>Custody</u>", as Mr. Frishberg requested in the alternative to withdrawing), as the contract allows (if it was not breached) and if it was breached, it should have been withdrawn to a external wallet due to Celsius lacking any authority to hold onto his assets, and since this was request pre-petition, it should have occurred. Under New York law, a contract is **ambiguous** if its terms *could suggest* more than one meaning when viewed objectively by a *reasonably* intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business. *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co*., N.A., 773 F.3d 110, 114 (2d Cir. 2014);

---

[49] Emphasis added.

**General Ambiguity**

Even without needing extrinsic evidence, it is crystal clear that one's interpretation of the Terms of Use can be very different from another's. This is corroborated by what Mr. Blonstein, Celsius's Chief Compliance Officer, said about the Terms of Service for earn and loans in his first deposition (pages 289, 290, 354, 359[50]):

    • "I can understand your other reading of this"

    • "[J]ust as a layperson, I would agree with your conclusion." The vast majority of Celsius's customers were "layperson[s]", they were unaccredited investors.

    • "I don't know why it was written this way."

    • "I agree, reading that, it says what you're say – it says what you're saying, so, you know." This was in reference to the title staying with the account holder at all times.


Thus, it is very clear that the Terms of Service have multiple interpretations. This is even further amplified, as Celsius' own Chief Compliance Officer understands and shares the view that more than one conclusion from the reading can be extracted. This, once again, demonstrates that the Terms of Use clearly *cannot* be found as **unambiguous**.


### The Terms of Use are Potentially Both Procedurally and Substantively Unconscionable

---

[50] And page 15 of
https://cases.stretto.com/public/x191/11749/PLEADINGS/1174912012280000000089.pdf

"The doctrine of **unconscionability** *seeks to prevent* **sophisticated parties with grossly unequal bargaining power from taking advantage of less sophisticated parties[51]**." *Spinelli v. NFL*, 903 F.3d 185, 208 (2d Cir. 2018) (quoting *United States v. Martinez*, 151 F.3d 68, 74 (2d Cir. 1998) (internal quotation marks omitted)). Under New York law, a contract provision may be deemed **unenforceable** on unconscionability grounds only where it is both procedurally and substantively unconscionable when made. *Chen-Oster v. Goldman, Sachs & Co[52]*: "A contract or clause is unconscionable **when there is an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party**." *Spinelli[53]* The procedural element of unconscionability requires an examination of the contract formation process and the alleged **lack of meaningful choice**. The focus is on such matters as the size and commercial setting of the transaction, whether deceptive or high-pressure tactics were employed, the use of fine print in the contract, the **experience and education of the party claiming unconscionability**, and whether there was **disparity in bargaining power**. *Am. Family Life Assurance Co. of N.Y. v. Baker[54]*, (citing *Gillman v. Chase Manhattan Bank)[55]*. The Debtors reliance on certain case law involving the enforceability of "click-wrap" agreements is misplaced and distinguishable under the circumstances. Mr. Frishberg is not aware of any case in which one party claimed to take title to billions of dollars of assets (in the course of the use of the contract) by virtue of a simple "clickwrap" agreement. Frankly, that would be **unprecedented**. To the extent that it is determined that "contracts" were formed between the parties, the one-sided "take it or leave it" contract formation process and lack of any meaningful choice by

---

51 Emphasis added.

52 449 F. Supp. 3d 216, 226 (S.D.N.Y. 2020). (Emphasis added)
53 903 F.3d at 208 (first quoting *Ragone v. Atl. Video at Manhattan Ctr.,* 595 F.3d 115, 122 (2d Cir. 2010); then quoting *Nayal v. HIP Network Servs. IPA, Inc*., 620 F.Supp.2d 566, 571 (S.D.N.Y.2009)).
54 778 F. App'x 24, 26 (2d Cir. 2019)
55 N.A., 73 N.Y.2d 1, 534 N.E.2d 824, 828, 537 N.Y.S.2d 787 (N.Y. 1988) (internal citations omitted).

users indicates procedural unconscionability. When coupled with the lofty promises and representations made by the Debtors outside of the Terms of Use (in public forums like the weekly AMA's), whereby users[56] were essentially lulled into a false sense of security, the unconscionability of the process becomes even more apparent. Courts assessing the substantive unconscionability of an agreement consider "whether one or more key terms are unreasonably favorable to one party." *See Baker*[57]: "[A]n unconscionable contract is one which is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms." Substantive unconscionability is indicated by contract terms so one-sided as to shock the conscience. *Homesite Ins. Co. v. Brezniak*[58]. Alternatively, substantive unconscionability consists of an allocation of risks or costs which is overly harsh or one-sided and is not justified by the circumstances in which the contract was made. If the Terms of Use are interpreted to mean what the Debtors claim them to mean, then they constitute the epitome of substantive unconscionability. There is no question that such an interpretation of the Terms of Use would result in the terms being unreasonably favorable to one party (the Debtors) and an allocation of risk or costs that is completely one-sided (again favoring the Debtors to the complete detriment of the users, such as Mr. Frishberg). In simple terms, the idea that a person (usually unaccredited persons) would give hundreds of thousands of dollars (or millions, in certain cases) of assets to the Debtors in exchange for a "fee" and subject their assets to complete loss at any time is **patently unconscionable**.

## Argument

---

[56] The term "users" is used for simplicity's sake. Mr. Frishberg is only arguing on his own behalf.

[57] 778 F. App'x at 27 (quoting *Sablosky v. Edward S. Gordon Co.*, 535 N.E.2d 643, 647 (N.Y. 1989)) (internal quotation marks and alterations omitted)

[58] 581 F. Supp. 3d 424, 427 (D. Conn. 2022)

As the Debtors stated[59]: "A contract requires an offer, acceptance, consideration[60], mutual asset, *and* **an intent to be bound.** *See Nowak v. JPMorgan Chase & Co*., 847 Fed.Appx. 31, 34 (2d Cir. 2021), also *see Register.com*, *Inc. v. Verio*, *Inc*., 356 F.3d 393, 427 (2d Cir. 2004). Typically,[61] the Debtors would be right, as the contract would be a binding contract (including the section that allows a user to close their account at any time), but they **materially breached** it. Mr. Frishberg *quite* clearly made his <u>lack</u> of "intent to be bound" (to put it mildly) known to Celsius, and later the Debtors, dozens of times, *he also* **voided** the contract prepetition. In Mr. Ferraro's deposition (after being asked: "What would be required for the contract to terminate or not to take effect?[62]"), he said: "They needed to talk to somebody in customer care. **But upon that conversation**, *if* **they did not want to** accept the terms and use, they **could withdraw their coins from the platform**[63]." As the contract clearly states in Section 19, Mr. Frishberg was/is (as he did) able to close his account at any time by simply requesting it. However, the Debtors refused, which was/is a **material breach** of contract, and since it occurred before the petition date, that made all of his assets not a part of the estate under Section 541. Speaking of the **material breach** of contract, as the Debtors stated: "It is irrelevant whether customers actually read or were aware of the specific contents of the contract, so long as the terms were "clear and conspicuous[64]"." Mr. Frishberg would argue that the same theory applies to Celsius's

---

[59] Emphasis added.

[60] The criteria of consideration, arguably was not met, specifically with the most recent Terms of Use version that Mr. Frishberg purportedly signed, since Mr. Frishberg did not gain anything from it, he only gave up rights, and continued to use the service. All rights reserved.

61 Mr. Frishberg reserves all rights, and is not stating that the contract is/was a binding one.

[62] Page 375, question shortened for space/judicial economy.

[63] Redacted Version, page 375. Emphasis added.

64 *See Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc*., 464 F. Supp.3d 634, 640 (S.D.N.Y. 2020) ("Even if there is no evidence that the offeree had actual notice of the terms of the agreement, the offeree will still be bound by the agreement if a reasonably prudent user would be on inquiry notice of the terms.")

representative/customer support staff's **material breach** of the contract. As the Debtors said, "it is irrelevant whether" Celsius and its representatives "actually read or were aware of the specific contents of the contract" because they still breached them. Just like not knowing something is a crime does not make it legal, not knowing what is in the contract is **not** a valid defense for **materially breaching** it. Also, Mr. Frishberg pointed to specific sections in the contract in my communication with Celsius when saying that he does have a right to close it at any time, so Celsius cannot claim that they were unaware of the contents of their own contract, since it was pointed out to their support staff. Mr. Frishberg also informed Celsius that the contract was voided due to their material breach of contract.

The Debtors do **not** have title or ownership of the crypto assets deposited by Mr. Frishberg to Celsius, *even if* the Earn Order is upheld on appeal, since he, as previously stated, is not in "Earn". The Debtors have not had title (assuming they ever actually had the title in the first place, which is still disputed, due to the Earn Order being under appeal) ownership or the right to hold onto/possess Mr. Frishberg's assets since the breach of contract occurred on July 5th, 2022 (or if this court rules that the contract is not breached, then the Debtors lost the title when Mr. Frishberg instructed them to close his account and stop paying him interest). Mr. Frishberg instructed Celsius to close his "Earn" account as is his **right** under section **19. B.** of the TOS[65]. Mr. Frishberg alleges that he has the **right** to close his account by simply telling Celsius to do so (which was done on the 5th of July, 2022, among other dates): "**If you want to terminate your Celsius Account with Celsius, you may do so by notifying Celsius at support@celsius.network[66]**."

---

[65] https://celsius.network/terms-of-use
[66] https://celsius.network/terms-of-use

This is clear and **<u>unambiguous</u>** language which gives him the right to terminate his account *at any time,* as there was no mention of any (relevant) limitations on the ability to close his account. The *only* thing that Mr. Frishberg had to do to close his account was to **<u>notify</u>** them, which he did numerous times, hence the account should be considered closed. They refused, thereby **materially breaching** the contract. Mr. Frishberg asked Mr. Ferraro (in the deposition, after reading him an excerpt) "Does this mean that somebody could close their account at any time prepetition[67]?", and he replied with "At ordinary course prepause, yes, sir." After Mr. Ferraro was asked about where in the contract it says that a limitation on withdrawals means that an account cannot be closed he responded with: "So in normal course, you're right. We would -- we would return coins and close an account. Once we pause, we can't return coins. We've paused that activity. We can't close an account if there's coins in there." The only issue with his statement is that nothing he stated about the so-called normal course was supported in the contract. There is a section that allows Celsius to limit/stop withdrawals, but *nothing that allows them to stop account closures*. Mr. Ferraro seemed to be just making things up as he went along to suit his narrative, because he said: "In normal course, if a customer wants to close their account, they would withdraw their coins and close the account. Post pause, it was -- no one had the ability to withdraw coins.We can't close your account if you have ten Bitcoin in there." He also referred to assets in earn as "their coins" (in reference to the customer) which contradicts his following statements about how the contract is purportedly clear about how Celsius owns the assets. After asking Mr. Ferraro several times (and him dodging the questions several times) he finally said (in reference to the entirety of the contract being unambiguous): "To me in reading

---

[67] Page 386

through it, it was clear, Mr. Frishberg." In the same line of questioning, he said "I think the contract's clear. I think it's unambiguous. Clearly you're in a different position," which is effectively him admitting that Mr. Frishberg and he have differing opinions on the interpretation of the contract, which is basically the textbook definition of ambiguity.

## I.    Account Closure

The sole way/requirement of closing your account with Celsius is to "**If you want to terminate your Celsius Account with Celsius, you may do so by notifying Celsius at support@celsius.network**[68]," nothing more, nothing less. Even Mr. Blonstein stated as much, Mr. Frishberg asked "Q[69]: "Does that, in your opinion, state that [to] e-mail Celsius support is sufficient to terminate your account?". He literally said: "A: I mean, the first sentence says, "If you want to terminate your Celsius account with Celsius, you may do so by notifying Celsius at support@celsius.network."" After Mr. Frishberg followed up with "Q: Correct. Is that what is required to terminate your account?" Mr. Blonstein clearly and unambiguously replied with: "A: That's what -- I mean, that's what that sentence says, yes." To avoid any potential for ambiguity Mr. Frishberg followed up once again: "So that is what is required to terminate your account, correct; yes or no?" Mr. Blonstein agreed that all that is required to close an account, and terminate the account, is to email Celsius: "A: I'm reading the same thing that you are referring to. That's what it says, yes. I agree." To prevent the Debtors from ever being able to argue that Mr. Frishberg did not have the right to close his account, Mr. Frishberg followed up with: "Q: Okay. So it does say, yes, to terminate your account you have to e-mail Celsius,

---

[68] https://celsius.network/terms-of-use

[69] Q are questions asked by Mr. Frishberg, and A are questions answered by Mr. Blonstein. Mr.

support@celsius.network, correct?" Mr. Blonstein confirmed with *finality* "That is what it says, yes".

      The moment that email was sent, the relationship between Mr. Frishberg and Celsius was terminated with the exception of a few irrelevant (Survival Section 35) terms. Relevant parts of Section 19[70] are listed here: "Once your Celsius Account is closed, you agree: (a) to continue to be bound by these Terms, as required by **Section 35** below (Survival)..... [other agreements you have with Celsius] will not be affected in any way by **the termination of these Terms.**" Mr. Frishberg asked[71] Mr. Blonstein: "Q: Okay. Thank you. And after e-mail[ing] that, it also --does your interpretation of it say that the terms terminate, minus the ones listed in Section 35, "Survival"?" Mr. Blonstein agreed, and replied with[72]: "A: Does it say -- it says, "Once your Celsius Account is closed, you agree...to continue to be bound by these Terms, as required by Section 35 below (Survival)," **yes, it does say that**." From this, it is crystal clear that if Celsius did *not* breach the contract, then the account was closed, and the terms terminated bar the survival sections. This means that the Debtors had, and continue to **not** have any authority to hold onto Mr. Frishberg's assets. Mr. Frishberg followed up with: "Q: Yes. Is your interpretation of the agreement that, for the terms to be terminated, the terms terminate after you request to close your account?[73]", and he also added "Q: Barring the Survival Section, of course[74]."

---

[70] Emphasis added.
[71] Page 447 Mr. Blonstein deposition.
[72] Page 447 Mr. Blonstein deposition. Emphasis added.
[73] Page 448 Mr. Blonstein deposition.
[74] Page 448 Mr. Blonstein deposition.

Celsius's Chief Compliance Officer, Mr. Blonstein stated/confirmed[75]: "A: **So you can terminate -- you can close your account, so your right** -- the title of that Section says, "**Your Right to Close Your...Account**," but it immediately follows with, you'll "continue to be bound by these terms." Just reading what it says there, again with the caveat that I'm not an attorney, so I think it's a little…" Mr. Frishberg corrected his partial misinterpretation of the contract: "Q: "These terms, as required by Section 35," and Section 35 only lists a few specific subsections. **But all other terms terminate, correct, other than the ones listed in Section 35**?" (emphasis added). Mr. Blonstein first confirmed Mr. Frishberg's question, *then* said that he wasn't sure what the terms said (it also seems like he started to say "I don't know" in various forms numerous times, but stopped himself), which seems to potentially hint at ambiguity, and he *then* once again, agreed with Mr. Frishberg: "A: **Yeah**, I mean, I don't -- I mean, I'm not a -- like I said, I'm the last one --I didn't write these terms, I'm not an attorney. **So I'm not sure**, **yeah**[76]."

Mr. Frishberg asked Mr. Blonstein the following: "Q: Yes. My question is, is your interpretation of these -- the Terms of Service of what you've read so far, and in general, that to close your account you need to e-mail Celsius and after you e-mail Celsius, the terms, other than the ones listed in Section 35, terminate, the rest of the ones that are not listed in Section 35?[77]" Celsius's Chief Compliance Officer, Mr. Blonstein <u>agreed</u> with Mr. Frishberg that the <u>Celsius TOU said that to close your account, and to terminate **all** of the terms other than ones listed in section 35</u>: "A: Agree to cont- -- I'm just reading again. "Once your...Account is closed, you

---

[75] Page 448 of the Mr. Blonstein deposition. Emphasis added.
[76] Page 449 of the Mr. Blonstein deposition. Emphasis added.
[77] Page 449-450 of the Mr. Blonstein deposition.

agree...to continue to be bound by these Terms, as required by Section 35." **So I agree that's what that says**[78]."

The terms of service could **not** be more **unambiguous** as Celsius's TOU states:"**If, at any time, for legal or other reasons,** a Celsius Account is **suspended** or frozen by Celsius, Loaned Digital Assets connected to such Celsius Account shall not be eligible to earn Rewards**[79].**"

## II.    Criteria For Earning Rewards

The above means that when Mr. Frishberg instructed Celsius to close his account at the time of the petition, the assets *should* **not** have been earning interest. According to the Celsius TOU (the contract between Mr. Frishberg and the Debtors), the requirements for being able to earn interest, **"thereby loaning your assets to Celsius"** are: "All Eligible Digital Assets that **you elect to utilize in the Earn Service** (if available to you) **and thus are loaned to Celsius** (1) are not being used as collateral for Loans, (2) have not had all rights in connection with them assigned to another Celsius user using CelPay, and (3) **were not requested for external transmission or withdrawal** (Eligible Digital Assets meeting **each of these three criteria,** **"Loaned Digital Assets"**) entitle you to Rewards while credited to your Celsius Account[80]." Mr. Frishberg asked[81] Mr. Blonstein: "Q: Would your understanding of what you read be that the title is only transferred to Celsius of the assets, [when] interest is being earned, and the criteria that

---

[78] Page 450. (Emphasis added)

[79] Celsius TOU, Section 12. Emphasis added.

[80] Celsius TOU, Section 12. Emphasis added.

[81] Mr. Blonstein deposition page 450-451.

you just read are being met?" Mr. Blonstein replied with: "A: **So, yeah**, I mean, I read the part at the top saying, you know, **there are certain conditions for the assets that are [on loan] to Celsius**, you know, that they are not being used as collateral somewhere else. They haven't been assigned to someone else. **They haven't been requested for withdrawal.** So I understand -- **I see that part, yes**[82]." Mr. Frishberg further clarified: "Q: So those criteria mean that you are getting paid rewards or interest, correct[83]?" Mr. Blonstein unambiguously agreed[84]: "A: **Yeah**, from what I see there, it says, "entitle you to Rewards while credited to your Celsius Account," **so, yes.**" *All* of those criteria have to be met for those assets to be loaned to Celsius, which they were not, as the assets **were** requested for external transmission/withdrawal many times (along with the much more important fact of the contract either being breached or terminated), and Mr. Frishberg also did **not** "elect" to utilize them after July 5th, 2022. Mr. Frishberg even asked Mr. Blonstein to confirm the various criterias laid out in the TOU: "Q: Would the absence of any one of these three criterias mean that you are not eligible to earn rewards[85]?" Mr. Blonstein replied with: "A: I'm not the right person to make that, like, in a legal reading of this. So let's see -- **so, yeah**, I think I got it[86]." After Mr. Blonstein reviewed the contract for a few minutes, Mr. Frishberg asked: "Q: Would the absence of any one of these three criterias mean that you are not eligible to earn rewards?[87]" Mr. Blondstein stated that someone not earning interest (thereby not lending the assets/title to the assets to Celsius) was intentional: "A: I'm not the right person to make that, like, in a legal reading of this. So let's see -- so, yeah, I think I got it. My

---

[82] Mr. Blonstein deposition page 451. Emphasis added.

83 Mr. Blonstein Deposition page 451.

[84] Mr. Blonstein deposition page 451-452. Emphasis added.

[85] Mr. Blonstein deposition page 452.

[86] Mr. Blonstein deposition page 452. Emphasis added. Irrelevant content removed.

[87] Mr. Blonstein deposition page 452.

understanding after, you know, reading this previously and, kind of, refreshing my memory the last few minutes, is what the -- <u>the intention</u> of this, and I think my guess is that you are probably focused on number 3 is, you know, we wouldn't want a customer to expect that during the period of time that they may have requested a withdrawal and the time that those assets leave the platform, that they would be earning rewards during that time. <u>I think that that was the intention</u>[88]." The Debtors cannot argue that they intended for the assets to be lent to Celsius while pending withdrawal, not only because the contract states otherwise, but also because Mr. Blonstein (counted as a Judicial Admission) stated otherwise. Mr. Frishberg then asked Mr. Blonstein: "Q: So would the absence -- let's say I requested a withdrawal. Would that mean I am no longer earning interest, just to confirm?[89]" Mr. Blonstein responded that he would need to check with the engineering team and he didn't know if it was the case. Mr. Frishberg pointed out to him[90]: "Q: It says right on page 631 of the same docket -- actually, technically starts at 630, paraphrasing here, that the rewards stop the second an external transmission is requested. From the **moment** these are entered into "**<u>an external transmission, withdrawal</u>** or transfer of rights...***request***."" Mr. Blonstein replied that he agreed that that is what it meant: "A: I'm just reading. Okay, **<u>I agree it does say that</u>**[91]." The foregoing is an example of a judicial admission made by Celsius.

   To avoid any future confusion or ambiguity, Mr. Frishberg clarified a question about the way interest is paid: "Q: Thank you. To -- just to confirm, it says that once a **<u>request</u>** has been

---

[88] Mr. Blonstein deposition page 452. Emphasis added.

[89] Mr. Blonstein deposition page 453.

[90] Mr. Blonstein deposition page 454. Emphasis added.

[91] Mr. Blonstein deposition page 454. Emphasis added.

entered, <u>a withdrawal request has been requested</u>, that **interest stops being paid at that**

**instant<u>[92]</u>?**" Mr. Blonstein read from the Terms of Use, and confirmed that interest is supposed to

stop being paid the second a withdrawal is requested: "A: **<u>Yeah</u>**, I can read where it -- starting on

page 30 -- page, sorry, 630, "Digital Assets, including those received as Rewards from previous

weeks, will begin gaining Rewards according to the hour, minute, and second on the timestamp

verifying the completion of the applicable transaction and **<u>shall cease and/or decrease the</u>**

**<u>amount paid as Rewards at the moment when the User has entered an external</u>**

**<u>transmission, withdrawal</u>** or transfer of rights (via CelPay) **<u>request</u>**, or posted any Loaned

Digital Assets as collateral for a...Loan[93].""" Mr. Frishberg asked: "Q: Thank you. Is it your

understanding that you are **only** earning interest when you elect to earn interest, like when you

elect to utilize it -- the quote says, "elect to utilize" it[94]?" Mr. Blonstein responded and stated:"A:

I'm just reading that sentence. **<u>Yeah</u>**, <u>I mean, the phrase "elect to utilize,"</u> I think -- I didn't write

this, but, **<u>yeah, when -- basically, when you fulfill the -- those items mentioned above</u>**,

meaning you transfer an asset from the platform and **<u>you are eligible to use the Earn Service</u>**,

you are basically sending **<u>your</u>** assets to Celsius to receive rewards[95]." Mr. Blonstein clearly and

unambiguously stated that *<u>only</u>* when "you fulfill those items mentioned above" *<u>and</u>* "you are

eligible to use the Earn Service" that you are transferring the title of your assets to Celsius. In

Mr. Frishberg's case both factors were not true, as Mr. Frishberg's assets were **not** (supposed to

be, per the contract) earning interest due to the requested withdrawal, Mr. Frishberg also did **not**

"elect" to utilize them after July 5th, 2022. Quite to the contrary, he made his position extremely

clear in his many phone calls and emails to Celsius. That makes those assets **not** eligible to be

---

[92] Mr. Blonstein deposition page 454. Emphasis added.

[93] Mr. Blonstein deposition page 454-455. Emphasis added.

[94] Mr. Blonstein deposition page 455. Emphasis added.

[95] Mr. Blonstein deposition page 455. Emphasis added.

"<u>Loaned Digital Assets</u>" which means they were **not** loaned to Celsius in any way shape or form at the time of the petition (or at any time after Mr. Frishberg requested his account closed on July 5th, 2022) and the **title/rights to the assets stayed solely with him.**

Mr. Frishberg asked Mr. Blonstein: "Q: *Even if* the assets are on Celsius, even if they are there, <u>once the criteria is no longer met</u>, they are no longer earning interest, correct?[96]" Mr. Blonstein confirmed that even if the assets are on Celsius (and presumably in the Earn account since they previously would be earning interest), that the moment the criteria stop being met, they stop earning interest: "A: Maybe, just, like, first focus on the withdrawal. So item 3 from page -- I guess the second paragraph of 629, **when you <u>request </u>to withdraw <u>your</u> asset** or when you send it to someone else via CelPay, **you stop -- you no longer would be earning rewards. So that is true**[97]." This unambiguous statement conclusively proves that Mr. Frishberg's assets were **not** in the enrolled "<u>Earn</u>" program (even though Celsius says they were in an "<u>Earn</u>" account) at any point after July 5th, 2022.

Mr. Frishberg asked: "Q: Would your understanding of what you read be that the title is only transferred to Celsius of the assets, [when] interest is being earned, and the criteria that you just read are being met[98]?" Mr. Blonstein replied with: "A: I don't see the part that you are seeing, where it's triggered -- **something is triggered by the payment of awards**. Let me just -- I can take a second to reread that. So, yeah, I mean, I read the part at the top saying, you know, **there are certain conditions for the assets that are [on loan] to Celsius**, you know, that they are not

---

[96] Mr. Blonstein deposition page 456. Emphasis added.

[97] Mr. Blonstein deposition page 456. Emphasis added.

[98] Mr. Blonstein deposition page 450-451.

being used as collateral somewhere else. They haven't been assigned to someone else. **They haven't been requested for withdrawal. So I understand -- I see that part, yes**[99]." Mr. Frishberg followed up with: "Q: So those criteria mean that you are getting paid rewards or interest, correct[100]?" Mr. Blonstein conclusively said: "A: Yeah, from what I see there, it says, "entitle you to Rewards while credited to your Celsius Account," **so, yes**[101]." What is clear from the deposition, is that Mr. Frishberg's account was ineligible to earn interest, thereby not transferring title (even if the account was not closed, which it was, and even if the contract was not materially breached, which it was) to Celsius.

### III.    Title/Ownership is Only Being Lent[102] When Interest is Being Earned By The Criteria

"Q: Did what you just read state that a Celsius customer is **only lending** their assets, A/K/A [AKA is a acronym for Also Known As] transferring the title to the assets or lending the title, whatever it is, giving Celsius the right to rehypothecate and loan out, etc., the assets **only** while they are earning interest?[103]" Mr. Blonstein confirmed that what Mr. Frishberg stated was true: "A: Let me reread that again. So I'm reading this as saying that when you are enrolled in the Earn Service, when you are using the Earn Service, **meaning you have sent coins to Celsius and they qualify for -- qualify based on those parameters that we talked about a few minutes ago**, you are giving the company the right to take those actions such as pledging,

---

[99] Mr. Blonstein deposition page 451. Emphasis added.

[100] Mr. Blonstein deposition page 451.

[101] Mr. Blonstein deposition page 451-452. Emphasis added.

[102] To be clear, Mr. Frishberg is not stating that the title/ownership ever was transferred, he reserves any and all rights.

[103] Mr. Blonstein deposition page 458-459. Emphasis added.

re-pledge, hypothecate, rehypothecate, and so on." This conclusively proves any assets a customer lends to Celsius is <u>only being lent to them when they are supposed to be earning interest per the Terms Of Use</u>, which Mr. Frishberg was not <u>supposed</u> to be earning, as was covered earlier. When Mr. Frishberg followed up on the seemingly unambiguous statement Mr. Blonstein made by asking: "Q: My question, to reiterate, is, even if you are not getting paid Rewards, are you still loaning your assets to Celsius[104]?" Mr. Blonstein replied with: "A.: **<u>Yeah, I'm not sure</u>**, is the answer to that question. I think that that's a legal reading of this -- this agreement and one that I'm not really -- I'm not the right person to answer that[105]." Mr. Blonstein's statement **heavily** implies ambiguity which, as covered earlier, *<u>any</u>* ambiguity **must** be interpreted in Mr. Frishberg's favor.

Mr. Frishberg asked Mr. Blonstin for clarification: "Q: Well, is your interpretation of the agreement that when somebody does not meet the criteria to earn Rewards that we went over earlier, is they are not loaning their assets, whether it is the title or the assets themselves, to Celsius?[106]" Mr. Blonstein responded with: "A: So just from reading this Section that we went through, my take on this is that when you send **<u>your</u>** assets to the company and **you are qualified, you know, you are qualified to use the Earn Servic**e, you are transferring the rights to those tokens to the company. <u>If you want the **terms to no longer apply**</u>, like you said earlier -- **like you were referencing earlier**, you know, you should withdraw your tokens and **<u>close your account</u>**. **But that's how *I* read it**[107]." Mr. Blonstein stated unambiguously that if you want the

---

[104] Mr. Blonstein deposition page 459.

[105] Mr. Blonstein deposition page 459-460. Emphasis added.

[106] Mr. Blonstein deposition page 460.

[107] Mr. Blonstein deposition page 459-460. Emphasis added.

Terms of Use to no longer apply, you need to close your account, which as covered earlier is exactly what Mr. Frishberg did.

In an attempt to resolve any potential misconceptions and misunderstandings, Mr. Frishberg asked: "Q: Okay.· In what we went over earlier, does it require somebody to withdraw their tokens or simply request their account closed for the terms to terminate, per what the terms say?[108]" Mr. Blonstein asked a clarifying question of Mr. Frishberg: "A: The question was do they have to withdraw their tokens or to notify --[109]". Mr. Frishberg responded and clarified his question/reasoning: "Q: Correct. The contract *only* says that you have to tell Celsius and then after that, the terms **terminate**. **Nothing's said about withdrawing the funds before doing that**[110]." Mr. Blonstein responded with: "A: Nothing -- I guess, like, <u>my immediate answer</u> to that would be to say, like, <u>nothing that we read says that</u> and I would have to go through the whole terms to evaluate that. But, <u>**yes, in the Section that we read, says that -- that is the -- that the -- described the process for closing the account and talk about the eligibility of the assets for the Earn Service.**</u> But the scenario that you are talking about, which is that could -- if someone, for example, had requested to withdraw their assets and they were no longer earning Rewards, were they no longer enrolled in the Earn Program or -- what -- sorry. Were they no longer bound by the Terms of Service, I would say that's not the case[111]." Mr. Blonstein's response was quite curious since it went against basically everything written in the contract and against some of his own previous responses. Mr. Frishberg asked a clarifying followup question: "Q: What if somebody requested to close their account and terminate all services, would they

[108] Mr. Blonstein deposition page 460-461.

[109] Mr. Blonstein deposition page 461.

[110] Mr. Blonstein deposition page 461. Emphasis added.

[111] Mr. Blonstein deposition page 461-462. Emphasis added.

still be -- would they still be bound by the Terms of Service other than the terms that survive the

termination of the terms, such as Section 35[112]?" Mr. Blonstein's response stated that he doesn't

know, and his response would be to talk to an attorney: "A: **My immediate answer is I would**

**say -- what I would say if somebody asked me that is I would go check with my lawyer,**

**right.** Because I don't -- the Terms of Service here are not [*potentially* implying that they are not

clear?] -- that's not my -- not what I wrote. I'm not the approver. I'm not -- yeah, and I'm not an

attorney. I'm not the right person to weigh in on the whole Terms of Service and what they -- the

legal -- you know, the correct legal reading of them." This signals ambiguity, since if the Chief

Compliance Officer of the company that wrote the contract does not understand it, and he stated

that he would go check with his lawyer if someone asked him the question that Mr. Frisberg

asked hin, this clear proof of ambiguity. Under New York law, a contract is **ambiguous** if its

terms *could suggest* more than one meaning when viewed objectively by a *reasonably* intelligent

person who has examined the context of the entire integrated agreement and who is cognizant of

the customs, practices, usages and terminology as generally understood in the particular trade or

business (such as a Chief Compliance Officer). *Chesapeake Energy Corp. v. Bank of N.Y. Mellon

Tr. Co.*, N.A., 773 F.3d 110, 114 (2d Cir. 2014).


IV.    **Further Ambiguity**


Even if the Debtors *somehow* did not breach the contract (which they most certainly did)

with Mr. Frishberg when he requested to close his account and they (contrary to what is

**unambiguously**[113] written in the contract) refused to do so, then the contract was clearly

---

[112] Mr. Blonstein deposition page 461-462.

[113] To quote what seems to be a favorite saying of the Debtors: "*In re Enron Corp.*, 292 B.R. 752, 762
(Bankr. S.D.N.Y. 2003) ("If the contract language is 'unambiguous,' this Court must enforce the plain,

breached when the Debtors paid interest/yield/earnings to his account when they should not

have, as the assets were not being loaned to Celsius and should not have been earning interest.

As clearly and **unambiguously** stated in the contract (emphasis added): "All Eligible Digital

Assets that **you elect to utilize** in the Earn Service (if available to you) and thus are loaned to

Celsius…..(3) were not requested for external transmission or withdrawal (Eligible Digital

Assets meeting each of these three criteria, **"Loaned Digital Assets"**) entitle you to Rewards…."

Mr. Frishberg was told multiple times by Celsius's customer support that his "request" was still

pending. He was told this on July 11th, 2022 (before the petition) and when he called after the

petition on July 14th, 2022, among other days, he was also told that it was pending. As the

contract clearly and **unambiguously** states: "Every transmission request shall be deemed

pending until accepted by us.We may refuse to accept such request, or delay the processing of an

approved request for any reasonable reason." Hence, if assets were requested to be withdrawn,

they were not being loaned to Celsius, which means that the title remained with Mr. Frishberg,

continues to remain with him, and was with him at the time of the petition. Assets that have been

requested for withdrawal are unable to earn interest, and simply requesting a withdrawal is

enough to cause the assets to be pending withdrawal, even with the "Pause" in effect, since in

either case, the terms of the contract *either* were breached, which caused Celsius to lose the

title/rights to the assets (assuming they had any) or, if the contract wasn't breached, his account

was to be considered closed and the terms of the contract, bar a *few irrelevant* sections,

**terminated**.

---

ordinary, and common meaning of those terms as a matter of law without reference to extrinsic
evidence.")"

Mr. Frishberg asked Mr. Blonstein about Section 35 "Survival:" "Q: Yes. By looking at the names of the sections, such as "Taxes," "Disclaimer of Warranty," etc., do they look like they have anything to do with withdrawals and account closures[114]?" Mr. Blonstein, Celsius's Chief Compliance officer replied: "A.: Again, I'm just trying to piece it together so I can understand. So you are basically -- so just to reconstruct this, you are saying that once a user notifies that they would like to terminate service, that the sections of the agreement that still apply --[115]." Mr. Frishberg confirmed: "Q: Other than the ones applicable, correct[116]." Mr. Blonstein "A: Yeah. **And then if just those things apply**, that that shouldn't have -- **that that does have an implication on whether the assets are enrolled in Earn**[117]?" Mr. Blonstein seemed to have had quite a hard time understanding/grasping the contract, but at the end, he seemed to have been able to push through the conflicting ambiguous nature of the contract. The fact that the Chief Compliance Officer of the very company who wrote the contract, and who also stated that about some parts he would ask his lawyer to clarify, had a hard time understanding the contract, how would an *average, or even an intelligent consumer* be able to understand it? Mr. Blonstein's statements at the hearing held on December 5th, 2022, basically said "well some of our customers are lawyers I'd assume[118]." Mr. Blonstein stated on page 465 of his deposition: "I'm not trying to represent that I did some comprehensive review of the terms. I definitely didn't," which would explain his various (in my opinion wrong) statements about how "Earn" assets are property of the estate.

---

[114] Mr. Blonstein deposition page 466.

[115] Mr. Blonstein deposition page 467-468. Emphasis added.

[116] Mr. Blonstein deposition page 468.

[117] Mr. Blonstein deposition page 468. Emphasis added.

[118] This is paraphrasing and not an actual quote.

V.    **Regulators's Statements**

Mr. Blonstein conceded in his deposition (pg. 275-78) that there was no effort made to ascertain whether customers actually understood the Terms of Use. Mr. Frishberg cannot speak for other customers, but he did not fully understand the Terms of Use until July or so of 2022, after reading it dozens of times. He still does not, nor does he *ever* think he will understand the TOU in the way that the Debtors are presenting it to this court in their motion which is attempting to claim "Earn" account assets as property of the estate. When Mr. Frishberg read the updated TOU, it seemed to him that the assets remained his, and he could withdraw them at any time he wished – **not** that he was somehow giving all of his assets to Celsius in exchange for interest that they also somehow owned.

Numerous states[119] have said as much: "First, the language of the Terms of Use provisions has evolved over time and it would be a monumental task to evaluate whether each customer actually read and understood those terms even if they clicked on them in order to access their accounts". Mr. Blonstein, who is Celsius's Chief Compliance Officer, himself admitted that he did not read the entire contract (when he said that he never got down to Section 35, "survival").

The Coordinating States[120] said that as regulatory scrutiny intensified, the Debtors tried to: "Write more protections for themselves into the language of those Terms of Use – and the nature of those changes and added protections were not necessarily clearly brought to the

---

[119] https://cases.stretto.com/public/x191/11749/PLEADINGS/1174911292280000000138.pdf

[120] The terms "Regulators" and "Coordinating States" are used interchangeably.

attention of the lay customers or their significance emphasized[121]." The coordinating states are correct: these changes were not brought to Mr. Frishberg's attention. The only changes of the TOU that were disclosed to him by Celsius were[122]:

"**Here's how these changes impact you:**

- **All coins transferred to Celsius by users in the United States prior to April 15, 2022 will continue to earn rewards. Those existing coins will continue to earn rewards from April 15th and onward, for as long as they remain in their Earn accounts.**
- **On April 15, 2022, Celsius will be launching a new Custody solution for users in the United States.** Your Custody account will serve as the centerpiece of your home for crypto, providing a secure way to navigate across Celsius' products, including store, access, borrow, spend, earn and grow.
- **New transfers made by non-accredited investors in the United States will be held in their new Custody accounts and will not earn rewards.** Non-accredited investors can continue to swap, borrow, and transfer within their Custody accounts based on their local jurisdiction."

**Nowhere in the notification about the changes in the TOU did it mention anything about transferring title/ownership.**


Regulators have accused Celsius of marketing illegal securities, incompetence, gross incompetence, negligence, fraud, fraudulent representation, and securities fraud (and more): "The Debtors have remained under investigation by numerous states, including the Coordinating States and others, as to whether those operations and the Terms of Use applicable thereto have,

---

[121] https://cases.stretto.com/public/x191/11749/PLEADINGS/1174911292280000000138.pdf Page 5. Emphasis added.

[122] These were the only relevant changes. I did not have a loan, nor was I an accredited investor so those changes are irrelevant.

inter alia, resulted in the Debtors marketing securities without necessary registrations and without complying with the regulatory framework of state (and federal) law."

Regulators have called into question if the Terms of Use are even legal. If the Terms of Use are legal, then Mr. Frishberg's assets are *still* <u>his</u> property, and not that of the estates, and if they are not legal, then his assets are *still* <u>his</u> property and not that of the Debtors: "There are significant issues with respect to whether the Debtors can rely on their own, arguably unlawful, Terms of Use to determine the purported ownership of these assets and what rights they have in them[123]."

Regulators also stated: "Customers were told over and over again that they were loaning their assets to the Debtors and they could recall that loan at any time they chose and receive it back. The use of the term "loan" would certainly lead normal lay persons to assume they retained ownership of the crypto they entrusted to the Debtors." It *seems* like the regulators are*, at the very least, implying* that the Debtors committed fraud by misrepresenting the facts. Clearly the contract was not unambiguous as the Debtors claim.

Regulators seem to be clearly stating that at no point were the assets *actually* conveyed or the title transferred (this includes the right to them also) to the Debtors: "If there were an actual transfer of full ownership, that transaction might well be a taxable event, but there is no evidence that such occurred or that any full purchase price was ever agreed to or paid out by the Debtors." What regulators also said, quite unambiguously was that: "The assets always remained subject to the customers' unilateral right to withdraw them at any time (with no need to pay anything to

---

[123] https://cases.stretto.com/public/x191/11749/PLEADINGS/1174911292280000000138.pdf

"buy" them back from the Debtors) and the further right to be paid "rewards" during the time that they "loaned" those assets to the Debtors to use."

Regulators do a great job of tearing apart the Debtors' flimsy argument when they state:"The Debtors also claim to own the assets that were deposited by its customers and not merely to have lawful possession thereof, pointing, for instance, to language in the most recent paragraph 13 that refers to such purported ownership. But, that language is itself highly ambiguous, stating that "you grant Celsius, . . . for the duration of the period during which the Eligible Digital Assets are loaned to us through your Celsius Account, all right and title to such Digital Assets, including ownership rights." In other words, the very language upon which the Debtors rely to show a transfer or ownership states, in the very same sentence, that the assets are being loaned to Celsius. Clearly, such contradictions rebut any claim that customers understood that they were giving away all rights to control their assets. (And that leaves aside the effect of any verbal statements made by Mr. Mashinsky or others that may have confused matters further, see., e.g., the recent filing at Docket No. 1464 by customer K. David Flora referring to those verbal assurances as to his retained ownership of his assets)."

Regulators also hit the nail on the head (so to speak) that there "is some mention in the Terms of Use that technical issues might require limits or delays in access to the account, [but] that is not the same as a general reservation of a right to eliminate the guaranteed withdrawal privileges customers were promised. It is far from clear that parties would have been as willing

to sign those Terms of Use if they were aware that the Debtors would interpret those terms as broadly as they do now."

Regulators also say that customers, such as Mr. Frishberg, have been "barred by the Debtors from retrieving them as promised" their assets.

## VI.    Material Breach Of Contract

It says **extremely clearly** and **unambiguously** in the contract that if Mr. Frishberg's account has a balance at the time it is closed, the assets would be returned to him: "**If your Celsius Account has a balance when we close it, we will repay and return the remaining Digital Assets to you, including accrued Rewards earned (if applicable) until the close date"**. Nowhere does it say *anything* about any relevant exception to closing the account. It does say "In the event of **irregular activity**, we *may* **hold assets until we close your Celsius Account,**[124]" except there was no irregular activity, and Celsius never cited any irregular activity. In any case, that irregular activity is likely to mean irregular activity such as a hack or unauthorized access to the account (as Mr. Blonstein confirmed in his deposition). They simply cited the irrelevant factor of the "Pause", which does **not** apply to Mr. Frishberg due to the termination of the contract. Even if the contract was not terminated, nowhere in the contract does it allow the Debtors to refuse to **close** an account. The breach of contract case is **not** (mainly) about the Debtors refusing to honor withdrawals, it is about the Debtors refusing to close the account, which are two different things since they each have their own section in the TOU.

---

[124] Emphasis added.

The Debtors do state in the contract: "Celsius reserves the right to withhold or delay the transmission of assets to you if **you fail** to comply with these Terms[125]," except Mr. Frishberg did not fail to comply with any of the terms of the contract (and even if he did, this part of the contract was terminated). In fact, it was Celsius who failed to comply, which is quite ironic. The Debtors *may* claim that Mr. Frishberg violated the Terms of Use by filing a lawsuit against them (which was filed *after* Celsius breached the contract with him ), but that simply is not true, as it unambiguously states in the contract "Notwithstanding the foregoing, you may bring an individual action in the small claims court of your state or municipality if the action is within that court's jurisdiction and is pending only in that court[126]." To rephrase one of the Debtors (seemingly favorite) lines: as a result, if the Terms of Use are enforceable as written, the digital assets transferred to the Celsius platform by Mr. Frishberg are **not** property of the Debtors' estate.

To further prove Mr. Frishberg's point, the Supreme Court ruled (Justice Scalia): "The **wrongful refusal** of a depositary bank **to pay to the order of its customer is a breach of contract, but it is not the control of customer property.**" See *Citizens Bank of Md. v. Strumpf* [127](1995). Celsius is not a bank, but it operated much in the same way, as the assets they held were those of Mr. Frishberg who deposited them, which means that the refusal of a depository bank (in this case Celsius) **constitutes a breach of contract,** but the refusal to allow the withdrawal is not them asserting control over his property. Thus, in Justice Scalia's view, the deposit account (in this case the assets of Mr. Frishberg) **is not property of the bankruptcy estate** when the bank **breaches** its contract by repudiating its duty to honor checks or

---

[125] Emphasis added. Celsius TOU.
[126] https://celsius.network/terms-of-use Section 27, subsection C. Emphasis added.
[127] Emphasis added.

**withdrawals**. This is *very* similar to what occurred when Celsius *not only* refused to honor the

withdrawal (as it is required to by various laws, and the terms of service, since the terms of

service allowing Celsius to restrict withdrawals were **terminated** after Mr. Frishberg instructed

Celsius to close the account), it also breached the contract by not closing Mr. Frishberg's

account, not allowing him to withdraw/transfer his assets (even though the sections of the terms

that allowed them to do so have been **terminated**), and by paying Mr. Frishberg

interest/earnings/yield on July 11th, 2022.


Celsius/the Debtors **cannot** have *some* parts of the contract be enforceable/in effect (such

as the limitations on withdrawals), while simultaneously having other parts be irrelevant/not in

effect (such as the closure of Mr. Frishberg's account that occurred on July 5th, 2022.) They

cannot have it both ways, either the contract is enforceable (by both parties) in its entirety, or it is

completely and totally unenforceable, thereby null and void <u>in Mr. Frishberg's case</u>. Either the

court must find that the contract is enforceable in its entirety for Mr. Frishberg's case (and that

Celsius **materially breached** it by not closing the account, which led to the contract being

voidable, and which Mr. Frishberg has voided, prepetition), which would lead to Mr. Frishberg's

assets being declared **<u>not</u>** property of the estate under Section 541(d), or that the entire contract is

null and void, causing all assets transferred by Mr. Frishberg to be returned, and Mr. Frishberg to

return to the Debtors any "interest" or "rewards" that was paid into his account. The terms of the

contract are *quite* clear, Mr. Frishberg had/has the right to close his account (pre bankruptcy at

least) at any time he wished. All Mr. Frishberg had to do (as he did) was to email Celsius's

support and instruct them to close it.

After Celsius was instructed to close the account (on July 5th, 2022), and they refused (also on July 5th, 2022), they **materially breached** their contract with Mr. Frishberg and lost the legal title to the assets. These assets should have been returned to Mr. Frishberg, and **not** transferred to the bankruptcy estate "**Where a debtor has lost legal and equitable interests in property prior to the petition date, that property does not become property of the estate upon the bankruptcy filing—even if the debtor still retains possession of the property.** *In re Rodgers*, 333 F.3d 64, 69 (2d Cir. 2003); *see also Lyon v. Contech Constr. Prods., Inc. (In re Computrex, Inc.)*, 403 F.3d 807, 812-13 (6th Cir. 2005) (holding that where a **debtor had only a possessory interest in funds, such funds were not property of the estate**); *In re Munroe*, 183 B.R. 667, 669 (Bankr. D.R.I. 1995) ("There is hardly any question that an entity which has no legal or equitable interest in the property and has **nothing more but a bare possession** has **no interes**t which qualified to be the 'properties of the estate.'") (internal quotation marks and citation omitted)." The Debtor has **mere** *possession* of Mr. Frishberg's assets, even though they should not, but that is not a reason to allow them to maintain *possession* when they lack any title or right to the assets. Mr. Frishberg's assets are **not** a part of the estate, and should be returned, or paid out in USD[128] to Mr. Frishberg as soon as possible. Alternatively, they could be declared to not be property of the estate under Section 541 of the Bankruptcy Code and returned at a later date.

In New York State[129], "The elements of a cause of action for breach of contract are:

(1) The formation of a contract between plaintiff and defendant.

---

[128] The USD value of the assets, at the time the check is written (and interest/airdrops etc), should be paid out to Mr. Frishberg plus a 5% premium due to the volatility of cryptocurrencies, and to account for fees associated with repurchasing the cryptocurrencies. Along with compensation for all additional damages dealt to Mr. Frishberg, including but not limited to: expenses such as filing fees, transportation, etc.

[129] *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)).

(2) The performance by plaintiff,

(3) The **defendant's failure to perform**[130], [and]

(4) The **resulting damage**[131]." 2 Leon C. Lazer, et al., New York Pattern Jury Instructions – Civil § 4.1, at 594 (2d ed. 2006); *see JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*, 69 A.D.3d 802, 803, 893 N.Y.S.2d 237 (2d Dep't 2010); *Furia v. Furia*, 116 A.D.2d 694, 498 N.Y.S.2d 12, 13 (2d Dep't 1986).

The first two points of the cause of action for a breach of contract are undisputable. The Defendant and Mr. Frishberg **did** enter into a contract and *Mr. Frishberg* **did** perform. The third part is disputed by the Debtors, but it is quite clear that Celsius **did fail** to perform (because if they did perform, Mr. Frishberg would not be a part of this bankruptcy). The **resulting damage is clear:** *if* Celsius fulfilled its contractual obligations then Mr. Frishberg's assets would have been transferred to Mr. Frishberg's external wallet. If customer service could not process the withdrawal request *directly* to a "Custody" wallet, then, in the United States, in the state of Florida (where Mr. Frishberg was located at the time, he is also a resident of California, and at that time, the assets could have been moved to a "Custody" wallet in California),  the coins would have been transferred to the "Custody" wallet as a "waystation" or holding ground on the way to my external wallet as part of the withdrawal process. If Celsius had completed even the first step of a withdrawal, which is moving the coins from Earn to "Custody", then, according to Celsius itself:

"Unlike the "Earn" Program, title to cryptocurrency "held in custody shall 'at all times remain with the [user]' and 'Celsius will not transfer, sell, loan or otherwise rehypothecate' digital assets

---

[130] Bolded text added for emphasis.
[131] Bolded text added for emphasis.

in custody unless 'specifically instructed by [users], except as required by valid court order, competent regulatory agency, government agency or applicable law.'"

1. Specifically, the Terms of Use provided: "Title to any of your Eligible Digital Assets in a Custody Wallet shall at all times remain with you and not transfer to Celsius."

2. "Celsius will not transfer, sell, loan or otherwise rehypothecate Eligible Digital Assets held in a Custody Wallet unless specifically instructed by you, except as required by valid court order, competent regulatory agency, government agency or applicable law."

If Celsius had begun the withdrawal process (as they were contractually **required** to), the assets would have not been a part of the bankruptcy estate, as, **at the very least,** they would have been in the "Custody" program. The Debtors have stated numerous times that they believe that assets in the "Custody" program are not a part of the estate. The Debtors violated the contract they had with Mr. Frishberg by not closing his account as requested and as the contract **required** them to do so, the "Pause" notwithstanding. Celsius's failure to do so caused Mr. Frishberg's assets to wrongly *purportedly* remain in the "Earn" account instead of being (at the very least) transferred to a "Custody" account, as terms of service required. This leads to **significant damage and harm** to Mr. Frishberg as it deprives him of access to his assets and, if not fixed, would lead Mr. Frishberg to *wrongfully* lose a **large** percentage of his assets because of the actions of the Debtors.

This **material breach** of contract on the part of the Debtors should have (and still should) resulted in an immediate[132], complete and total return of all assets that Mr. Frishberg deposited with Celsius due to the contract being null and void.

If the Debtors had closed Mr. Frishberg's "Earn" account, the assets would have had[133] to have been transferred (per their own terms of service) either to an external crypto wallet.

On July 5th, 2022, the contract between Mr. Frishberg and the Debtors was breached[134] when they refused to close Mr. Frishberg's "Earn" account. The contract signed between the Debtors and Mr. Frishberg stated **nothing** about them being able to refuse to close accounts (other than a court order/request from law enforcement, of which there was none). Their claims that they couldn't close Mr. Frishberg's account are *irrelevant*, and frankly insulting that they are attempting to mislead the court on this, when there is *clearly* **no** basis in the **contract** for Celsius to have refused to close the account. There was nothing in the contract stating that accounts could not be closed on demand (and since the contract is purportedly unambiguous, according to the Debtors themselves, extrinsic evidence such as the "ordinary course" nonsense that Mr. Ferraro brought up in his deposition, is not relevant).

---

132 Mr. Frishberg recognizes that at this time, it may not be possible for the assets to be returned immediately in kind. See *Request For Relief* for further clarification.

133 According to the Terms of Service (contract) section 11. Withdrawals: "Subject to these Terms, for any of your Eligible Digital Assets that you elect to utilize in the Earn Service (if available to you), you have a call option on all loans made to Celsius to demand immediate, complete or partial repayment of any loan at any time through (i) transfer to a Custody Wallet, if available to you, or (ii) a complete or partial withdrawal of Eligible Digital Assets at any time. Such repayment will terminate in whole or in part your loan to Celsius and you shall no longer accrue Rewards on the amount of loans as of the time of your exercise of the call option. Celsius initiates the withdrawal process immediately following a withdrawal request when possible; however, we may require up to three (3) days after you submit your withdrawal request to process the withdrawal."

134 See **Exhibit B**, **C** and **D**.

After the **material breach** of contract occurred, there was nothing giving Celsius the legal right to continue to hold onto Mr. Frishberg's assets. To quote the Debtors[135] "when a contract's terms are **unambiguous**, courts **must** apply them as written. *In re Enron Corp*., 292 B.R. 752, 762 (Bankr. S.D.N.Y. 2003) ("If the contract language is '**unambiguous**,' this Court must enforce the plain, ordinary, and common meaning of those terms as a matter of law without reference to extrinsic evidence.")." The common meaning of "If you want to terminate your Celsius Account with Celsius, you may do so by notifying Celsius at support@celsius.network," is that if a customer wants to close his/her account at *any* time, *all* one would have to do, is email Celsius, and **no** amount of complex legal theories or case law can change that. The Debtors did not have the title to the assets, nor do they now. Courts have interpreted section 541(d) to "expressly" provide that "property in which a debtor **holds only bare legal title is not property of the estate**." [*Golden v. Guardian (In re Lenox Healthcare, Inc.)*, 343 B.R. 96, 100 (Bankr. D. Del. 2006); s*ee also In re S.W. Bach & Co.*, 435 B.R. 866, 878 (Bankr. S.D.N.Y. 2010). This would mean that the assets should have been returned to Mr. Frishberg, but the (soon to be) Debtors did not do so. Chapter 11 Bankruptcy protections do not go into effect until the (soon to be) Debtors actually file for Chapter 11 Bankruptcy. What the Debtors did is effectively theft: they took Mr. Frishberg's assets and transferred them to the bankruptcy estate in violation of both bankruptcy law and the contract (which they **materially breached**/voided).

Here, Celsius was unjustly enriched when—without any **contractual right** to do so, and in the admitted absence of *any* equitable interest in the coins—it wrongfully retained Mr.

---

135 Emphasis added.

Frishberg's cryptocurrency. Once Mr. Frishberg terminated his "loan" to Celsius by instructing them to close his account, no contract existed between Mr. Frishberg and Celsius, since according to the terms of service, the contract ***terminated*** bar a few survival provisions and because Celsius **materially breached** it. Celsius had **no** more of a **contractual right** to do anything with the coins in Mr. Frishberg's account (that was closed) than it did with coins that anyone else held in an external wallet, such as Coinbase, or any other coins that were transferred to external wallets.

To the extent that Celsius has continued to hold, use, commingle, stake, or hypothecate coins in which it held no **right or title**, its actions not only constitute conversion of Mr. Frishberg's property[136] and an infringement on Mr. Frishberg's rights, including property rights, but *also* violate state law and/or regulations in various states, including the state of California (of which Mr. Frishberg is a resident of) who on August 8th, 2022 ordered Celsius to stop selling illegal securities. For example, New York prohibits any person from engaging "in any virtual currency business activity" **without a license** (and Celsius seems to lack licenses for *basically* everything). *See* 23 CRR-NY 200.3. "Virtual currency business activity" is defined to include, among other things, "**storing, holding, or maintaining custody or control** of virtual currency on behalf of others." 23 CRR-NY 200.2(q)(2). Celsius, which does not have a New York virtual currency license (also known as a BitLicense), is violating New York regulation by storing, holding, and maintaining control of cryptocurrency on behalf of Mr. Frishberg (This is relevant

---

[136] A claim for conversion exists where "the defendant acted without authorization, defendant exercised dominion or right of ownership over property belonging to the plaintiff, plaintiff has made a demand for the property, and that demand has been refused." *Lagemann v. Spence,* 2020 WL 5754800, at *10 (S.D.N.Y. May 18, 2020), report and recommendation adopted, 2020 WL 7384009 (S.D.N.Y. Dec. 16, 2020) (citation omitted). Conversion claims apply to cryptocurrency

because the contract is/was governed by New York law for some reason). Celsius is similarly

violating laws or regulations in the other so-called "<u>Prohibited States</u>" like **California** (which

became one on August 8th, 2022, when it ordered Celsius to stop selling illegal securities).

In equity and good conscience, Celsius ought not to retain Mr. Frishberg's property under

these circumstances.

In addition to Celsius' **unjust enrichment**, there was an implied, and contractually

written promise by Celsius that, once Mr. Frishberg requested to close his "<u>Earn</u>" account, he

would no longer be subject to any (relevant[137]) previously agreed contractual terms between

Celsius and himself. In effect, Celsius would respect Mr. Frishberg's **property rights**. Celsius

instead **blatantly** violated those rights and denied Mr. Frishberg access to **<u>his own</u>**

**<u>property</u>**—even though *after* the **material breach** of contract, the *entire* contract, including all

of the clauses named in Section 35, was voided. If the breach of contract did not occur, then the

entirety of the contract bar the irrelevant terms listed in Section 35, **terminated**. *After* the

**material breach** of contract, Mr. Frishberg **<u>never</u>** granted/re-granted Celsius the contractual

right to suspend/limit access to his account **<u>or any contractual rights for them to do anything</u>**

**<u>with his assets</u>**. On the contrary, Mr. Frishberg demanded *many times* that his assets either be

returned to him or, at the very least (as a compromise[138]), be moved to a "<u>Custody</u>" account by

---

137 There are various clauses that are supposed to be in effect after an account closure, as seen in Section

35 of the contract, but none of them are relevant, nor do they allow Celsius to have **<u>any</u>** sort of control over

Mr. Frishberg's assets. They are " Sections 16 (Taxes), 25 (Indemnification), 26 (Disclaimer of Warranty), 27
(Disputes, Binding Individual Arbitration, and Class Actions and Class Arbitrations Waiver), 28 (Our
Ownership of the Services and Celsius IP), 30 (Waiver) and 33 (Governing Law and Venue)"
138 That offer was denied, and the offer is now withdrawn.

way of converting the "<u>Earn</u>" account (which should have been closed) to a "<u>Custody</u>[139]" or

"<u>Withhold</u>" account. Accordingly, Mr. Frishberg's coins in his account are subject to a

constructive trust, if they are not under express trust under the contract terms.


   The Debtors ended up holding Mr. Frishberg's assets in an express or constructive trust

once they **materially breached** the contract (and even if the contract was *not* breached, the

assets were still held in a constructive trust). "Thus, courts have concluded that property which a

**<u>debtor holds in trust (express or constructive) for another does not become property of the</u>**

**<u>estate when the debtor files for bankruptcy</u>**[140]." *In re Edison Bros., Inc.*, 243 B.R. 231, 235

(Bankr. D. Del. 2000) (citing *In re Columbia Gas Systems, Inc.*, 997 F.2d 1039, 1059 (3d

Cir.1993)) ("**<u>Congress clearly intended the exclusion created by section 541(d) to include not</u>**

**<u>only funds held in express trust, but also funds held in constructive trust</u>**[141]"); see also *In re*

*Flanagan*, 503 F.3d 171, 180 (2d Cir.2007) ("The effect of a constructive trust in bankruptcy is

profound. While the bankrupt estate is defined very broadly under § 541(a)(1) of the Bankruptcy

Code to include all legal or equitable interests of the debtor,_ **any property that the debtor holds**

**<u>in constructive trust for another is excluded from the estate pursuant to § 541(d)</u>**[142]....").


### 1. Cause exists to grant relief[143] from the automatic stay.

  22. 11 U.S.C. §362(d)(1) provides:

---

[139] Which is no longer possible/legal due to California ordering Celsius to cease all activities in California.
[140] Emphasis added.
[141] Emphasis added.
[142] Emphasis added.
[143] The Debtors are highly likely to argue that Mr. Frishberg is attempting to lift the stay fully, and that somehow this will lead to "opening the floodgates", and have thousands of cases filed all over the country and the world, which is ludicrous and factually wrong. Mr. Frishberg does not NECESSARILY seek to lift the automatic stay, as he believes it is not necessary to be able to argue his case in this court, and get the compensation he deserves.

> On request of a party in interest and after notice and a hearing, the court shall grant relief
>
> from the stay provided under subsection (a) of this section, such as by terminating,
>
> annulling, modifying, or conditioning such stay . . . for cause, including the lack of
>
> adequate protection of an interest in property of such party in interest. . . .

11 U.S.C. §362(d).

The Bankruptcy Code does not define the phrase "for cause." *In re Residential Cap., LLC*, 2015 WL 1281960, at *3 (Bankr. S.D.N.Y. Mar. 18, 2015[144]). The legislative history indicates that it is intended to be a flexible standard. *See* S. Rep. No. 989, 95th Cong., 2d Sess. 52, *reprinted* in 1978 U.S. Code Cong. & Admin. News 5787, 5838 ("The lack of **adequate protection of an interest in property** is one cause for relief, but is not the only cause."); H.R. Rep. No. 595, 95th Cong., 2d Sess. 343–44, *reprinted* in 1978 U.S. Code Cong. & Admin. News 6300 (stating that the "facts of each request will determine whether relief is appropriate under the circumstances").

*Numerous* courts have found that a debtor's **bare** possession of property, without any accompanying **legal or equitable interest**, is "**insufficient** to justify [the] continuation [of the automatic stay] where relief has been sought." *In re Mizuno*, 288 B.R. 45, 49–50 (Bankr. E.D.N.Y.2002); *see also In re Richmond*, 513 B.R. 34, 41 (Bankr. E.D.N.Y. 2014) (same); *Khan v. Citibank*, No. CV PX 16-3121, 2017 WL 2311185, at *1 (D. Md. May 26, 2017) (noting that because "a *mere* **possessory interest in not subject to a plan of reorganization**," cause <u>exists</u> to lift the automatic stay under 11 U.S.C. § 362(d)(1)). To make something crystal clear, Mr.

---

[144] The oft-cited Sonnax factors were identified by the Second Circuit as "factors to be weighed in deciding whether litigation should be permitted to continue in another forum" and thus appear to be inapposite here. *See In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990).

Frishberg does not[145] *currently* seek to litigate this matter outside of Your Honor's courtroom. *If* it is necessary, the automatic stay can be lifted to allow him to assert his claims to his assets within this courtroom. Mr. Frishberg does not seek, nor does he plan to litigate this matter outside of this courtroom at this time. This court can and should rule on this Adversary Proceeding.

Here, Celsius' bare possession of Mr. Frishberg's coins, *without* any corresponding **legal or equitable interest** in such coins, does **not** justify the continuation of the automatic stay. Rather, Celsius' **lack of legal or equitable interest** constitutes "cause" for terminating the stay and returning Mr. Frishberg's coins to their rightful owner.

### 2. The Debtors have no equity in the Plaintiff's Assets, and the coins are <u>not</u> necessary to the Debtors' reorganization.

Section 362(d)(2) of the Bankruptcy Code **requires** a court to grant relief from the automatic stay against property if "(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2). "The creditor bears the burden to show a lack of equity. . . . Once lack of equity is established, the burden shifts to the debtor to show that the property is necessary for effective reorganization." *In re Ehrenfeld,* 2020 WL 5758819, at *3 (S.D.N.Y. Sept. 28, 2020) (citations omitted); *see also In re Thomas*, No. 14-11738 (MG), 2017 WL 123746, at *2 (Bankr. S.D.N.Y. Jan. 5, 2017) ("If the

---

[145] All rights reserved, including but not limited to appealing a decision, which would necessitate going outside of Your Honor's courtroom. I also reserve the right to have my Adversary Proceeding tried in the District Court (which would require going outside of Your Honor's courtroom) if the Debtors do not consent to it being heard in front of you. I also reserve the right to have my Adversary Proceeding tried via a jury trial outside of Your Honor's courtroom even if the Debtor's consent to it being heard in front of you (in the District Court).

movant shows that the debtor lacks equity in the property, the debtor must then show 'that there [is] a reasonable possibility of a successful reorganization within a reasonable time' and that the property is 'essential' to such a reorganization.") (quoting *In re Timbers of Inwood Forest,* 484 U.S. 365, 375-76 (1988)).


Celsius has **no legal or equitable interest** in, or **right to use**, Mr. Frishberg'*s* coins. Celsius has *mere* possession (which they should **not** have) of property belonging to Mr. Frishberg. The assets they continue to hold onto are worth approximately $3,300 on the petition date. To call that a drop in the bucket would be a **massive** understatement. Even if the Court were to consider the appreciation in the price of crypto assets, and any interest/gains they may have made on them through various means including staking[146]. That amount is still just approximately .00000077 (that is *six* zeros) percent of the Debtors' $4.3 billion in (what they claim are their) assets. There is simply no *plausible* argument that such an insanely **miniscule** amount could be "essential" to the Debtors' yet-to-be-announced reorganization plan. Furthermore, due to regulatory constraints, the Debtors cannot earn returns by staking or hypothecating the coins since California's Department of Financial Protection and Innovation (DPFI) ordered Celsius[147] to stop providing unregulated securities on August 8th 2022[148]. The coins for all intents and purposes are worthless to the estate. They cannot legally deploy them in any way, shape, or form. Mr. Frishberg's assets are roughly 1/1,300,000th of the estate. How can

---

[146] Staking is a way to generate interest or yields on ETH.

[147] DPFI stated, "Under section 25532 of the Corporations Code, Celsius Network Inc., Celsius Network Limited, Celsius US Holding LLC, Celsius Network LLC, and any of their subsidiaries, and Alexander Mashinsky, are ordered to desist and refrain from the further offers and sale of securities in California, including but not limited to the Earn Rewards accounts, unless such sale has been qualified under Corporations Code section 25111, 25112, or 25113, or unless such security or transaction is exempted or not subject to qualification"

[148]
https://dfpi.ca.gov/2022/08/08/dfpi-continues-to-bring-actions-against-crypto-interest-account-providers/

such a tiny sum, which cannot even be used to generate any form of yields (and is frankly more

of a liability than an asset since their **material breach of contract**), be essential to the estate?

The answer is quite simple: **it isn't**.


Celsius has *claimed* in the past that by returning Mr. Frishberg's assets, "it is less

likely that other unsecured creditors will receive equal treatment" (equal treatment being a return

of assets). That is *irrelevant*, as Mr. Frishberg should **not** be a creditor, as the Debtors lack any

title/legal right to *continue* to illegally hold onto Mr. Frishberg's assets. Simply put, the only

reason Mr. Frishberg is a "unsecured creditor[149]" is because the Debtors *wrongfully* transferred

his assets to the bankruptcy estate when they had **no** title or authority to do so. Celsius moved

assets when they did **not** have the right, permission, or authority to do so or, in other words, they

*stole* them. Mr. Frishberg is *solely* in this position because of the actions of the Debtors. *Mr.*

*Frishberg's* assets should not, and cannot be a part of the estate, because the estate does **not** have

a **legal or equitable interest** in them; *see Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th

Cir. 1984) (holding that the "**rights a debtor has in property at the commencement of the**

**case continue in bankruptcy—no more, no less[150]**"). Thus, if a debtor holds **no** *legal or*

*equitable* interest in property as of the commencement of the case, such property does **not**

become property of the debtor's estate under section 541 and the debtor is **prohibited** from

distributing such property to its creditors. The Debtor's argument (that they used previously in

Mr. Frishberg's Lift Stay Motion) was that returning Mr. Frishberg's assets would be

"inconsistent with two key tenets of chapter 11: equal treatment among **similarly situated**

---

[149] Mr. Frishberg disputes his status as an "unsecured creditor" and continues to state that he should not
be a creditor, or a part of the bankruptcy process at all.
[150]Emphasis added,

**creditors** and an orderly process[151]." Mr. Frishberg is the only so-called creditor who has both

filed a small claims court lawsuit and a Lift Stay Motion, therefore, no one else is similarly

situated, as Mr. Frishberg is not necessarily seeking to lift the automatic stay at this time. The

Debtor's statement that: "The majority of the Debtors' creditors are Celsius customers just like

Frishberg[152]" is very wrong. Mr. Frishberg is extremely uniquely situated, even if you take into

account all of the "30 other complaints already filed in various small claims courts around the

country," that would be less than .01% of creditors. A majority *typically* consists of more than

50.01%, **not** .01%.


    After the **material breach** of contract, Celsius lost any and all rights they (may have)

had, including *any and all* **title, legal/equitable interest** in *Mr. Frishberg's* assets.


**3. The Preference Limitation is not applicable and is not a valid basis for denying**

**Mr. Frishberg access to his own property.**

Since the amount of his withdrawal is under $7,575, no further analysis is required.


**4. The industry standard is to allow account closures at any time; Celsius' terms match the**

**rest of the industry.**


It would have been *nothing* **unusual** *or* **idiosyncratic** about Celsius allowing Mr.

Frishberg to close his account in accordance with Celsius' **industry-standard** Terms of Use,

---

[151] https://cases.stretto.com/public/x191/11749/PLEADINGS/1174908252280000000049.pdf Emphasis
added.

152 Emphasis added

regardless of the fact that there was a "Pause"[153] on withdrawals, as there is nothing[153] in the contract that allows Celsius to refuse to close Mr. Frishberg's account. The account closure request was done "**according to ordinary business terms.**" Second, the requested withdrawal of crypto, which *should* have occurred *after* the *requested* account closure since the sections that allowed **Celsius to restrict withdrawals were no longer in effect as of the termination of the non-survival terms (section 35), or if the contract was breached, then the transfer should have still occurred due to there being nothing in place anymore to allow Celsius to hold onto Mr. Frishberg's assets**.

## REGULATORY ORDERS

Celsius has also had a great deal of regulatory scrutiny due to allegations (from approximately 40 states) that Celsius was offering unregulated securities, which Mr. Frishberg, as a non accredited investor should not have had access to[154].

For example:

1. On September 17, 2021, the New Jersey Bureau of Securities (the "NJ Securities Bureau") entered a Summary Cease and Desist Order (the "NJ Order") against the Debtors (a) finding that the Debtors had offered and sold unregistered securities in violation of various New Jersey state securities statutes and (b) prohibiting the Debtors

---

153 There is nothing that is relevant, since there was no pending legal action against Mr. Frishberg, nor any requests from law enforcement/potential money laundering issues etc.

154 As was stated by the Defendant's attorney, Mr. Patrick Nash: "as of April 2022, it was no longer possible to be a participant in the Earn program if you were a US-based non-accredited investor"

from (i) "offering for sale any security, including any Earn Rewards product to or from

New Jersey unless the security is registered with the NJ Securities Bureau" and (ii)

"accepting any additional assets into an existing Earn Rewards account." By its terms, the

NJ Order became effective on November 1, 2021; however, upon information and belief,

the effective date was delayed following discussions between the Debtors and the NJ

Securities Bureau.

2.  Substantially similar orders were entered on August 8, 2022[155], September 16 and 23,

2021, in California[156], Alabama and Kentucky, respectively[157].

3.   On October 18, 2021, the New York Attorney General announced an order (the "NY

Order") (which was made available to the public only in redacted form) demanding that

any unlawful selling or offering for sale of securities and/or commodities within or from

the state of New York that are not registered by N.Y. Gen. Bus. Law § 352 cease[158]. Upon

information and belief, the Debtors denied receiving the NY Order, but acknowledged the

New York Attorney General requested information on or around October 18, 2021.

---

155 https://dfpi.ca.gov/wp-content/uploads/sites/337/2022/08/D-R-Celsius-Network-Inc.pdf

156 It should be noted that the Plaintiff is a resident of California.

157 *See* Cal. Dept. Fin. Protection and Innovation, Desist and Refrain Order at 5:10-15 ("[Debtors] are ordered to desist and refrain from further offers and sale of securities in California, including but not limited to the Earn Rewards accounts, unless such sale has been qualified under" California securities laws.); Ala. Sec. Comm., Admin. Order No. SC-2021-0012 ¶ 10 (ordering Debtors to show cause why they "should not be ordered to cease and desist from any further violations of the Alabama Securities Act" because "the Earn Rewards product is not currently registered with the Commission"); Ken. Dep't Fin. Inst., Admin. Order 2021-AH-00024, at 9 (ordering Debtors to cease and desist from "soliciting or selling any security in Kentucky unless that security is registered with the Department").

158 *See* Office of the Attorney General of New York, Press Release (Oct. 18, 2021).

4.  Upon information and belief, the Debtors denied receiving the NY Order, but
acknowledged the New York Attorney General requested information on or around
October 18, 2021.

## EXAMPLES OF MATERIAL MISREPRESENTATIONS, FRAUDULENT MISREPRESENTATION, AND MORE[159]

Celsius promoted and advertised its services, using social media, and various news sources. In particular, Mr. Alex Mashinsky would host weekly AMAs (Ask Mashinsky Anything) ("AMAs") on YouTube.com. The AMAs are filled with repeated material misrepresentations concerning the financial stability of Celsius, the risks associated with depositing cryptocurrency at Celsius, its regulatory compliance, *and* its transparency and ownership of the cryptocurrency assets.

**A. Representations concerning Regulation Compliance**

- On October 10, 2020, Mashinsky replied to a tweet: "We are ready for all outcomes. We registered with the SEC in 2018 so we won't have the issues others have."

- During a media interview in December 2020, Mashinsky stated, "Celsius from day one, one of the first things we did . . . was register with the SEC . . . ."

- In December 2021, Mashinsky was quoted in Barron's as stating, "The regulators looked into us and said these guys know what they're doing."

---

[159] Mr. Frishberg would like to thank the Ad Hoc Group of Borrowers, and their counsel, for the use of their Adversary Proceedings as a template for some of the below claims.

- In an AMA from December 3, 2021, Mashinsky represented that "states and other regulators have looked into Celsius, they all came back thumbs up, there's no problem, we didn't find anything…."

**B. Representations concerning The Safety Of Its Business Model:**

- [t]he Celsius business model is structured to do the exact opposite of what banks do — by giving 80% of total revenue back to our community each week in the form of earned interest. We earn profits by lending coins to hedge funds, exchanges, and institutional traders, and by issuing asset backed loans at an average of 9% interest.

- Mashinsky publicly claimed in an April 22, 2022 AMA that "what Celsius does best, better than anybody else, is go out to market and earn yield on these assets."

- Mashinsky claimed on April 13, 2022 "[o]n the institutional side, we have very credible counterparties that have billions of dollars on their balance sheet and for those, we have undercollateralized but we don't offer any non-collateralized loans."

**C. Representations concerning Celsius' Financial Stability:**

- A run on the bank cannot happen at Celsius because Celsius never lends more than what it has …we always have enough coins and enough collateral and so on to return all the assets to all of our users. Celsius, Expansion in Asia with Special Guest Lennis Lai (OkEx) - Celsius AMA, YouTube (April 30, 2021), https://www.youtube.com/watch?v=LaIfR4BuIno.

- Celsius takes full responsibility if anything goes bad we take full responsibility that's part of why we raised it 750 million and now we have over two billion dollars on our balance

sheet again more than anybody else." Celsius AMA 10th December 2021, YouTube

(December 10, 2021), https://www.youtube.com/watch?v=X304U3isWzg.

**D. Representations concerning a potential Bankruptcy of Celsius**

- On March 25, 2021, Mashinsky, posted on Twitter, in reply to a Twitter user who asked

  what would happen to their coins in the event of Celsius's bankruptcy, that "all coins are

  returned to their owners even in the case of bankruptcy." That is clearly not so.



**E. Representations concerning Ownership of Cryptocurrency**

- In a November 26, 2019 AMA, Mr. Mashinsky stated "[t]hese are your coins, not

  our coins. Whatever you put in, if you put in one Bitcoin, you will be withdrawing

  one Bitcoin . . . It's always your Bitcoin. Always your Ether. Always your CEL

  Token." https://www.youtube.com/watch?v=H1n5g7uJyvQ

- On July 24, 2020, Mr. Mashinsky stated: [W]hen you give us bitcoin it's not like

  it's ours, right? It's yours legally. It is still your bitcoin. The only thing we do is

> when you lend us your bitcoin, we lend them to people who pay us interest. When
>
> they return them, it goes back to the wallet and it's still yours from that wallet.
>
> Celsius Network AMA with Alex Mashinsky and HFN's Roni CohenPavon,
>
> YouTube (July 24, 2020), https://www.youtube.com/watch?v=kC-89USzxaM.

As detailed at length in the Final Examiner's Report, Celsius knew that the representations identified above (and others that were not, due to judicial economy) were false. *See* Examiner's Report, Part II, Article VI,G at pp. 256-67 entitled "**Celsius did not Correct Its Misleading and Inaccurate Statements**" ("the Examiner found **no** evidence that **anyone** at Celsius suggested or executed on a process of correcting or retracting inaccurate and misleading statements that Celsius's employees identified and removed (or attempted to remove) between May 2021 and June 2022.")[160].

In reasonable reliance upon the Debtors' misrepresentations, Mr. Frishberg entered a contractual arrangement in which he lent his assets to Celsius, and one of the contractual provisions was that Mr. Frishberg could terminate his loan to Celsius, at any time. Mr. Frishberg did terminate his loan to Celsius (of his assets), and closed his account on July 5th, 2022.

## SECOND CLAIM FOR RELIEF

### (Constructive Trust)

Mr. Frishberg repeats and realleges each of the foregoing paragraphs (and all relevant sections of this Adversary Proceeding) as if fully set forth at length herein.

---

[160] (Emphasis added)

The Supreme Court has held that property held by a debtor in trust *is **not*** property of the

estate. *United States v. Whiting Pools, Inc[161]*., ("Congress plainly excluded property of others

held by the debtor in trust at the time of the filing of the petition.").


The New York Court of Appeals has *expressly* stated that a person wrongfully acquiring

property can be treated as a <u>constructive trustee notwithstanding the lack[162] of a fiduciary

relationship</u>. S*ee Simonds v. Simonds*, 380 N.E.2d 189, 194 (NY 1978). Relying on *Simonds*, the

Second Circuit has "found that the fourth element is the most important because 'the purpose of

the constructive trust is prevention of unjust enrichment.'" *In re Grubb & Ellis Co*., No.

12-10685 MG, 2012 WL 1036071, at *6 (Bankr. S.D.N.Y. Mar. 27, 2012) (Glenn, J.), aff'd, 523

B.R. 423 (S.D.N.Y. 2014) (quoting *In re First Cent. Fin. Corp.*, 377 F.3d 209, 212 (2d Cir.

2004).


Constructive trust property that is **commingled** with a Debtor's assets **does not become**

**property of the estate where the trust funds can be identified or traced.** *In re Schick*, 234

B.R. 337, 343 (Bankr. S.D.N.Y. 1999). The fact that the trust *res* has been commingled with

other funds in an account **does not** prevent tracing, "but it requires the court to adopt a special

procedure to determine which of the fungible funds in the account are traceable as part of the

alleged trust *res*. When a bankrupt debtor is acting as trustee of a constructive trust and money

held in trust has been commingled with other funds, the so-called 'intermediate balance rule'

---

[161] 462 U.S. 198, 205 n.10 (1983).

[162] Even though Celsius started to hold a fiduciary relationship to me once it became insolvent, and also once it started to approach the zone of insolvency. According to the *Examiner's Final* report, Celsius US was insolvent since it's inception. While the Debtors claim that the entirety of the Examiner's report is hearsay, I am sure that it can be verified by using direct documents, which I reserve the right to obtain via discovery.

may be applied to determine how much money the beneficiary can actually recover." *In re Drexel Burnham Lambert Grp., Inc.*, 142 B.R. 633, 637 (S.D.N.Y. 1992). Under the intermediate balance rule, "[t]he bankruptcy court will follow the trust funds and decree restitution where the amount of the deposit has at all times since the intermingling of funds equaled or exceeded the amount of the trust funds." (quoting 4 King, *Collier on Bankruptcy* ¶ 541.13, at 541–79–541–80 (15th ed. 1992). Quite simply, the Debtors hold approximately 1,300,000 times as many assets (valued in USD at the time of the petition) as they owe Mr. Frishberg, so to make an argument that the coins are not there would be silly and a waste of this court's time. Even if somehow the Debtors have managed to lose all of the assets they possess/own, then Mr. Frishberg is still owed[163] his coins even *if* they have been converted into other property or are otherwise missing from the estate. *See In re Columbia Pac. Mortg., Inc.*.

When a debtor holds legal title to but does not have equitable interest in certain property, the debtor **must** turn such property over to the holders with such equitable interest in the property. *See MCZ, Inc. v. Andrus Res., Inc. (In re MCZ, Inc.)*, 82 B.R. 40, 42 (Bankr. S.D. Tex. 1987) ("[w]here Debtor merely holds bare legal title to property as agent or bailee for another, **Debtor's bare legal title is of no value to the estate, and Debtor should convey the property to its rightful owner[164]**."

Additionally, a debtor who holds *proceeds attributable to property owned by another* holds only **bare legal title** to such property and thus, **must** turnover such proceeds to the interest

---

[163] [See, e.g., *In re Columbia Pac. Mortg., Inc.*, 20 B.R. 259, 262–64 (Bankr. W.D. Wash. 1981) (awarding holder of participation ownership interest proceeds of a property sale because holder was beneficial owner, and debtor only held legal title to the proceeds)].

[164] Emphasis added.

holder of such property. Therefore, Mr. Frishberg is owed the proceeds from his coins if they have been converted into other property, dissipated, or are otherwise missing from the estate. If they have not been converted, dissipated or otherwise became missing from the estate (as in the coins are still there), Mr. Frishberg is *still* owed his coins. [See, e.g., I*n re Columbia Pac. Mortg., Inc.*, 20 B.R. 259, 262–64 (Bankr. W.D. Wash. 1981) (awarding holder of participation ownership interest proceeds of a property sale because holder was beneficial owner, and debtor only held legal title to the proceeds)]. So, regardless of what occurred with Mr. Frishberg's assets (such as a termination of the account due to a account closure, or a material breach of contract causing the Terms of Use to be voided, or Mr. Frishberg's assets being held in express/constructive trust after he exercised his call option to demand immediate payment), Mr. Frishberg holds title to them, and the assets (and the proceeds of his assets) must be returned to him.

## THIRD CLAIM FOR RELIEF

### (Deceptive Trade Practices)

Mr. Frishberg repeats and realleges each of the foregoing paragraphs (and all relevant sections of this Adversary Proceeding) as if fully set forth at length herein. Each of the Debtors is a person. Each of the Debtors misrepresented material facts concerning the transfer of assets to Celsius, the ownership, and material facts about Celsius's business model, solvency, and effectively everything. Mr. Frishberg reserves all rights, including addressing these claims at a later time, after a scheduling order and briefing schedule have been agreed upon, it will be followed with memorandums of law.

## FOURTH CLAIM FOR RELIEF

### (Consumer Fraud)

Mr. Frishberg repeats and realleges each of the foregoing paragraphs as if fully set forth at length herein. Each of the Debtors is a person. Mr. Frishberg is a consumer, and each of the Debtors misrepresented material facts concerning the transfer of assets to Celsius, the ownership, and material facts about Celsius's business model, solvency, and effectively everything. Mr. Frishberg reserves all rights, including addressing these claims at a later time, after a scheduling order and briefing schedule have been agreed upon, it will be followed by memorandums of law.

The Debtors engaged in unlawful practices (i.e. consumer fraud) by, among other things misrepresenting, deceiving, fraudulently stating, fraudulently promising, unfairly endorsing, suppressing or concealing material facts concerning Celsius and the "Earn[165]" program, including, without limitation, false and misleading claims as detailed in the Examiner's Report concerning, *inter alia*:

    a. the Debtors' financial health;

    b. the Debtors' compliance with applicable laws and regulations;

    c. the Debtors' ability to meet obligations;

    d. the Debtors' ability to safeguard customer assets; and

    e. the Debtors' revenue sources; and

---

[165] Which, to be clear, Mr. Frishberg is no longer a part of, and has not been a part of since July 5th, 2022.

The Debtors made these misrepresentations of material facts and/or actively concealed these material facts in connection with inducing consumers to open or maintain accounts on the Celsius Platform. The Debtors made these misrepresentations with the intent of inducing reasonable consumers, such as Mr. Frishberg, to rely on such misrepresentations. Mr. Frishberg reasonably relied upon the Debtors' misrepresentations, to his detriment. As a direct and proximate result of these unlawful practices, Mr. Frishberg suffered harm, including (but not limited to) monetary damages, legal fees[166] and the costs of litigation[167].

## FIFTH CLAIM FOR RELIEF

### (Fraudulent Misrepresentation)

Mr. Frishberg repeats and realleges each of the foregoing paragraphs as if fully set forth at length herein. The Debtors had a duty to communicate information to Mr. Frishberg in an accurate, **timely** and **truthful** manner. As detailed in the Final Examiner's Report, the Debtors made factual representations to Mr. Frishberg regarding the Celsius Platform and his accounts thereon, including, without limitation, false and misleading claims about, *inter alia*:

a. the Debtors' financial health;

b. the Debtors' compliance with applicable laws and regulations;

c. the Debtors' ability to meet obligations;

d. the Debtors' ability to safeguard customer assets;

e. the Debtors' revenue sources; and

---

[166] Such as court filing fees.

[167] Including direct, and indirect damages due to being engaged in litigation. All rights reserved.

Each of these representations were material to Mr. Frishberg's decision to transfer his assets to the Celsius Platform. Each of the Debtors' representations of material fact were false, as the Debtors intentionally and knowingly mischaracterized how the assets would be handled on the Celsius Platform, among other things. The Debtors:

a. knew that their representations of material fact were false and misleading at the time that they represented the information to Mr. Frishberg

b. misrepresented the material facts with reckless indifference to their truth; and/or

c. should have known that their representations of material facts were false and misleading at the time that they represented the information to Mr. Frishberg. The Debtors *intentionally* communicated the *inaccurate* information to Mr. Frishberg for the purpose of inducing Mr. Frishberg to rely on those misrepresentations. Mr. Frishberg justifiably relied upon the Debtors' misrepresentations of material facts to his <u>detriment</u>. Mr. Frishberg' reliance on the Debtors' misrepresentations of material fact was reasonable. But for the Debtors' fraudulent representations, Mr. Frishberg would have never signed any agreements, or used any of the Debtors' services, and never have opened/maintained an account on the Debtors' platform. As a direct and proximate result of the Debtors' misrepresentations of material fact, Mr. Frishberg suffered significant harm, including, but not limited to, monetary damages totaling not less than the value of his[168] assets, at the time he is compensated, and the expenses[169] he incurred in pursuit of this case.

---

[168] This includes the interest/inflation rate/gains that his assets either generated, or *could have* generated, if they were in his custody. All rights reserved.

[169] Direct and indirect, all rights reserved.

## SIXTH CLAIM FOR RELIEF

### (Breach Of Contract)

Mr. Frishberg repeats and realleges each of the foregoing paragraphs as if fully set forth at length herein. To the extent that the "Earn" Terms of Use constitutes a binding contract, the Debtors were obligated to fulfill both the express and implied terms thereof.

The Debtors materially breached the express and implied terms of the Terms of Use[170] by, among other things, misrepresenting how Mr. Frishberg's assets would be treated by the Debtors on the Celsius Platform. Additionally, since at least July 5th, 2022, the Debtors have prevented Mr. Frishberg from recovering his assets, even though the Terms of Use provide: "for any of your Eligible Digital Assets that you elect to utilize in the Earn Service (if available to you), you have a call option **on all loans made to Celsius to demand immediate, complete or partial repayment of any loan at any time through (i) transfer to a Custody Wallet, if available to you, or (ii) a complete or partial withdrawal of Eligible Digital Assets at any time[171].**"

Had the Debtors permitted Mr. Frishberg to withdraw his assets, or transfer them to "Custody", (if he desired), then the Debtors would not have materially breached the contract, causing Mr. Frishberg to void it. This entire ordeal (for Mr. Frishberg), and all of this litigation, could have been avoided *if* the Debtors simply followed *their own contract*. As a result of the Debtors' material breaches of the Terms of Use, Mr. Frishberg suffered significant harms,

---

[170] This is assuming the Terms of Use were ever valid, and not null and void. All rights reserved, this is not an admission of anything, etc, etc.

[171] (Emphasis added.)

including, but not limited to, monetary damages in an amount not less than the value of his assets

(at the time of their, still to occur return),various expenses/actual damages, and litigation costs.

## SEVENTH CLAIM FOR RELIEF

### (Unjust Enrichment[172])

Mr. Frishberg repeats and realleges each of the foregoing paragraphs as if fully set forth

at length herein.

The Debtors repeatedly represented that the crypto assets that Mr. Frishberg transferred

(or would transfer), was his property. In reliance on the Debtors' representations, Mr. Frishberg

transferred his assets onto the Celsius Platform. To the extent Mr. Frishberg's assets are

determined[173] to be property of the Debtors' bankruptcy estates, the transfers of the assets to the

Debtors enriched the Debtors' bankruptcy estates by the value of the assets. To the extent that

Mr. Frishberg cannot withdraw his assets from Celsius, the transfers of the assets impoverished

Mr. Frishberg by the value of the Collateral (as well as expenses incurred in the return of the

assets, including but not limited[174] to interest, opportunity cost, time, mental energy, etc). It is

---

[172] And conversion, which is included in the event that there is not found to be a breach of contract. The Debtors claim that a breach of contract, and a conversion claim cannot typically be made together. Mr. Frishberg reserves all rights to that regard, and does not take a position at this time on that matter, but has included this footnote for clarity's sake, since the Debtors tend to misconstrue, and twist Mr. Frishberg's words/intentions. This is also included for judicial economy, as conversion and unjust enrichment are quite similar.

[173] The Debtors claim that Mr. Frishberg's assets are in "Earn", Mr. Frishberg disputes this, for judicial economy, see the other arguments that were made in the rest of this Adversary Proceedings, and specifically Claim for Relief one. Mr. Frishberg disputes that the Earn Order applies to him, and is currently appealing it (since it purportedly applies to him, he has standing). Mr. Frishberg also contends that the Earn Order is invalid for the reasons laid out in the Earn Appeal.

[174] To be clear, Mr. Frishberg is not necessarily making a claim for any/all of the listed damages. They are simply listed to convey the harm that Mr. Frishberg suffered due to the Debtor's negligent actions. And Mr. Frishberg does not intend to (but reserves all rights to, in case it is necessary) pursue punitive damages.

inequitable and unjust to permit the Debtors' bankruptcy estates to continue to retain Mr.

Frishberg's assets.

Here, Celsius was unjustly enriched when—without any **contractual right** to do so, and

in the absence of _any_ equitable interest in the coins—it wrongfully retained Mr. Frishberg's

cryptocurrency. Once Mr. Frishberg terminated his "loan" to Celsius by instructing them to close

his account, no contract existed between Mr. Frishberg and Celsius, since according to the terms

of service, the contract **_terminated_** bar a few survival provisions and because Celsius **materially**

**breached** it. Celsius had **no** more of a **contractual right** to do anything with the coins in Mr.

Frishberg's account (that was closed) than it did with coins that anyone else held in an external

wallet, such as Coinbase, or any other coins that were transferred to external wallets.

To the extent that Celsius has continued to hold, use, commingle, stake, or hypothecate

coins in which it held no **right or title**, its actions not only constitute **conversion** of Mr.

Frishberg's property[175] and an infringement on Mr. Frishberg's rights, including property rights,

but _also_ violate state law and/or regulations in various states, including the state of California (of

which Mr. Frishberg is a resident of) who on August 8th, 2022 ordered Celsius to stop selling

illegal securities. For example, New York prohibits any person from engaging "in any virtual

currency business activity" **without a license** (and Celsius seems to lack licenses for _basically_

everything). _See_ 23 CRR-NY 200.3. "Virtual currency business activity" is defined to include,

---

175 A claim for conversion exists where "the defendant acted without authorization, defendant exercised
dominion or right of ownership over property belonging to the plaintiff, plaintiff has made a demand for the
property, and that demand has been refused." _Lagemann v. Spence,_ 2020 WL 5754800, at *10 (S.D.N.Y. May
18, 2020), report and recommendation adopted, 2020 WL 7384009 (S.D.N.Y. Dec. 16, 2020) (citation
omitted). Conversion claims apply to cryptocurrency

among other things, "**storing, holding, or maintaining custody or control** of virtual currency

on behalf of others." 23 CRR-NY 200.2(q)(2). Celsius, which does not have a New York virtual

currency license (also known as a BitLicense), is violating New York regulation by storing,

holding, and maintaining control of cryptocurrency (*purportedly*, since Mr. Frishberg does not

want them to hold/store it for him, and is more than capable of doing it himself) on behalf of Mr.

Frishberg (This is relevant because the contract is/was governed by New York law for some

reason, since Celsius was banned from operating in New York). Celsius is similarly violating

laws or regulations in the other so-called "Prohibited States" like **California** (which became one

on August 8th, 2022, when it ordered Celsius to stop selling illegal securities).


        In equity and good conscience, Celsius ought not to retain Mr. Frishberg's property under

these circumstances.


        In addition to Celsius' **unjust enrichment**, there was an implied, and contractually

written promise by Celsius that, once Mr. Frishberg requested to close his "Earn" account, he

would no longer be subject to any (relevant[176]) previously agreed contractual terms between

Celsius and himself. In effect, Celsius would respect Mr. Frishberg's **property rights**. Celsius

instead **blatantly** violated those rights and denied Mr. Frishberg access to **his own**

**property**—even though *after* the **material breach** of contract, the *entire* contract, including all

of the clauses named in Section 35, was voided. In essence, the Debtors committed an act of

---

176 There are various clauses that are supposed to be in effect after an account closure, as seen in Section

35 of the contract, but none of them are relevant, nor do they allow Celsius to have **any** sort of control over

Mr. Frishberg's assets. They are "Sections 16 (Taxes), 25 (Indemnification), 26 (Disclaimer of Warranty), 27
(Disputes, Binding Individual Arbitration, and Class Actions and Class Arbitrations Waiver), 28 (Our
Ownership of the Services and Celsius IP), 30 (Waiver) and 33 (Governing Law and Venue)"

conversion, by taking Mr. Frishberg's property and making it purportedly property of the estate.

If the breach of contract did not occur, then the entirety of the contract bar the irrelevant terms

listed in Section 35, **terminated**. *After* the **material breach** of contract, Mr. Frishberg **never**

granted/re-granted Celsius the contractual right to suspend/limit access to his account **or any**

**contractual rights for them to do anything with his assets**. On the contrary, Mr. Frishberg

demanded *many times* that his assets either be returned to him or, at the very least (as a

compromise[177]), be moved to a "Custody" account by way of converting the (since

terminated/closed) "Earn" account (which should have been closed) to a "Custody[178]" account.

Accordingly, Mr. Frishberg's coins in his account are subject to a constructive trust, if they are

not under an express trust under the contract terms (such as "*Custody*").


       The Debtors ended up holding Mr. Frishberg's assets in an express or constructive trust

once they **materially breached** the contract (and even if the contract was *not* breached, the

assets were still held in a constructive trust). "Thus, courts have concluded that property which a

**debtor holds in trust (express or constructive) for another does not become property of the**

**estate when the debtor files for bankruptcy[179]**." *In re Edison Bros., Inc*., 243 B.R. 231, 235

(Bankr. D. Del. 2000) (citing *In re Columbia Gas Systems, Inc*., 997 F.2d 1039, 1059 (3d

Cir.1993)) ("**Congress clearly intended the exclusion created by section 541(d) to include not**

**only funds held in express trust, but also funds held in constructive trust[180]**"); see also *In re*

*Flanagan*, 503 F.3d 171, 180 (2d Cir.2007) ("The effect of a constructive trust in bankruptcy is

profound. While the bankrupt estate is defined very broadly under § 541(a)(1) of the Bankruptcy

---

[177] That offer was denied, and the offer has since been withdrawn.
[178] Which is potentially no longer possible/legal due to California ordering Celsius to cease all activities in California.
[179] Emphasis added.
[180] Emphasis added.

Code to include all legal or equitable interests of the debtor, **any property that the debtor holds in constructive trust for another is excluded from the estate pursuant to § 541(d)**[181]....").
And the Supreme Court has found that property held in a trust, is not property of the estate. *See United States v. Whiting Pools, Inc*[182]., ("Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition.").

## RESERVATION OF RIGHTS

I reserve any and all rights, including but not limited to the right to amend this Adversary Proceeding. Nothing in this Adversary Proceedings is intended or should be construed as (a) an admission as to the validity of any claim against Mr. Frishberg, (b) a waiver of Mr. Frishberg's rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Adversary Proceeding, or any cited documents or any order granting the relief requested by this Adversary Proceeding, (e) a waiver or limitation of Mr. Frishberg' rights under the Bankruptcy Code or any other applicable law, or (f) a concession by Mr. Frishberg that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Adversary Proceeding are valid, and Mr. Frishberg expressly reserves his rights to contest the extent, validity, or perfection or seek avoidance of all such liens.

## CONCLUSION

Once Celsius **materially breached** the contract it had signed with Mr. Frishberg (on July 5th, 2022, July 6th, 2022, and July 11th, 2022, among other dates), the Debtors were holding

---

[181] Emphasis added.
[182] 462 U.S. 198, 205 n.10 (1983).

assets of the Plaintiff that they had no legal right/no legal title to hold, and yet they *continue* to hold *his* assets. *And even if* the contract was *not* **materially breached**, then the Debtors still do not have the right to have held, and continue to hold, Mr. Frishberg's assets since it clearly and **unambiguously** states in the contract that after the account is closed, the contract (bar a few irrelevant provisions) terminates. Among the sections that terminate are the ones that allow Celsius to refuse Mr. Frishberg to withdraw his own assets.

## REQUEST FOR RELIEF

1. Mr. Frishberg requests that Your Honor rules that his assets are **not** a part of the estate as defined under section 541(d) of the Bankruptcy Code.

2. Mr. Frishberg requests that Your Honor order the Debtors to compensate Mr.Frishberg for the assets with USD (for whatever the value of the assets is right before the check is written) + a 5% premium due to the high volatility of crypto and the various fees associated with repurchasing his assets.

3. Mr. Frishberg also requests that the Debtors be ordered to pay all of Mr. Frishberg's expenses[183] incurred in the filing of this (and the July 11th, 2022 small claims court) lawsuit, such as filing fees, transportation, etc, along with any gains from the assets since the bankruptcy filing such as rewards from staked ETH, interest/yield earned and the airdropped[184] WETH[185], and any other airdrops that were either delivered, or if the snapshot was taken between the breach of contract, and when the assets are returned to

---

[183] "Sunk costs" can be recovered: *See In re Apollo Air Passenger Computer Reservation Sys. (CRS)*, 720 F. Supp. 1068, 1076 (S.D.N.Y. 1989).
[184] A Airdrop refers to what is effectively a gift of a cryptocurrency to a wallet that holds tokens that qualify for the Airdrop.
[185] WETH is a fork of ETH, https://coinmarketcap.com/currencies/ethereum-pow/

Mr. Frishberg's custody, or the USD value is paid out. The WETH[186] *should* be paid out

in the USD value at the highest point[187] that Mr. Frishberg would have been able to sell it

at, if the Debtors did not wrongfully hold onto his assets. WETH's value has significantly

decreased and Mr. Frishberg was harmed due to Celsius holding it during the time and

depriving him of the ability to sell it.

4.  Mr. Frishberg also respectfully requests compensation for direct damages stemming from

    Celsius/the Debtor's actions.

5.  Mr. Frishberg respectfully requests that for avoidance of further issues and doubt, this is

    ruled a non-preferential payment. This is because Mr. Frishberg had no insider

    information, including any about the bankruptcy filing and because section 547(c)(9) of

    the Bankruptcy Code[188] prohibits a debtor from seeking to avoid a potential preferential

    transfer to a particular transferee if the "aggregate value of all property" at issue is less

    than $7,575 (the "Statutory Cap")."

6.  Alternatively, Your Honor may simply rule that the assets are **not** property of the estate,

    and Mr. Frishberg will have the highest priority claim (since it is not property of the

    estate), have his assets returned either in kind, or in USD[189], along with other damages

---

[186] WETH is an airdropped fork of ETH which was airdropped to all ETH holders.

[187] *See United States ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian Construction Corp., et al,* 95 F.3d 153, 161 (2d Cir.1996)(quoting *Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 493 N.E.2d 234 (N.Y.1986) (per curiam)("Loss of future profits as damages for breach of contract have been permitted in New York under long-established and precise rules of law.")).

[188] According to the Debtor's themselves, page 6, paragraph 4:
https://cases.stretto.com/public/x191/11749/PLEADINGS/117490901228000000022.pdf

[189] The USD value of the assets, at the time the check is written (and interest/airdrops, including any airdrops that occur at a later date, but the snapshot was taken during the time the Debtors were wrongly holding Mr. Frishberg's assets, etc) should be paid out to Mr. Frishberg plus a 5% premium due to the volatility of cryptocurrencies, and to account for fees associated with repurchasing the cryptocurrencies. Along with compensation for all additional damages dealt to Mr. Frishberg, including, but not limited to: expenses such as filing fees, transportation, etc.

caused by the Debtors to Mr. Frishberg. The claim can be paid out at a later time when

other claims (such as perhaps "<u>Custody</u>"/"<u>Withhold</u>") are. Doing so would not require

lifting the automatic stay.


## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, The Plaintiff respectfully requests as follows:

(i) the grant of relief as set forth in the final paragraph of the Claim for Relief;

(ii) the grant such other and further relief as this Court deems just and proper under the
circumstances.


Respectfully submitted,


<u>/s/*Daniel A. Frishberg*</u>

Daniel A.Frishberg

*Pro Se*

Tampa, Florida, USA

March 9th, 2023

**Exhibit A:**

## <u>DECLARATION OF DANIEL A. FRISHBERG IN SUPPORT OF DANIEL A. FRISHBERGS' ADVERSARY PROCEEDINGS</u>

I, Daniel A Frishberg, hereby declare under penalty of perjury:

1. I make this declaration based upon my personal knowledge. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

2. I am a non-insider customer of Celsius, with no prior/insider knowledge of the bankruptcy or "<u>Pause.</u>"

3. On July 5th, 2022, I instructed Celsius to close my "<u>Earn</u>" account, terminating my relationship with Celsius effective immediately.

4. On July 5th, 2022, Celsius breached[190] the contract[191] they had signed with me by refusing to close the account as *required*[192] by the contract, which caused them to lose any title that they may have had to hold onto my assets.

5. On July 11th, 2022, I called Celsius's customer support, and once again requested that my account be closed, and the assets withdrawn to an external wallet due to the breach of contract. They informed me that my case had been moving to a "special support team, since you used a legal term". They also informed me that my case was still being reviewed.

6. On July 11th, 2022, I filed a lawsuit in Hillsborough County small claims court.

7. On July 13th, 2022, I served notice upon Celsius, Kirkland and Ellis (the debtors attorneys), and Stretto of my lawsuit. I also called Stretto, and Kirkland and Ellis to

---

[190] See **Exhibit B**, **C** and **D** for the breach.
[191] See **Exhibit F** https://celsius.network/terms-of-use for the contract.
[192] Added for emphasis, also see section 19, B. of the contract.

verbally inform them of the lawsuit. On July 18th, 2022, Kirkland and Ellis responded[193]

and confirmed receipt of the notice.

8.  Numerous times between July 5th, 2022, and late July, 2022, I called Celsius and its

support team, each time they informed me that my so-called request for a

withdrawal/transfer/account closure was being worked on.

9.  On July 28th, 2022, I filed a Lift Stay Motion. It was entered into the courts system on

August 3rd, 2022.

10. I currently have cryptocurrency assets in a "Earn" account that were frozen there when

Celsius instituted the "Pause."

11. The value of the cryptocurrency assets both currently, and as of the time of both my

instructions to close the "Earn" account, and bankruptcy filing, and the entire time since,

is/was below $7,575.

12. I do not have any outstanding loans in the Borrow Program, nor have I ever taken any

loans from Celsius through the Borrow Program.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that to the best of my

knowledge and recollection the foregoing is true and correct.


Signed:

Daniel A. Frishberg *Pro Se*

/s/*Daniel A. Frishberg*
Tampa, Florida, USA
March 9th, 2023,

---

[193] See **Exhibit G**.

**Exhibit B:**



## Exhibit C:

 **Customer Care Expert** (Celsius Network)

Jul 5, 2022, 23:32 UTC

Hello Daniel,

Thank you for reaching out to the Celsius Customer Care Team. Although we are sad to see you go, we understand your desire to remove your account from the Celsius Platform.

We have had the opportunity to review your account and it appears you still have a significant balance remaining. As recently announced to the community, Celsius has paused all withdrawals, swaps, and transfers between accounts. At this time, we are not able to process an account deletion until we have restored functionality of withdrawals.

We know this is not an easy situation for you, and we apologize for the inconvenience this may cause you. Please keep in mind that Celsius is continuing its operations, and our objective is to restore withdrawals, swaps, and transfers as quickly as possible. However, the process will take some time, and there may be delays.

We will share further information on this topic when it becomes available.

For additional assistance, please reply to this email or simply call us at 1-866-HODL-NOW (1-866-463-5669). We are looking forward to your call!

Best regards and HODL on!

Read our FAQs and learn more from our Help Center https://support.celsius.network/hc/en-us

## Exhibit D:

 **Customer Care Expert** (Celsius Network)

Jul 6, 2022, 02:37 UTC

Hello Danny,

We understand the reasons and urgency behind your request. However, as I mentioned earlier, Celsius announced the pause on withdrawals, Swap, and transfers between accounts (this includes internally from Earn to Custody) to attempt to stabilize our liquidity and operations.

In that same section of the Terms of Use you referenced, it also reads; Celsius and our third-party partners may experience cyber-attacks, extreme market conditions, or other operational or technical difficulties which could result in the immediate halt of transactions either temporarily or permanently. Provided that Celsius has taken reasonable commercial and operational measures to prevent such events in technical systems controlled by Celsius, Celsius is not and will not be responsible or liable for any loss or damage of any sort incurred by you as a result of such cyber-attacks, operational or technical difficulties or suspensions of transactions. Withdrawal limits based on amounts and/or frequency may apply from time to time, based on legal, regulatory, AML, and/or security considerations. Our policies and procedures may require additional security and/or compliance checks that require additional time to complete.

Our team is working diligently around the clock and we will continue to update the community and our clients as and when it becomes appropriate. I have provided our Terms of Use for your convenience.

For additional assistance, please reply to this email or simply call us at 1-866-HODL-NOW (1-866-463-5669). We are looking forward to your call!

Best regards and HODL on!

Read our FAQs and learn more from our Help Center https://support.celsus.network/hc/en-us

**Exhibit E:** (unmodified):



**Tuesday, April 12th, 2022**

Dear Celsians,

Today, we are writing to give our community advance notice of upcoming changes, which will go into effect on April 15, 2022. These changes provide a path forward for our users in the United States to continue holding coins and earning rewards with Celsius.

As we previously have acknowledged, Celsius has been working closely with regulators around the world. It is our intention to be as transparent with our community as possible. More specifically, we have been in ongoing discussions with United States regulators regarding our Earn product.

As a result, there will be changes to the way our Earn product will work for users based in the United States.

**Here's how these changes impact you:**

- **All coins transferred to Celsius by users in the United States prior to April 15, 2022 will continue to earn rewards. Those existing coins will continue to earn rewards from April 15th and onward, for as long as they remain in their Earn accounts.**
- **On April 15, 2022, Celsius will be launching a new Custody solution for users in the United States.** Your Custody account will serve as the centerpiece of

your home for crypto, providing a secure way to navigate across Celsius' products, including store, access, borrow, spend, earn and grow.

- **New transfers made by non-accredited investors in the United States will be held in their new Custody accounts and will not earn rewards.** Non-accredited investors can continue to swap, borrow, and transfer within their Custody accounts based on their local jurisdiction.

- All coins posted as collateral against a loan that is opened prior to April 15, 2022, will be returned to their Earn accounts when the loan is repaid. Those coins will resume earning rewards for as long as they remain in their Earn accounts.

- **Verified accredited investors in the United States will be able to add new coins into their Earn accounts to earn rewards.** For additional information on how to become an accredited investor, contact us at https://celsius.network/customer-care or read more.

- Users located outside of the United States will be unaffected by these changes. They will continue to have access to all of the products and services available to them prior to these changes.

- Watch our Custody tutorial video to learn more.

Celsius will never stop advocating for financial freedom and we thank our community for their ongoing support. We will continue to provide updates as we engage with regulators and ensure the delivery of our services to our users globally.

If you have questions or require additional assistance, contact us at 1-866-HODL-NOW (1-866-463-5669). Our Customer Care Center is available Monday - Saturday, from 10AM - 11PM EST or contact us at https://celsius.network/customer-care

Sincerely,

The Celsius Team

**Exhibit F**[194]:

# Terms of Use

## Last Revised: April 14, 2022

## 1. Introduction

Celsius Network LLC and its Affiliates (collectively, **"we," "our," "us",** or **"Celsius"** ) provide the following Terms of Use that, as they may be modified from time to time by Celsius in its sole discretion (the **"Terms"**) apply to our users (**"you"**or **"User(s)"**) and govern each User's access to, and use of, Celsius' products and services as well as our mobile and web-based application(s), our website(s), any software, programs, documentation, tools, hardware, internet-based services, components, and any updates (including software maintenance, service information, help content, bug fixes or maintenance releases) provided to you by Celsius, directly or indirectly, through our mobile application, our website, or any other online services we provide (each a "Service," and collectively the **"Services"**).

**PLEASE CAREFULLY REVIEW THESE TERMS BEFORE USING, OR CONTINUING TO USE, ANY OF CELSIUS' SERVICES. THE TERMS INCLUDE IMPORTANT INFORMATION ABOUT YOUR RELATIONSHIP**

---

[194] It should be noted that specific, important sections have been highlighted, and are not shown this way outside of this document.

**WITH CELSIUS, INCLUDING MANDATORY ARBITRATION OF DISPUTES BETWEEN YOU AND CELSIUS INSTEAD OF CLASS ACTIONS OR JURY TRIALS THE SERVICES ARE PROVIDED SOLELY FOR USE BY YOU, AND YOUR USE OF THE SERVICES IS EXPRESSLY CONDITIONED ON YOUR CONSENT TO, AND COMPLIANCE WITH, THE TERMS. BY ACCESSING OR USING OUR SERVICES, YOU AGREE TO BE BOUND BY THE TERMS. IF YOU DO NOT AGREE TO ANY OF THE PROVISIONS OF THESE TERMS YOU SHOULD IMMEDIATELY STOP USING THE SERVICES. IN ADDITION, OUR PRIVACY POLICY IS INCORPORATED INTO THE TERMS IN ITS ENTIRETY. WE ENCOURAGE YOU TO READ THE TERMS CAREFULLY AND USE THEM TO MAKE INFORMED DECISIONS.**

**IMPORTANT NOTICE REGARDING THE TREATMENT OF DIGITAL ASSETS**

**THE TREATMENT OF DIGITAL ASSETS IN YOUR CELSIUS ACCOUNT MAY HAVE CHANGED DEPENDING ON THE JURISDICTION IN WHICH YOU RESIDE AND WHETHER CELSIUS' CUSTODY SERVICE (SEE SECTION 4(B) BELOW) IS AVAILABLE TO YOU. PLEASE READ THE FOLLOWING TERMS CAREFULLY SO THAT YOU UNDERSTAND THESE CHANGES AND CAN MAKE INFORMED FINANCIAL DECISIONS.**

**BEGINNING APRIL 15, 2022 (THE "MODIFICATION DATE"), THE FOLLOWING TERMS SHALL APPLY:**

## <u>TERMS APPLICABLE TO ALL USERS RESIDING IN THE UNITED STATES</u>

1. **IF YOU RESIDE IN THE UNITED STATES AND HAVE ACCESS TO CELSIUS' CUSTODY SERVICE VIA YOUR CELSIUS ACCOUNT, ANY ELIGIBLE DIGITAL ASSET TRANSFERRED TO YOUR CELSIUS ACCOUNT ON OR AFTER THE MODIFICATION DATE WILL BE INITIALLY TRANSFERRED TO A CUSTODY WALLET AS PART OF THE CUSTODY SERVICE.**

2. **DIGITAL ASSETS HELD IN A CUSTODY WALLET WILL NOT EARN REWARDS THROUGH CELSIUS' EARN SERVICE (SEE SECTION 4(D) BELOW).**

3. **ANY ELIGIBLE DIGITAL ASSET THAT YOU LOANED TO CELSIUS THROUGH THE EARN SERVICE PRIOR TO THE MODIFICATION DATE WILL CONTINUE TO EARN REWARDS PURSUANT TO THE TERMS HEREIN, UNTIL SUCH TIME AS ANY SUCH ELIGIBLE DIGITAL ASSET IS THEREAFTER USED IN A SERVICE OTHER THAN THE EARN SERVICE (E.G., THE SWAP SERVICE, CELPAY SERVICE, BORROW SERVICE, OR VOLUNTARILY MOVED TO THE CUSTODY SERVICE) OR OTHERWISE WITHDRAWN FROM YOUR CELSIUS ACCOUNT (EACH AN "EARN SERVICE TERMINATION EVENT").**

## <u>TERMS APPLICABLE TO NON-ACCREDITED U.S. USERS</u>

1. **IF YOU RESIDE IN THE UNITED STATES AND ARE NOT REGISTERED WITH CELSIUS AS ACCREDITED INVESTORS (A "NON-ACCREDITED U.S. USER") ANY ELIGIBLE DIGITAL ASSET THAT IS SUBJECT TO AN EARN SERVICE TERMINATION EVENT WILL NOT HAVE ACCESS TO THE EARN SERVICE THEREAFTER; SUCH ELIGIBLE DIGITAL ASSET, HOWEVER, MAY BE USED IN CELSIUS' OTHER SERVICES SUBJECT TO THE TERMS HEREIN.**

2. **IF YOU ARE A NON-ACCREDITED U.S. USER, ANY DIGITAL ASSET TRANSFERRED TO CELSIUS ON OR AFTER THE**

**MODIFICATION DATE WILL <u>NOT</u> EARN REWARDS AND <u>NOT</u> HAVE ACCESS TO THE EARN SERVICE.**

<u>**TERMS APPLICABLE TO ACCREDITED U.S. USERS**</u>

1. **IF YOU RESIDE IN THE UNITED STATES AND ARE REGISTERED WITH CELSIUS AS AN ACCREDITED INVESTOR (AN "ACCREDITED U.S. USER"), YOU SHALL HAVE ACCESS TO THE EARN SERVICE SUBJECT TO THE TERMS HEREIN.**
2. **IF YOU ARE AN ACCREDITED U.S. USER AND AND HAVE ACCESS TO THE CUSTODY SERVICE VIA YOUR CELSIUS ACCOUNT, ANY ELIGIBLE DIGITAL ASSET TRANSFERRED TO CELSIUS ON OR AFTER THE MODIFICATION DATE WILL INITIALLY BE TRANSFERRED TO A CUSTODY WALLET, BUT MAY THEREAFTER BY USED IN THE EARN SERVICE AT YOUR DISCRETION.**
3. **IF YOU ARE AN ACCREDITED U.S. USER AND DO <u>NOT</u> HAVE ACCESS TO THE CUSTODY SERVICE VIA YOUR CELSIUS ACCOUNT, ANY ELIGIBLE DIGITAL ASSET TRANSFERRED TO CELSIUS ON OR AFTER THE MODIFICATION DATE WILL BE INITIALLY TRANSFERRED TO THE EARN SERVICE AND CONSTITUTE A LOAN TO CELSIUS.**
4. **PROVIDED THAT YOU CONTINUE TO MAINTAIN YOUR STATUS WITH CELSIUS AS AN ACCREDITED U.S. USER, YOUR ABILITY TO USE THE EARN SERVICE SHALL CONTINUE WITH RESPECT TO ALL ELIGIBLE DIGITAL ASSETS IN YOUR CELSIUS ACCOUNT.**

<u>**TERMS APPLICABLE TO USERS RESIDING OUTSIDE THE UNITED STATES**</u>

1. **IF YOU RESIDE OUTSIDE THE UNITED STATES, YOU SHALL HAVE ACCESS TO THE EARN SERVICE SUBJECT TO THE TERMS HEREIN.**

2. **ANY ELIGIBLE DIGITAL ASSET THAT YOU LOANED TO CELSIUS THROUGH THE EARN SERVICE PRIOR TO THE MODIFICATION DATE, WILL CONTINUE TO EARN REWARDS.**
3. **ANY ELIGIBLE DIGITAL ASSET TRANSFERRED TO CELSIUS WILL BE INITIALLY TRANSFERRED TO THE EARN SERVICE AND CONSTITUTE A LOAN FROM YOU TO CELSIUS.**

Please take further notice that Celsius may modify the Terms at any time and in its sole discretion by posting the revised Terms on the Celsius website. You shall be bound by such modifications effective immediately upon posting. It is your responsibility to review these Terms prior to each use of the Services.

Celsius reserves the right to implement, change, modify, or increase any fee, rates or other related cost in connection with your Celsius Account or the use of any of the Services at any time. In the event a fee applies to you, we will notify you of the pricing of the fee prior to your providing authorization to complete the subject transaction or transfer. By accepting the Terms you hereby agree to pay all fees associated with or incurred by your use of the Celsius Account or any of the Services.

The Services provided in connection with specific Eligible Digital Assets listed on Appendix A are provided by the Affiliate **Celsius EU UAB**, a limited liability company incorporated in Lithuania.

## 2. Definitions

Capitalized terms shall have the meanings assigned to them in these Terms, unless the context requires otherwise.

**"Account" or "Celsius Account"** means a User's designated user account on the Celsius website or mobile application, allowing a User to access and use the Services, view the User's balance of Eligible Digital Assets held in custody on the User's behalf or loaned by the User to Celsius, and any rewards gained on loaned Eligible Digital Assets, and manage the User's personal information and profile.**YOUR CELSIUS ACCOUNT IS NOT A BANK ACCOUNT, DEPOSIT ACCOUNT, SAVINGS ACCOUNTS, CHECKING ACCOUNT, OR ANY OTHER TYPE OF ASSET ACCOUNT AND SHOULD NOT BE CHARACTERIZED AS A BANKING PRODUCT OR SERVICE. THE USE OF TERMS SUCH AS "ACCOUNT," "ACCOUNT BALANCE," "WITHDRAW" AND SIMILAR LANGUAGE IN CONNECTION WITH THE EARN SERVICE AND THE BORROW SERVICE (SEE FURTHER SECTIONS 4(D) AND 4(E) BELOW, RESPECTIVELY) DOES NOT IMPLY OR ESTABLISH, AND SHALL NOT BE TAKEN TO SUGGEST, ANY FORM OF CUSTODY RELATIONSHIP, AND SUCH LANGUAGE IS USED HEREIN AS TERMS OF CONVENIENCE ONLY IN REFERRING TO USERS' BORROWING OR LENDING OF DIGITAL ASSETS TO OR FROM CELSIUS AS PART OF THE EARN SERVICE AND BORROW SERVICE, AND CELSIUS' OBLIGATION TO TRANSFER DIGITAL ASSETS TO USERS UPON THE TERMINATION OF SUCH LOANS OR REPAYMENT OF SUCH BORROWING IN CONNECTION WITH THESE SERVICES.**

**"Affiliate"** means an entity that owns or controls, is owned or controlled by, or is or under common control or ownership with a party, where control is defined as the direct or indirect power to direct or cause the direction of the

management and policies of such party, whether through ownership of voting securities, by contract, or otherwise.

**"AML"** stands for Anti-Money Laundering, which means a set of procedures, laws, and regulations that are intended to stop the practice of generating income through illegal actions.

**"Blockchain"** means a system in which records of transactions made in Digital Assets are maintained across several computers that are linked in a peer-to-peer network.

**"CEL Token"** means Celsius' native token.

**"Custody Wallet"** means a Virtual Wallet where all Eligible Digital Assets held therein are custodial assets maintained either by us or by a third party institution or other entity selected by Celsius (a "**Third Party Custodian**").

**"Digital Asset"** means a digital representation of value in which encryption techniques are used to regulate the generation of digital units and verify the transfer of assets, operating independently from a central bank.

**"Eligible Digital Assets"** means the types of Digital Assets we may choose to designate for inclusion under one or more of the Services from time to time, which are subject to change and/or limitation in our sole discretion, based on business, regulatory and/or other considerations.

**"Fiat,"** when used in reference to money or currency, means the coin and paper money of a country that is designated as legal tender, circulates, and is customarily used and accepted as a medium of exchange in the country of issuance.

**"KYC"** stands for Know Your Customer (or Client), which means the process of a business verifying the identity of its customers or clients and assessing potential risks of illegal intentions for the business relationship.

**"Pegging"** is the practice of fixing the exchange rate of one currency to the value of another currency or asset.

**"Stablecoin"** means a Digital Asset that is Pegged to a Fiat currency.

**"Virtual Wallet"** or **"Virtual Wallet Address"** means an on-Blockchain virtual address in which Digital Assets can be held and transferred.

# 3. Eligibility and Proof of Identity

In order to use the Services you must first register for a Celsius Account.

In order to be eligible to access and use the Services, you must (i) be eighteen (18) years of age or older, (ii) have the legal ability to enter into and be bound by these Terms, (iii) comply with these Terms, and (iv) register for

and maintain an active and valid Celsius Account. Celsius is not obligated to accept any application from any applicant and has sole and absolute discretion to accept or reject applications to create Celsius Accounts.

The Services are not available where prohibited by law or by Celsius policy, as updated from time to time; currently, such places include, but are not necessarily limited to, the countries of Iran, North Korea, Sudan, South Sudan, Syria, Cuba, or any other country against which the United States, the United Kingdom or the European Union imposes financial sanctions or embargoes.

Be advised that in some jurisdictions, due to regulatory considerations, Celsius may not provide part or all of the Services, which may include support for some Eligible Digital Assets or the CEL Token.

Due to changing regulatory requirements and interpretations in the Digital Assets markets, Celsius may use its sole and absolute discretion to, among other things, reject specific applications to open Celsius Accounts, prohibit use of part or all of the Services and/or close, freeze or suspend Celsius Accounts, where Celsius, in its sole and absolute discretion, has determined that regulatory or policy reasons prevent Celsius from being able to offer its Services.

Celsius is subject to AML, KYC, and U.S. sanction requirements under the Bank Secrecy Act (**"BSA"**), Uniting and Strengthening America by Providing

Appropriate Tools Required to Intercept and Obstruct Terrorism Act (**"USA PATRIOT Act"**), and the Office of Foreign Assets Control (**"OFAC"**).

Under applicable AML and OFAC rules, Celsius is obligated to maintain certain information about you, including User records and transaction history, for five years (seven years for Users residing in the state of New York), or a longer period as may be required under applicable laws. Under certain circumstances, Celsius is required to report to the competent authorities of any unusual transactions, or of any suspicion it may have that any User might be involved in any financial crime or illicit activity.

Celsius is required to comply with applicable AML and KYC requirements before and after you register for a Celsius Account. When you register for a Celsius Account, we will ask for documentation and information, including but not limited to copies of your government-issued identification document (e.g. Passport, driver's license). For corporate Celsius Accounts, we may require identification information related to the directors, officers, authorized representatives, or equity owners of the business. We may also gather and use information about you from third parties, to help us confirm your identity, perform our AML/KYC checks and/or determine your access to the Services You represent and warrant at all times that any and all information provided by you to us is true, accurate, and not misleading in any respect. If any such information changes, it is your obligation to provide the new information to us as soon as practicable following such change.

## 4. Services

### A. Celsius Account

Your Celsius Account allows you to view your balances in connection with the Services provided to you by Celsius and access the Services and conduct certain transactions online. You are solely responsible for the activities under your Celsius Account and for securing your Celsius Account IDs, passwords, hints, or any other codes that you use to access your Celsius Account and the Services. Celsius is not responsible for any loss or compromise of your access information and/or your personal information, or for any loss that you may sustain due to compromise of your access information and/or personal information.

**CELSIUS MAY RESTRICT SERVICES IN CERTAIN JURISDICTIONS DUE TO APPLICABLE LAWS, REGULATIONS, AND BUSINESS CONSIDERATIONS, AT ITS SOLE DISCRETION. ANY SERVICES AVAILABLE TO YOU WILL BE THOSE ACCESSIBLE VIA YOUR CELSIUS ACCOUNT. IF YOU RESIDE IN THE UNITED STATES, THE SERVICES AVAILABLE TO YOU MAY DEPEND ON YOUR STATUS AS AN ACCREDITED INVESTOR. CELSIUS MAY REQUEST FROM YOU PROOF OF ACCREDITED INVESTOR STATUS PERIODICALLY OR AT ANY TIME, IN CELSIUS' SOLE DISCRETION. THE FAILURE OF A USER TO TIMELY RESPOND TO SUCH A REQUEST MAY RESULT IN THE TEMPORARY OR PERMANENT LOSS OF THAT USER'S ABILITY TO USE A SERVICE.**

**CELSIUS IS NOT LIABLE TO ANY LOSS OR DAMAGE RESULTING FROM
SUCH TEMPORARY OR PERMANENT LOSS OF USE TO ANY SERVICE.**

We will not be liable for following any instruction we receive through your
Celsius Account, even if it was not authorized by you, or if it was entered by
mistake or is otherwise inaccurate. To verify the authenticity of any instruction
we receive through your Celsius Account, at our sole discretion we may
require your signature or identification in any form we deem necessary, and
we may accept digital images and electronic signatures for documents that
need to be signed. You agree to reimburse us (and we may charge you or
deduct from the balance of your Celsius Account) for all claims, costs, losses,
and damages, including reasonable attorneys' fees, that result from our
following instructions we receive through your Celsius Account to take any
action related to your Celsius Account.

Your Celsius Account is not a bank account, deposit account, savings
accounts, checking account, or any other type of asset account and should
not be characterized as a banking product or service. All Eligible Digital Asset
balances on your Celsius Account represent Digital Assets that are either (1)
held in your Custody Wallet by Celsius or a Third Party Custodian, (2) loaned
by you to Celsius, or (3) posted to Celsius as collateral and, therefore, owned,
held and/or controlled by Celsius (under the applicable Service, as further
detailed herein), and subject to Celsius' obligation to deliver such Digital
Assets back to you upon the termination of the applicable Service.

Celsius may freeze, suspend or terminate your Celsius Account at any time in
its sole discretion, in addition to taking any action and seeking any remedy it
may be entitled to in law or in equity, including if Celsius suspects your
involvement in any fraudulent activity of any kind or other misuse of the
Services, provision by you of inaccurate or misleading information, or your
involvement in any money laundering or other financial crime related to you or
your Celsius Account.

## B. Custody

Our custody (**"Custody"**) Service allows you to store Eligible Digital Assets in
a Custody Wallet accessible through your Celsius Account. **PLEASE NOTE
THAT WHEN YOU USE OUR CUSTODY SERVICE TO STORE ELIGIBLE
DIGITAL ASSETS YOU WILL NOT RECEIVE A FINANCING FEE,
REWARDS OR FINANCIAL COMPENSATION OF ANY KIND ON ELIGIBLE
DIGITAL ASSETS SO STORED.**

When you use the Custody Service, you understand and agree that Celsius
may act as the custodian or we may use a Third Party Custodian to provide
the Custody Service. Celsius will inform, update, and/or obtain your consent in
advance, as applicable, in the event that a Third Party Custodian is used to
provide the Custody Service to you. Celsius will use reasonable skill in the
selection, appointment, and periodic review of Third Party Custodians. By
using the Custody Service, you understand and agree to appoint Celsius or a
Third Party Custodian selected by Celsius as your agent to store and secure

Eligible Digital Assets in a Custody Wallet, and perform other duties customarily performed by a custodian. You understand that the Custody Service may be performed by a custodian in a jurisdiction other than where you are domiciled. By using the Custody Service, you authorize Celsius to transfer your Eligible Digital Assets to a Third Party Custodian or Custodians as may be selected by Celsius, and to instruct and cause any such Third Party Custodian to transfer your Eligible Digital Assets to another Third Party Custodian or Custodians as may be selected by Celsius, or to Celsius, in each case without the need for any further notice to or consent from you, and consistent with providing the Custody Services as set forth herein.

Title to any of your Eligible Digital Assets in a Custody Wallet shall at all times remain with you and not transfer to Celsius. Celsius will not transfer, sell, loan or otherwise rehypothecate Eligible Digital Assets held in a Custody Wallet unless specifically instructed by you, except as required by valid court order, competent regulatory agency, government agency or applicable law. As title owner of assets, you bear all risk of loss. Celsius shall have no liability for any Digital Asset price fluctuations or any or all loss of Digital Assets. Notwithstanding the foregoing, Celsius may suspend your access to Services, including the Custody Service and your access to a Custody Wallet, in the event of market disruptions or periods of volatility. Celsius or a Third Party Custodian controls the private keys to the Blockchain addresses of all Custody Wallets. Celsius will use reasonable care and commercially reasonable efforts in connection with the Custody Service to store and secure Eligible Digital Assets in a Custody Wallet. You understand that your use of the Custody Service, whether provided by Celsius or a Third Party Custodian,

does not create a fiduciary relationship between you and Celsius or any Third
Party Custodian. Neither Celsius nor any Third Party Custodian has any
fiduciary duty to you. Celsius has no duty to inquire into, supervise, or
determine the suitability of any transaction you initiate involving Eligible Digital
Assets in a Custody Wallet. Eligible Digital Assets in a Custody Wallet may be
comingled with the Eligible Digital Assets of other Users, and Celsius is under
no obligation to return the actual Eligible Digital Assets initially transferred by
you to a Custody Wallet, but will return Eligible Digital Assets of the identical
type reflected in your Celsius Account at the time you request such a return.
Celsius may provide information regarding the Eligible Digital Assets in a
Custody Wallet to comply with any applicable law, regulation, rule, or request
by law enforcement or government agencies.

Eligible Digital Assets held in a Custody Wallet are subject to the other
provisions of these Terms, unless where expressly stated otherwise. Celsius
retains the right to set-off any Eligible Digital Assets in a Custody Wallet
against any obligations you may have to us. You understand and
acknowledge that the legal treatment of Digital Assets remains unsettled and
may vary depending on the jurisdiction in which you reside. In the event that
you, Celsius or any Third Party Custodian becomes subject to an insolvency
proceeding, it is unclear how your Digital Assets would be treated and what
rights you would have to such Digital Assets. Celsius does not make any
representation as to the likely treatment of Digital Assets in your Celsius
Account, including those in a Custody Wallet, in the event that you, Celsius or
any Third Party Custodian becomes subject to an insolvency proceeding
whether in the U.S. or in any other jurisdiction. You explicitly understand and

acknowledge that the treatment of Digital Assets in the event of such an insolvency proceeding is unsettled, not guaranteed, and may result in a number of outcomes that are impossible to predict reliably, including but not limited to you being treated as an unsecured creditor and/or the total loss of any and all Digital Assets reflected in your Celsius Account, including those in a Custody Wallet.

Upon your instruction to Celsius to use one of the other Services detailed in this Section (such as, but not limited to, Swap, CelPay, and Borrow), or otherwise offered by Celsius, where such Services are available to you through your Account, the Eligible Digital Assets being used in such other Service may involve transferring your assets out of a Custody Wallet. Eligible Digital Assets that are transferred out of, or not held in, a Custody Wallet are not subject to the custody functions set forth in this Section.

Until further notice, the Custody Service will only be available in certain jurisdictions.

**C. Swap**

**i. Introduction to Swap Service**

Our Swap Service, if available to you, allows you to exchange one type of Eligible Digital Asset for another type of Eligible Digital Asset in your Celsius Account, provided that the exchange is of a Digital Asset pair supported by

Celsius (**"Supported Pair"**). Celsius may choose to add, remove, change, or impose any additional limits on Supported Pairs from time to time, in its sole discretion and without providing prior notice.

By using Celsius' Swap Service, you will allow Celsius to exchange the type and amount of the Digital Asset in your Celsius Account that you choose to swap (the **"Swapped Assets"**) into the type of Digital Asset you choose to receive (the **"New Assets"**). The amount of New Assets to be received in exchange for the Swapped Assets is determined by the amount of Swapped Assets multiplied by the applicable conversion rate of the relevant Digital Asset pair (the **"Exchange Rate"**).

**ii. Exchange Rates**

Celsius will use reasonable efforts to source the best rate for a Supported Pair across multiple venues. However, we cannot guarantee that the Exchange Rates offered on our platform would always be optimal, and you understand and acknowledge that Celsius is not under any obligation to provide the best rate for a Supported Pair. You further acknowledge that it is your responsibility to check if a better rate is available on another platform. In line with Celsius' commitment to transparency, the Exchange Rates quoted may include an offset from the prevailing market rate (also known as "spread") to mitigate both Celsius' exposure to price volatility between the time the Exchange Rate is confirmed and the time the transaction is executed. The spread may be set by

Celsius and/or third party vendors working with Celsius to complete the Swap transaction.

Exchange Rates available on our platform are moment-in-time specific, and due to the volatility in crypto markets, change constantly and rapidly. An Exchange Rate is only final when you approve the transaction and it has been accepted and confirmed.

### iii. Swap Transactions are Final

All Swap transactions are final and irreversible once approved by you.

You should therefore carefully review the terms of each transaction before you approve it. Celsius will not be liable for any errors in your order. If you believe a transaction was not executed in accordance with your instructions, please contact support@celsius.network.

We may reject or cancel a Swap transaction where we deem it reasonably necessary, e.g., where there was an error in the Exchange Rate or in the execution of the transaction, or where the quoted Exchange Rate is no longer available.

### iv. Execution

Each Swap transaction is entered into between you and Celsius (as buyer or seller, as applicable), and Celsius does not act as your broker, agent, or intermediary.

By entering into any Swap transaction, you hereby appoint Celsius or a Third Party Custodian to act as the custodian of the Swapped Assets for the purpose of exchanging those assets, and for the duration necessary to complete the exchange.

During periods of high volume, illiquidity, or volatility in the marketplace for any Digital Asset, the actual market rate at which trade is executed may be different from the prevailing rate indicated at the time of your order or trade. You acknowledge and agree that Celsius is not liable for any such price fluctuations. In the event of periods of high volume, illiquidity, or volatility in the marketplace for any Digital Asset or other market disruption of any kind or Force Majeure event (see further Section 34 below, "Force Majeure"), Celsius may suspend access to the Swap Service and/or prevent you from completing any actions via the Swap Service. Following any such event, you understand that prevailing market rates when trading resumes may differ significantly from the rates available prior to such event.

**v. Representations and Warranties**

By using the Swap Service, you represent and warrant to Celsius that:

1. the information provided by you to Celsius, including, but not limited to, regarding your place of residency, is accurate and up-to-date;
2. you are using Celsius' Swap Service solely for your own personal purposes, and not on behalf of any other person or for business purposes;
3. you are aware of, and can withstand, the risks involved in holding, using and trading digital assets, and you have read and understood our Risk Disclosure;
4. you will NOT use borrowed funds for the purpose of using our Swap Service, and particularly you shall NOT use funds borrowed from Celsius for such purpose;
5. you will be solely responsible for all tax reporting and payment obligations which may apply to you as a result of using the Swap Service;
6. your use of the Swap Service shall be at all times in full compliance with all laws and regulations applicable to you, and you shall not use it for any illegal purposes, including, but not limited to, activities involving financial crime, money laundering or terrorism financing, or the proceeds thereof.

Any breach of these representations and warranties by you shall constitute a breach of these Terms, and may result in, among other legal action, the termination of your Celsius Account.

**D. Earn Rewards**

Our Earn Service allows you to earn a financing fee from Celsius, referred to as "Rewards," in the form of Digital Assets (either in-kind, i.e., in the same Digital Asset you transfer, or in CEL Tokens, where permitted) in exchange for entering into open-ended loans of your Eligible Digital Assets to Celsius under the terms hereof. **If our Earn Service is available to you, upon your**

**election, you will lend your Eligible Digital Assets to Celsius and grant Celsius all rights and title to such Digital Assets, for Celsius to use in its sole discretion while using the Earn Service.**

The balance of Eligible Digital Assets loaned by you to Celsius, and any Rewards gained thereon (see further Section 12 below, "How Rewards are Calculated and Earned") are visible via your Celsius Account. Once such Eligible Digital Assets are received by Celsius into your Earn balance, they shall be Celsius' property, in every sense and for all purposes, and you will immediately start accruing Rewards on such Digital Assets in accordance with the terms hereof (unless explicitly provided for the purpose of being utilized for any other Service), and the corresponding amount (and kind) of Eligible Digital Assets shall be reflected in your Celsius Account balance. We reserve the right to reject entry into any loan transaction, and/or the right to repay any loan of Digital Asset already made, each at your expense.

You may terminate any loan to Celsius at any time, and request that Celsius return the borrowed Eligible Digital Assets and deliver any Rewards accrued from the Earn Service, by transferring such Eligible Digital Assets and Rewards to your external Virtual Wallet (in accordance with Section 11 below, "Withdrawals") or to the Custody Service, if available.

The Earn Service is not an investment program nor a speculative tool. Rather, you are earning Rewards as a financing fee on the loan of Eligible Digital Assets you have transferred to Celsius in connection with the Earn Service,

and in accordance with the rates published by Celsius from time to time, pursuant to these Terms.

**AS FURTHER EXPLAINED IN SECTION 1 ABOVE, BEGINNING APRIL 15, 2022, THE EARN SERVICE WILL NOT BE AVAILABLE FOR ANY DIGITAL ASSET TRANSFERRED TO CELSIUS OR USED IN A SERVICE OTHER THAN THE EARN SERVICE AFTER THAT DATE BY A NON-ACCREDITED U.S. USER. ANY ELIGIBLE DIGITAL ASSET LOANED TO CELSIUS THROUGH THE EARN SERVICE PRIOR TO APRIL 15, 2022, INCLUDING SUCH ELIGIBLE DIGITAL ASSETS OF NON-ACCREDITED U.S. USERS, WILL CONTINUE TO EARN REWARDS THROUGH THE EARN SERVICE PURSUANT TO THE TERMS HEREIN, UNTIL SUCH TIME AS SUCH ELIGIBLE DIGITAL ASSET IS THEREAFTER USED IN A SERVICE OTHER THAN THE EARN SERVICE (E.G., THE SWAP SERVICE, CELPAY SERVICE, BORROW SERVICE, OR VOLUNTARILY MOVED TO THE CUSTODY SERVICE) OR OTHERWISE WITHDRAWN FROM THE APPLICABLE USER'S CELSIUS ACCOUNT. THE EARN SERVICE WILL REMAIN FULLY AVAILABLE TO ACCREDITED U.S. USERS OR USERS RESIDING OUTSIDE THE UNITED STATES.**

### E. Borrow

You may apply to borrow certain Fiat currencies or Stablecoins from an Affiliate of Celsius, as will be agreed between you and Celsius or its Affiliates in writing, against Eligible Digital Assets in your Celsius Account (each, a

**"Loan"**). If approved, such application shall be subject to a separate agreement to be entered into between you and the Celsius Affiliate (the **"Loan Agreement"**), and Celsius or its Affiliates shall hold the Digital Assets provided as collateral under the Loan Agreement for the benefit of the Lender subject to the terms hereof, including without limitation Sections 9, 10 and 13.

In no circumstances shall it be permissible for you to use the proceeds of such Loans to purchase additional Digital Assets through any third party fiat "on-ramp" service providers that may be integrated in or connected with the Celsius platform from time to time, and you represent and warrant that you will not do so. Celsius further does not recommend or encourage any use of borrowed funds for purchasing Digital Assets or making any financial investment. You represent that any use by you of the proceeds of Loans shall be in full compliance with all applicable laws and regulations, these Terms, and the applicable Loan Agreement, and you shall be solely responsible and liable for any breach of any of the foregoing.

Any Eligible Digital Assets you provide as collateral under a Loan Agreement shall not be eligible for another Service provided by Celsius at the same time, including the Earn Service, as set out above, and by entering into any Loan Agreement you explicitly authorize Celsius to deduct the amount of Eligible Digital Assets corresponding to the collateral amount from the applicable Service in your Celsius Account.

Celsius may in its sole discretion offer other forms of commercial arrangement under the Borrow Service, such as a sale and repurchase arrangement, based on its regulatory, business, or other considerations.

**F. CelPay**

CelPay is Celsius' proprietary Digital Asset tool for Celsius Users, which allows you to transfer ownership or assign your rights with Celsius, as applicable, in connection with selected Eligible Digital Assets to other registered Celsius Users (see further Section 15 below, "CelPay").

By entering into any CelPay transaction you explicitly authorize Celsius or its Affiliates to deduct such amounts of Eligible Digital Asset as you instruct us to transfer to another user from your Celsius Account, and to be added to the balance of the Celsius Account of such other User. Conversely, by accepting any CelPay transaction from another User you agree that the amounts of Eligible Digital Asset sent to you shall be added to the balance of your Celsius Account.

# 5. Celsius Account Types

**A. Individual Celsius Account**

This Celsius Account is owned by only one natural person who is and will continue to be the only person authorized to take any action in the Celsius Account. By opening an Individual Celsius Account, you represent and warrant that you are and shall at all times continue to be the sole beneficial owner of the Celsius Account and user of all Services facilitated or generated therefrom.

## B. Corporate Celsius Account

This Celsius Account is owned by a corporation, unincorporated association, a company, a partnership, fiduciary, sole proprietorship, or other legally recognized group (interchangeably defined as an **"Entity"**) holding a Celsius Account in any capacity other than an individual capacity. An Entity can apply to open a Celsius Account through any natural person(s) who is duly authorized by the Entity to do so (an **"Authorized Representative"**).

Such Authorized Representative represents and agrees, on behalf of the Entity, as well as on his or her own behalf, that he or she:

1. is fully authorized to execute all documents or otherwise complete our requirements in his or her stated capacity;
2. has provided us all documents or other information necessary to demonstrate that authority; and
3. will provide other documents and complete other requirements as we may request from time to time.

We may refuse to recognize any such authorization if, in our reasonable judgment, it appears to be incomplete or improperly executed.

By opening a Corporate Celsius Account, the Authorized Representative represents and warrants on behalf of the Entity that the Entity is and shall at all times continue to be the sole beneficial owner of the Celsius Account and user of all Services facilitated or generated therefrom and that the ultimate beneficial owners of all assets and assets belonging to the Entity are as represented during the establishment of the Corporate Celsius Account. The Entity registered as holder of a Corporate Celsius Account, the ultimate beneficial owner(s) of such Entity and any Authorized Representative(s) shall each be responsible for updating Celsius immediately of any change in the details of the Entity, ultimate beneficial owner(s) and/or Authorized Representative(s), including any appointment or termination of the same, change of control in the Entity or change in the registration details of the Entity, and such persons shall be jointly and severally liable to Celsius for any breach of these Terms in connection with the Corporate Celsius Account.

### C. Maximum Number of Accounts

Each User is authorized to have a maximum of **one** Individual Celsius Account and **one** Corporate Account (such as in the case of a sole proprietorship) at any given time. Requests for additional accounts must be sent via email to app@celsius.network. Celsius may deny a request for an additional account in its sole discretion and for any reason. Celsius may merge, freeze, suspend, or terminate any Account(s) in its sole discretion and for any reason, including to the extent Celsius reasonably believes any such Account(s) to be in breach of this policy.

# 6. Authorized Users

For both Individual and Corporate Celsius Accounts, we may follow any instructions regarding your Celsius Accounts provided that we reasonably believe such instructions are authorized by the Celsius Account holder, and we will not be held liable for following any instructions provided by a person designated or identified as an authorized User or Authorized Representative.

# 7. Account Balance

Your Celsius Account balance visible through the platform shall indicate, the balance of Eligible Digital Assets attributed to each Service, to the extent applicable and available. You can transfer additional Eligible Digital Assets to Celsius by transferring the same to the Virtual Wallet Address(es) provided in your Celsius Account (or as otherwise notified by us to you). Any Eligible Digital Asset received will be treated by us as being transferred to your Celsius Account beginning on the date and at the time stamped on the Blockchain confirmation.

If Celsius chooses to designate "wrapped" Digital Assets (i.e., Digital Assets Pegged to the value of the corresponding Digital Asset on its "native" Blockchain) for inclusion under one or more of the Services, any such Eligible Digital Assets that you transfer to Celsius may be repaid to you in, and reflected in your Celsius Account balance as, the corresponding native Eligible Digital Asset. In the event Celsius incurs any loss or damage as a

result of the Digital Assets that you transfer to Celsius being wrapped, such as, but not limited to, from the wrapped Digital Asset becoming De-Pegged from the value of the native Digital Asset, Celsius may recover such losses or damages from the Eligible Digital Assets in your Celsius Account pursuant to Section 9 of these Terms. Nothing herein shall oblige Celsius to accept "wrapped" Digital Assets, and it is your sole responsibility to make sure such "wrapped" Digital Assets are Supported Digital Assets prior to transferring them to your Celsius Account.

**It is your sole responsibility to make sure that Digital Assets you wish to transfer to Celsius are Eligible Digital Assets, and that your transfer of Eligible Digital Assets on the Blockchain is directed over the correct Blockchain and to the correct Virtual Wallet Address as provided to you by Celsius (which may differ from time to time and between different Digital Assets).**

**If you do not carefully follow these instructions, your Digital Assets may be irrevocably lost, and Celsius may not be able to assist you in retrieving them. Celsius will not be liable to you for any such loss and shall not be under any obligation to retrieve such Digital Assets.**

## 8. Ownership of Digital Assets

You hereby represent and warrant to us that any Eligible Digital Asset transferred by you for the purpose of utilizing Celsius' Services is owned by

you or that you are fully permitted to carry out transactions using such Eligible Digital Assets without restriction or limitation, and that your use of the Services is solely for your own account and benefit, and not on behalf of any other person or entity. You further represent and warrant that all such Eligible Digital Assets are free from any claims, indebtedness, liens, or third party interests.

## 9. Setoff and Security Interest Rights

You grant us a security interest in any and all Eligible Digital Assets using the Earn Service for debts, amounts owed, or liabilities incurred to us or any of our Affiliates by you or any of your Authorized Representatives, if any ("**Obligations**"). Obligations may include both secured and unsecured debts, and Obligations you owe individually or together with someone else, including Obligations under other transactions or agreements between you and us or any of our Affiliates.

We also may take or set off from any Digital Asset in your Celsius Account, including any of your Digital Assets using the Custody Service (i.e., in a Custody Wallet), or deduct from any obligations Celsius may have to you, any direct, indirect, and acquired Obligations that you owe us or our Affiliates. These rights are in addition to other rights we may have to take, transfer, or charge from any assets or balance in your Celsius Account for Obligations you owe us or our Affiliates pursuant to these Terms.

Your acceptance of these Terms serves as your consent to Celsius' asserting its security interest or exercising its right of setoff should any laws governing your Celsius Account require your consent. If the law restricts our ability to take, transfer, or setoff from any obligations to you, or if your Celsius Account balance is protected from attachment, levy, or legal process, you waive those conditions and limits to the full extent that you may do so by contract, and you authorize us to take any actions to offset your Obligations in your Celsius Account being used in the Earn Service.

We hereby agree that, to the extent permitted by applicable law, in the event that Celsius breaches its obligation under these Terms, you may set off assets or amounts we owe you with respect to your Celsius Account, against your Obligations. If the law restricts your ability to take, transfer, or setoff our obligations to you, or if they are protected from attachment, levy, or legal process, we waive those conditions and limits to the full extent that we may do so by contract, and we authorize you to apply our obligations to you to your Obligations.

## 10. Risk Disclosure

Before using any of Celsius' Services, you should ensure that you fully understand and can afford to undertake the risks involved. You should carefully read and make sure you understand our Risk Disclosure page, which lists some, but not all of the risks involved in holding, trading and using crypto assets generally, and using Celsius' services specifically. The risks listed

below and in our Risk Disclosure page are intended to provide you with a general outline of the risks involved, but cannot capture all such risks.

These Terms and your use of any of our Services do not create a fiduciary relationship between us and you; your Celsius Account is not a checking or savings account, and it is not covered by insurance against losses. Celsius has no duty to inquire into, supervise, or determine the suitability of any transaction you initiate involving Eligible Digital Assets in your Celsius Account. We may lend, sell, pledge, hypothecate, assign, invest, use, commingle or otherwise dispose of assets and Eligible Digital Assets that are not held in a Custody Wallet (if available to you) to counterparties or hold the Eligible Digital Assets with counterparties, and we will use our best commercial and operational efforts to prevent losses. By transferring Digital Assets to Celsius, or lending Eligible Digital Assets to Celsius while using the Earn Service, or otherwise using the Services, you will not be entitled to any profits or income Celsius may generate from any subsequent use of any Digital Assets (or otherwise), nor will you be exposed to any losses which Celsius may suffer as a result thereof. You agree and acknowledge that you are exposed to the possibility that Celsius may become unable to repay its obligations to you in part or in full, in which case any Digital Assets in your Celsius Account that are not using the Custody Service may be at risk of partial or total loss.

**ELIGIBLE DIGITAL ASSETS ARE NOT LEGAL TENDER. CELSIUS IS NOT A BANK OR DEPOSITORY INSTITUTION, AND YOUR CELSIUS ACCOUNT IS NOT A DEPOSIT ACCOUNT. ELIGIBLE DIGITAL ASSETS**

**REPRESENTED IN YOUR CELSIUS ACCOUNT ARE NOT HELD BY
CELSIUS AS A FIDUCIARY, ARE NOT INSURED BY ANY PRIVATE OR
GOVERNMENTAL INSURANCE PLAN (INCLUDING THE FEDERAL
DEPOSIT INSURANCE CORPORATION (FDIC) OR THE SECURITIES
INVESTOR PROTECTION CORPORATION (SIPC)), AND ARE NOT
COVERED BY ANY COMPENSATION SCHEME. YOUR CELSIUS
ACCOUNT DOES NOT CONSTITUTE AN INVESTMENT CONTRACT OR A
SECURITY, IS NOT TRANSFERABLE AND MAY NOT BE TRADED,
EXCHANGED OR SOLD TO ANY THIRD PARTY UNDER ANY
CIRCUMSTANCES.**

Celsius does not provide any legal, tax or financial advice and you are
strongly advised to obtain independent legal, tax or financial advice prior to
making any financial decision, including buying, trading, holding, or using
Digital Assets. There are significant risks associated with Digital Assets, and
you are solely responsible to make sure you understand such risks and
assess whether such risks are appropriate for you. Celsius does not make any
offers, recommendations, or invitations for you to deal in Digital Assets or use
any Services, and does not take into account your personal circumstances,
financial situation, needs or goals. Before making any financial decision, you
should carefully assess your financial situation and capacity, and only use
funds that you can afford to lose. Before entering into any transaction or using
any of the Services you should ensure that you understand and have made an
independent assessment of the suitability and appropriateness of a
transaction into which you are entering and the nature and extent of your
exposure to risk of loss in light of your own objectives, financial and

operational resources, and other relevant circumstances. Past performance is no guarantee of future results.

Legislative and regulatory changes or actions at the state, federal, or international level may adversely affect the use, transfer, exchange, and value of Digital Assets. Transactions in Digital Assets may be irreversible, and, accordingly, losses due to fraudulent or accidental transactions may not be recoverable.

The value of Digital Assets may be derived from the continued willingness of market participants to exchange Digital Assets for Fiat currencies or other Digital Assets. If such willingness is abolished for any reason, this may result in the potential for a permanent and total loss of value of a particular Digital Asset.

The volatility and unpredictability of the price of Digital Assets may result in significant loss over a short period of time. The nature of Digital Assets may lead to an increased risk of fraud or cyber-attack, including rollback attacks or Blockchain reorganizations. The nature of Digital Assets means that any technological difficulties experienced by Celsius or third parties may limit, delay or prevent the access or use of Digital Assets and/or cause losses of Digital Assets. Although Celsius takes precautionary measures to protect against cyber threats, circumstances may arise where losses or damages are incurred.

In light of these risks, which are only some of the risks involved in using the Services and holding or trading in Digital Assets, and do not constitute an exhaustive list of such risks, you should carefully consider whether holding or trading Digital Assets in general and/or using our Services is suitable for you in light of your financial condition.

## 11. Withdrawals

Subject to these Terms, for any of your Eligible Digital Assets that you elect to utilize in the Earn Service (if available to you), you have a call option on all loans made to Celsius to demand immediate, complete or partial repayment of any loan at any time through (i) transfer to a Custody Wallet, if available to you, or (ii) a complete or partial withdrawal of Eligible Digital Assets at any time. Such repayment will terminate in whole or in part your loan to Celsius and you shall no longer accrue Rewards on the amount of loans as of the time of your exercise of the call option. Celsius initiates the withdrawal process immediately following a withdrawal request when possible; however, we may require up to three (3) days after you submit your withdrawal request to process the withdrawal.

For every withdrawal request, you will be required to provide the details of the Virtual Wallet to which you wish to receive your repayment of Digital Assets. For the avoidance of doubt, any repayment shall be in-kind (i.e., in the same type of Eligible Digital Assets loaned by you, but not the actual same Digital Assets originally transferred by you). In the event that the details you provide

are inaccurate, incomplete, or misleading, your Digital Assets may be permanently lost. We will not be liable for any loss that results from inaccurate, incomplete, or misleading details that you may provide for such transfer. If the transfer address you specify is one to which we are unable to process transfers, we will have no liability for any resulting failure or delay in processing your requested withdrawal.

Celsius and our third-party partners may experience cyber-attacks, extreme market conditions, or other operational or technical difficulties which could result in the immediate halt of transactions either temporarily or permanently. Provided that Celsius has taken reasonable commercial and operational measures to prevent such events in technical systems controlled by Celsius, Celsius is not and will not be responsible or liable for any loss or damage of any sort incurred by you as a result of such cyber-attacks, operational or technical difficulties or suspensions of transactions. Withdrawal limits based on amounts and/or frequency may apply from time to time, based on legal, regulatory, AML and/or security considerations. Our policies and procedures may require additional security and/or compliance checks that require additional time to complete. Any individual request to exceed withdrawal limits set by Celsius must be sent via email to app@celsius.network.

Every transmission request shall be deemed pending until accepted by us. We may refuse to accept such request, or delay the processing of an approved request for any reasonable reason, including but not limited to inaccurate or misleading information provided by you, or any doubt or suspicion of fraud, misrepresentation, a sanctioned transaction, money

laundering, terrorism financing or other financial crime related to your Celsius Account.

# 12. How Rewards Are Calculated and Earned

All Eligible Digital Assets that you elect to utilize in the Earn Service (if available to you) and thus are loaned to Celsius (1) are not being used as collateral for Loans, (2) have not had all rights in connection with them assigned to another Celsius user using CelPay, and (3) were not requested for external transmission or withdrawal (Eligible Digital Assets meeting each of these three criteria, **"Loaned Digital Assets"**) entitle you to Rewards while credited to your Celsius Account.

We periodically update our rates and the rate changes are made in our sole discretion. Rewards will be payable in arrears and added to the principal loaned by you to Celsius, as part of the Earn Service, and reflected in your Celsius Account balance weekly.

We calculate the Rewards on Loaned Digital Assets based on market demand for each Eligible Digital Asset. **Reward rates are not determined based on Celsius' income or profit, generated directly or indirectly as a result of the use by Celsius of a particular Digital Asset, a type of Digital Assets, or otherwise.**

Rewards are payable based on a daily periodic rate applicable to the Loaned Digital Assets. The daily periodic rate is calculated by dividing the then-applicable annual reward rate by three hundred sixty-four (364) days; then it is further divided down to the hour, minute, and second of that day. Loaned Digital Assets, including those received as Rewards from previous weeks, will begin gaining Rewards according to the hour, minute, and second on the timestamp verifying the completion of the applicable transaction and c, or posted any Loaned Digital Assets as collateral for a Loan. Therefore, any Loaned Digital Asset that you elect to utilize in the Earn Service (if available to you) mid-week will receive Rewards with no distinction, based on the rates calculated for the relative time within the allocation period.

We will reflect the Rewards earned for the previous week on or around the first business day of each week, through our platform. Your Celsius Account must be active on the date the Rewards are payable for you to receive the applicable Rewards. All Rewards will be added to your Celsius Account balance in-kind (in the same Eligible Digital Asset that is reflected in your Celsius Account) or, subject to your in-app choice and regulatory and business considerations, in CEL. Once Rewards are added to your Celsius Account balance, they shall be treated as an integral part of your Eligible Digital Assets, you shall be deemed to have elected to utilize in the Earn Service (if available to you), including with respect to such Rewards, which shall thus be loaned to Celsius, for all purposes. To make such in-kind Reward payments as accurate as possible, Celsius rounds non-integer, rational numbers to the sub-cent, which is the smallest possible decimal available for the applicable Eligible Digital Asset.

For users who are citizens or legal residents of the United States, Celsius requires your Taxpayer ID (TIN) or Social Security Number (SSN) to be updated in your Celsius Account in order to gain Rewards. Celsius is not obligated to reflect credits in your Celsius Account retroactively with Rewards that would have been gained if you had otherwise updated your profile with your TIN or SSN.

If Celsius has determined, in its sole and absolute discretion, that for any regulatory or legal reason we are limited in the Rewards rate we may offer you on your Eligible Digital Assets loaned to Celsius (or if we are completely restricted from paying any Rewards to you whatsoever), the Rewards to which you shall be entitled will be limited accordingly. Based on our reasonable interpretation of legal requirements, without prior notice, we may limit the Rewards to which you will be entitled.

If, at any time, for legal or other reasons, a Celsius Account is suspended or frozen by Celsius, Loaned Digital Assets connected to such Celsius Account shall not be eligible to earn Rewards.

## 13. Consent to Celsius' Use of Digital Assets

In consideration for the Rewards payable to you on the Eligible Digital Assets using the Earn Service, for us entering into any Loan Agreement, and the use of our Services, you grant Celsius, subject to applicable law and for the duration of the period during which you elect to utilize the Eligible Digital

Assets in the Earn Service (if available to you) and thus loan such Eligible Digital Assets to us through your Celsius Account, or as collateral under the Borrow Service (if available to you), all right and title to such Eligible Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion. You acknowledge that with respect to Digital Assets used by Celsius pursuant to this paragraph:

1. You will not be able to exercise rights of ownership;
2. Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; and
3. In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, any Eligible Digital Assets used in the Earn Service or as collateral under the Borrow Service may not be recoverable, and you may not have any legal remedies or rights in connection with Celsius' obligations to you other than your rights as a creditor of Celsius under any applicable laws.

# 14. Hard Forks and Airdrops

Any Blockchain may undergo software updates from time to time, which will result in a permanent divergence in the Blockchain (a **"Hard Fork"**). The

result is that such Blockchain will split into two separate and distinct Blockchains, and any Digital Asset on that original Blockchain may entitle its holders to a new type of Digital Asset (the **"Forked Asset"**). You agree and understand that the support of any Forked Asset in your Celsius Account is solely at the discretion of Celsius. If we do not make a public announcement confirming our support of a Forked Asset ahead of an anticipated Hard Fork, we will not support the Forked Asset and such Forked Asset will be an unsupported Digital Asset (**"Unsupported Assets"**), in which case all Celsius Accounts will be denominated in the legacy Digital Asset and all Rewards will accrue and be payable in the legacy Digital Asset. You agree that Celsius assumes no responsibility whatsoever with respect to those Unsupported Assets and you will not be able to recover the Unsupported Assets from Celsius. Celsius assumes absolutely no responsibility whatsoever with respect to Unsupported Assets.

In the event that a Hard Fork achieves the required consensus, it is possible that we will only support the Forked Asset and will discontinue our support of the legacy Digital Asset. In the event of a Hard Fork that entitles you to a Forked Asset, you are advised to withdraw the applicable Digital Assets from your Celsius Account prior to the relevant date for the Hard Fork. Celsius is not obligated in any way to monitor or maintain balances of Forked Asset issued to holders of the applicable Digital Assets upon a Hard Fork, or to credit you for the value of such Forked Asset. In the event you wish to receive Forked Asset issued upon a Hard Fork, you are advised to withdraw the applicable Digital Asset from your Celsius Account prior to the relevant date for the Hard Fork. All determinations regarding Hard Forks shall be made by

Celsius in its sole and absolute discretion and in accordance with applicable law.

In the event that a Digital Asset network attempts to or does distribute Digital Assets to Blockchain addresses pertaining to an Eligible Digital Asset via airdrop or bootstrapping (collectively, an "Airdrop"), the support of any such new Digital Assets in your Celsius Account is solely at the discretion of Celsius. If we do not make a public announcement confirming our support of such new Digital Assets, we will not support such new Digital Assets and such new Digital Assets will be treated as Unsupported Assets. To the extent you wish to receive the new Digital Assets to be delivered via Airdrop, you are advised to withdraw the applicable Digital Assets from your Celsius Account prior to the relevant date for the Airdrop. You further agree and understand that Digital Assets delivered via Airdrop do not create or represent any relationship between us and the sender and/or the related Digital Asset network and do not subject us to any obligations whatsoever as they relate to the sender and/or the related Digital Asset network.

All determinations regarding the Forked Assets and/or Digital Assets delivered via Airdrop will be made by Celsius in its sole and absolute discretion and in accordance with applicable law.

# 15. CelPay

CelPay is Celsius' proprietary Digital Asset tool for Celsius Users, which allows you to transfer ownership or assign your rights with Celsius, as applicable, in connection with selected Eligible Digital Assets to other registered Celsius Users.

By using our CelPay feature, you understand and acknowledge that:

1. you are transferring your ownership to, or assigning your rights in, the Eligible Digital Assets you select when using CelPay, and that such transfers of ownership or assignment of rights may not be recorded on any Blockchain, but rather on Celsius' ledger;
2. by making any CelPay transaction, you are authorizing Celsius to deduct the corresponding amount of Eligible Digital Assets from your Celsius Account balance, and to transfer or credit such amount to the balance of the receiving User's Celsius Account;
3. Celsius is not responsible, and will not interfere in any way in, any dispute between you and the User involved in the CelPay transaction;
4. if you initiate a CelPay transaction to an unintended or incorrect User, you may irrevocably lose your rights in connection with the said Eligible Digital Assets, and it is your sole responsibility to make sure you provide the correct details when initiating a CelPay transaction;
5. the completion of a CelPay transaction may not be immediate, and it may take some time before such transaction is processed and the relevant Celsius Account balances are updated;
6. use of the CelPay feature is subject to limitations on amounts transacted, as determined in Celsius' sole discretion from time to time;
7. all transactions made through CelPay are final and irreversible;
8. by making any CelPay transaction you represent to Celsius that you are familiar with the person to whom the transaction is

made, and that such transaction is not made for any illicit or illegal purpose. You acknowledge that Celsius would hold you responsible for any damages it may incur by any unlawful use of the CelPay feature; and

9. Celsius shall not be a party to, and shall not be obligated to take an active part in the resolution of, any dispute between a transferor or transferee when using CelPay.

Celsius does not accept any liability for CelPay transactions or attempted transactions that would violate any law or regulation, including without limitation, KYC requirements, embargoed or restricted persons or locations, prohibitions against money laundering and/or anti-bribery laws, and structured transactions or tax evasion, the responsibility for which shall lie solely with the participating User(s). Celsius may refuse to perform, block, or otherwise void any CelPay transaction that Celsius reasonably believes could violate any law or regulation.

# 16. Taxes

Within Celsius' platform, you will be able to see a record of the transactions related to your use of the Services which you may wish to use for the purposes of making any required tax filings or payments. It is your responsibility to determine what, if any, taxes apply to your use of the Services, and to collect, report, and remit the correct tax to the appropriate tax authority. We may deduct or make any tax withholdings or filings that we are required by law to make, but we are not responsible for determining whether and which taxes apply to your transaction, or for collecting, reporting, or remitting any taxes arising from any transaction or in connection with your

Celsius Account. You are responsible for complying with applicable law. You agree that Celsius is not responsible for determining whether or which laws may apply to your transactions, including tax law. You are solely responsible for reporting and paying any taxes arising from your use of the Services.

## 17. Service Activity Statements

We will make all logs and records of activities concerning your use of the Services available to you through our platform only. We do not generate periodic statements showing the activity conducted through your use of the Services. You must examine these logs and records and notify us of any unauthorized use of your Celsius Account or credentials, or any error or irregularity with respect to the records of your use of the Services, within fourteen (14) calendar days after the error occurs. If notice is not received within the fourteen (14) calendar-day period, you will not be able to raise any further claim in this respect.

## 18. Conversion Rates

Any conversion between a Digital Asset and another Digital Asset or Fiat currency shall be made by us in accordance with the rates and prices applicable at the actual time of conversion. Applicable rates are indexed to those used by industry-leading platforms, as we may choose to use from time to time, in our sole discretion. We currently use rates provided by CMC Markets, Coinpaprika, and our own rates as determined by our liquidity

providers. We may change these rate sources at any time and without giving notice or updating these Terms, and you shall not have any claims regarding our choice of rate sources or rates used by Celsius or made available by any third party.

# 19. Closing a Celsius Account

A. Celsius' Right to Celsius Account Closure

We have the right to suspend, freeze or close your Celsius Account at any time for any reason without advance notice, including by blocking your access to the Celsius Account or the Services. If your Celsius Account has a balance when we close it, we will repay and return the remaining Digital Assets to you, including accrued Rewards earned (if applicable) until the close date, less any applicable Obligations, withholding tax and other applicable deductions, unless prohibited by applicable law. In the event of irregular activity, we may hold assets until we close your Celsius Account. Any Digital Assets that Celsius returns to you will be sent to the designated withdrawal addresses in your user profile on the Celsius platform for each respective Digital Asset you hold. Celsius Accounts are not transferable or assignable in whole or in part. Celsius may be required by law to turn over any Digital Assets related to abandoned or unclaimed Celsius Accounts to the state of your last known residence (**"Escheatment"**). Escheatment periods vary by jurisdiction, and you are responsible to determine the applicability of such laws in your place of residence. Celsius reserves the right to recover any administrative charges,

payments, or fees which it may incur in connection with such unclaimed or abandoned Celsius Accounts, as permitted by applicable law.

B. Your Right to Close Your Celsius Account

If you want to terminate your Celsius Account with Celsius, you may do so by notifying Celsius at support@celsius.network. Once your Celsius Account is closed, you agree: (a) to continue to be bound by these Terms, as required by Section 35 below (Survival) (b) to immediately stop using the Services, (c) that we reserve the right (but have no obligation) to delete all of your information and Celsius Account data stored on our servers, and (d) that we shall not be liable to you or any third party for termination of access to the Services or for deletion of your information or Celsius Account data. You acknowledge that any legal obligations you may have under any other agreement with Celsius or its Affiliates (including any Loan Agreement or agreement governing lending or investing in Celsius or its Affiliates) will not be affected in any way by the termination of these Terms and any such other agreement between you and Celsius will continue to be in effect[195] in accordance with its terms.

# 20. Liability for Unauthorized Transfers from Your Celsius Account

---

[195] It should be noted that when Celsius failed to close the account as required in this section, the entirety of the contract was breached/voided.

If you believe that your Celsius Account has been used by an unauthorized party, or if your Service Activity Statements reflect activity or transactions that you did not conduct or authorize, you must notify us IMMEDIATELY via email to security@celsius.network. **YOU ARE SOLELY RESPONSIBLE FOR MAINTAINING THE SECURITY AND CONFIDENTIALITY OF YOUR LOGIN DATA, AND YOU ACCEPT ALL RISKS OF UNAUTHORIZED ACCESS AND USE OF YOUR CELSIUS ACCOUNT.**

## 21. Eligible Digital Assets

We may, from time to time and in our sole discretion, add and/or remove certain Digital Assets from our list of Eligible Digital Assets. If a Digital Asset is removed, it will no longer be available to be used in connection with our Services. We will seek in good faith to notify our Users of our intention to add and/or remove Digital Assets in connection with any of our Services as soon as commercially reasonable. However, under certain circumstances (e.g., for regulatory reasons) such changes may be required to be made immediately and without prior notice. In the event any Digital Asset ceases to be an Eligible Digital Asset, you will no longer be entitled to receive any Rewards in connection with our Earn Service (if available to you), or otherwise make any other use of it via our Services. We may choose to disallow the use of any Eligible Digital Asset for certain Services, or treat any Digital Asset as an Eligible Digital Asset for certain Users or groups of Users for certain Services, in our sole discretion. We may, from time to time, provide certain Services in connection with certain Eligible Digital Assets by different entities within the

Celsius group, and any change in and/or assignment by the contracting entity shall not be considered an amendment of these Terms.

## 22. Disclosure of Celsius Account Information

We may disclose information to third parties about you, your Celsius Account, or the transactions you make:

1. where it is necessary for the provision of our Services under these Terms;
2. in order to verify the existence and condition of your Celsius Account for a third party, such as a referral partner;
3. for the purpose of conducting our AML and KYC checks and compliance with applicable laws;
4. If you give us written authorization;
5. In order to comply with any request or order by any government agency or competent court; or
6. As described in our Privacy Policy (https://celsius.network/privacy-policy/)

## 23. Conflict/Disputes Involving Your Celsius Account

We are not liable to you for errors that may result in a financial loss to you. We may take any action that is authorized or permitted by these Terms or applicable laws without liability to you, even if such action causes you to incur fees, expenses or damages. If third parties make claims on your Celsius Account, or if we receive conflicting instructions from you, or if we become involved in or concerned about a dispute between you and any third party, we reserve the right to react in ways that we believe in good faith to be

appropriate, including by closing, suspending or freezing your Celsius Account, delivering the Digital Assets available therein to you or to any third party, or interpleading assets to court, all as we reasonably deem appropriate under the circumstances. You are liable for all expenses and fees we incur for such conflicts or disputes, including internal costs and attorneys' fees, and we may charge or deduct them directly from your Celsius Account balance.

We are not responsible for delays or losses incurred as a result of an error in the initiation of any transaction and have no obligation to assist in the remediation of such transactions. By initiating any transfer or using Celsius' Services in any way, you attest that you are transacting in an Eligible Digital Asset which conforms to the particular Virtual Wallet into which assets are directed. For example, if you select an Ethereum Virtual Wallet Address to receive assets, you shall be solely responsible to assure that you are initiating a transfer of Ethereum alone, and not any other currency such as Bitcoin or Ethereum Classic. Celsius incurs no obligation whatsoever with regard to non-Eligible Digital Assets sent to Celsius, or for Eligible Digital Assets sent to an incompatible Virtual Wallet Address. Erroneously transmitted assets will be lost. We recommend users send a small amount of Digital Asset as a test prior to initiating a transfer of a significant amount of Digital Assets.

**We reserve the right to limit access to your Celsius Account, which can include temporarily or permanently removing your Celsius Account access via the internet, and/or restricting your Celsius Account, and/or closing your Celsius Account without prior notice to you (unless prior notice is required by law), and we shall have no liability for such actions.**

**In addition, Celsius reserves the right to withhold or delay the transmission of assets to you if you fail to comply with these Terms. Our total aggregate liability to you for any claim is limited to the face value of the applicable item or transaction, or the actual value of any assets not properly credited or debited by us.**

# 24. Legal Process Affecting Celsius Account

If any legal action, such as an attachment, garnishment, levy, seizure, third party claim or enforcement action by any competent authority in any jurisdiction (**"Legal Process"**) is brought against or in connection with your Celsius Account, we may refuse to permit (or may limit) withdrawals or transfers from your Celsius Account until the Legal Process is satisfied or dismissed. Regardless of the terms of such Legal Process, we have first claim to any and all assets in your Celsius Account. We will not contest any Legal Process on your behalf, and we may take actions to comply with Legal Process without liability to you, provided that we reasonably believe any such action is appropriate under the circumstances. If we incur any expenses in connection with any Legal Process, including without limitation reasonable attorneys' fees, we may charge such expenses and fees to any of your Celsius Accounts without prior notice to you, or we may bill you directly for such expenses and fees. Any garnishment or levy against your Celsius Account is subject to our right of setoff and security interest.

# 25. Indemnification and Limitation of Liability; Legal Fees and Costs for Lawsuits

You agree to indemnify and hold harmless Celsius and its Affiliates, and their respective employees, managers, officers, directors, partners and shareholders from any losses, damages, suits and expenses, of whatever kind, including reasonable legal fees, that we incur in connection with or arising out of your access to or use of the Services, or our activities in connection with such Services, and for your breach of these Terms or violation of any law, regulation, order or other legal mandate, or the rights of a third party, or any act or omission by you or any person acting on your behalf while using your Celsius Account, regardless of whether the specific use was expressly authorized by you. You agree to comply with all applicable laws, regulations, or rules, and to not use your Celsius Account or the Services for any transaction or activity that is illegal or violates applicable laws, regulations or rules. Please note, your agreement to comply includes any and all applicable laws and regulations of the United States, as well as of your place of residency, citizenship, business, locality and any law applicable to you.

We are not liable to you for claims, costs, losses or damages caused by an event that is beyond our reasonable control (e.g. the acts or omissions of third parties, natural disaster, emergency conditions, government action, equipment or communications malfunction). We are not liable for special, incidental, exemplary, punitive or consequential losses or damages of any kind. Except for any setoff permitted by applicable law and Section 9 of these Terms, any

obligations of ours may be satisfied solely from the assets of Celsius. Without limiting the generality of the foregoing, in no event shall you have any recourse, whether by setoff or otherwise, with respect to our obligations, to or against any assets of any person or entity other than Celsius, including, without limitation, any member, shareholder, Affiliate, investor, employee, officer, director, agent or advisor of Celsius. For the avoidance of doubt, the foregoing shall not limit any setoff permitted by applicable law and Section 9 of these Terms.

## 26. Disclaimer of Warranty

**THE CELSIUS SERVICES ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT ANY WARRANTY UNDER THESE TERMS AND TO THE EXTENT ALLOWED BY APPLICABLE LAW ALL EXPRESS OR IMPLIED CONDITIONS, REPRESENTATIONS, AND WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, SATISFACTORY QUALITY, OR ARISING FROM A COURSE OF DEALING, USAGE, OR TRADE PRACTICE, OR WARRANTY OF NON-INFRINGEMENT ARE DISCLAIMED. IN NO EVENT SHALL CELSIUS, ITS AFFILIATES AND SERVICE PROVIDERS, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, JOINT VENTURERS, EMPLOYEES OR REPRESENTATIVES, BE LIABLE (A) FOR ANY AMOUNT GREATER THAN THE VALUE OF THE BALANCE OF YOUR CELSIUS ACCOUNT(S) OR (B) FOR ANY LOST PROFITS, DIMINUTION IN**

**VALUE OR BUSINESS OPPORTUNITY, ANY LOSS, DAMAGE, CORRUPTION OR BREACH OF DATA OR ANY OTHER INTANGIBLE PROPERTY OR ANY SPECIAL, INCIDENTAL, INDIRECT, INTANGIBLE, OR CONSEQUENTIAL DAMAGES, WHETHER BASED IN CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE, ARISING OUT OF OR IN CONNECTION WITH AUTHORIZED OR UNAUTHORIZED USE OF THE CELSIUS SERVICES OR THE CELSIUS ACCOUNT, OR THESE TERMS, EVEN IF AN AUTHORIZED REPRESENTATIVE OF CELSIUS HAS BEEN ADVISED OF OR KNEW OR SHOULD HAVE KNOWN OF THE POSSIBILITY OF SUCH DAMAGES.**

**CELSIUS MAKES NO REPRESENTATIONS ABOUT THE ACCURACY, ORDER, TIMELINESS OR COMPLETENESS OF HISTORICAL OR CURRENT ELIGIBLE DIGITAL ASSETS PRICE DATA AVAILABLE THROUGH THE CELSIUS SERVICES. CELSIUS WILL MAKE REASONABLE EFFORTS TO ENSURE THAT REQUESTS FOR TRANSACTIONS ARE PROCESSED IN A TIMELY MANNER BUT CELSIUS MAKES NO REPRESENTATIONS OR WARRANTIES REGARDING THE AMOUNT OF TIME NEEDED TO COMPLETE PROCESSING (WHICH IS DEPENDENT UPON MANY FACTORS, INCLUDING THOSE OUTSIDE OF OUR CONTROL), AND CELSIUS SHALL NOT BE LIABLE FOR ANY LOSSES OR DAMAGES WHICH YOU MAY INCUR AS A RESULT OF ANY DELAY IN THE PROVISION OF THE SERVICES.**

# 27. Disputes, Binding Individual Arbitration, and Class Actions and Class Arbitrations Waiver

**A. Disputes. The terms of this Section shall apply to all Disputes between you and Celsius. For the purposes of this Section, "Dispute" shall mean any dispute, claim, or action between you and Celsius arising under or relating to your Celsius Account, the Celsius platform, these Terms, or any other transaction involving you and Celsius, whether in contract, warranty, misrepresentation, fraud, tort, intentional tort, statute, regulation, ordinance, or any other legal or equitable basis, and shall be interpreted to be given the broadest meaning allowable under law.**

**B. Binding Arbitration**: You and Celsius further agree: (i) to arbitrate all Disputes between the parties pursuant to the provisions in these Terms; (ii) these Terms memorialize a transaction in interstate commerce; (iii) the Federal Arbitration Act (9 U.S.C. § 1, et seq.) governs the interpretation and enforcement of this Section; and (iv) this Section shall survive termination of these Terms. ARBITRATION MEANS THAT YOU WAIVE YOUR RIGHT TO A JUDGE OR JURY IN A COURT PROCEEDING AND YOUR GROUNDS FOR APPEALS ARE LIMITED. The arbitrator may award you the same damages and relief as a court sitting in proper jurisdiction could, and may award declaratory or injunctive relief. In addition, in some instances, the costs of arbitration could exceed the costs of litigation and the right to discovery may be more limited in arbitration than in court. The decision of the arbitrator shall be final and enforceable by any court with jurisdiction over the parties.

**C. Small Claims Court**. Notwithstanding the foregoing, you may bring an individual action in the small claims court of your state or municipality if the action is within that court's jurisdiction and is pending only in that court.

**D. Dispute Notice**. In the event of a Dispute, you or Celsius must first send to the other party a notice of the Dispute that shall include a written statement that sets forth the name, address and contact information of the party giving it, the facts giving rise to the Dispute, and the relief requested (the **"Dispute Notice"**). The Dispute Notice to Celsius must be addressed to: Celsius Network LLC, 121 River Street, PH05, Hoboken, NJ 07030 USA, with a copy to legal@celsius.network, or to the most recent email or mailing address we have on file or otherwise in our records for you (the **"Celsius Notice Addresses"**). Any Dispute Notice to you shall be delivered by one of the communication channels you have provided Celsius, which may include email or other electronic transmission, and you agree that such a delivery of a Dispute Notice to you shall be sufficient. Should you require to obtain a Dispute Notice by any other communication channel, you must inform Celsius of such a requirement in writing. Following submission and receipt of the Dispute Notice, you and Celsius each agree to act in good faith to seek to resolve the Dispute before commencing arbitration. If Celsius and you do not reach an agreement to resolve the Dispute within sixty (60) days after the Dispute Notice is received, you or Celsius may commence an arbitration proceeding pursuant to this Section.

**E. WAIVER OF CLASS ACTIONS AND CLASS ARBITRATIONS. YOU AND CELSIUS AGREE THAT EACH PARTY MAY BRING DISPUTES AGAINST THE OTHER PARTY ONLY IN AN INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR**

**REPRESENTATIVE PROCEEDING, INCLUDING WITHOUT LIMITATION FEDERAL OR STATE CLASS ACTIONS, OR CLASS ARBITRATIONS. ACCORDINGLY, UNDER THE ARBITRATION PROCEDURES OUTLINED IN THIS SECTION, AN ARBITRATOR SHALL NOT COMBINE OR CONSOLIDATE MORE THAN ONE PARTY'S CLAIMS WITHOUT THE WRITTEN CONSENT OF ALL AFFECTED PARTIES TO AN ARBITRATION PROCEEDING. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, YOU AND CELSIUS AGREE THAT NO DISPUTE SHALL PROCEED BY WAY OF CLASS ARBITRATION WITHOUT THE WRITTEN CONSENT OF ALL AFFECTED PARTIES.**

**F. Arbitration Procedure**. If a party elects to commence arbitration, the arbitration shall be governed by the rules of the American Arbitration Association ("**AAA**") that are in effect at the time the arbitration is initiated (the "**AAA Rules**"), available at https://www.adr.org/Rules or by calling 1-800-778-7879, and under the rules set forth in these Terms, except that AAA may not administer any multiple claimant or class arbitration, as the parties agree that the arbitration shall be limited to the resolution only of individual claims. If there is a conflict between the AAA Rules and the rules set forth in these Terms, the rules set forth in these Terms shall govern. You may, in arbitration, seek any and all remedies otherwise available to you pursuant to federal, state, or local laws. All Disputes shall be resolved by a single neutral arbitrator, and both parties shall have a reasonable opportunity to participate in the selection of the arbitrator as provided in the AAA Rules. The arbitrator is bound by these Terms. The arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to resolve all disputes arising out of or relating to the interpretation,

applicability, enforceability or formation of these Terms, including, but not limited to, any claim that all or any part of these Terms is void or voidable. The arbitrator shall be empowered to grant whatever relief would be available in a court under law or in equity. The arbitrator's award shall be binding on the parties and may be entered as a judgment in any court of competent jurisdiction. You may choose to engage in arbitration hearings by telephone or by video conference. Hearings in any arbitration commenced by you that are not conducted by telephone or videoconference shall take place in New York, New York, unless there is a location in the continental United States more convenient to you, in which case the arbitration shall take place either in New York, New York, or such other location in the continental United States, at your option.

**G. Initiation of Arbitration Proceeding. If either you or Celsius decide to arbitrate a Dispute, we agree to the following procedure:**

1. Write a Demand for Arbitration[196]. The demand must include a description of the Dispute and the amount of damages sought to be recovered. You can find a copy of a Demand for Arbitration at https://www.adr.org/Forms?practice=all (**"Demand for Arbitration"**).
2. Send one copy of the Demand for Arbitration, plus the appropriate filing fee, to
American Arbitration Association
Case Filing Services
1101 Laurel Oak Road, Suite 100
Voorhees, NJ 08043
OR
File online using AAA WebFile at https://www.adr.org

---

[196] It should be noted that arbitration was not required in the Plaintiffs case since it was below $10,000, and thus should have been handled via small claims court.

> OR
> File at any of the AAA's offices.
> 3. Send one copy of the Demand for Arbitration to the other party at the same address as the Dispute Notice, or as otherwise agreed to by the parties.

Hearing Format. In all hearing formats, the arbitrator shall issue a written decision that explains the essential findings and conclusions on which an award, if any, is based. During the arbitration, the amount of any settlement offer made by Celsius or you shall not be disclosed to the arbitrator.

> 1. The discovery or exchange of non-privileged information relevant to the Dispute may be allowed during the arbitration as determined by the Arbitrator in accordance with AAA Rules.
> 2. Arbitration Fees. With respect to any Dispute where the amount claimed is $20,000 U.S. or less (or the equivalent amount in a different currency, whether fiat or otherwise), Celsius shall pay, or (if applicable) reimburse you for, all fees paid or payable to AAA, including filing, administration, and arbitrator fees ("**Arbitration Fees**") for any arbitration commenced between Celsius and you (and whether initiated by Celsius or by you) pursuant to provisions of these Terms. You are responsible for all costs that you incur in connection with the arbitration other than Arbitration Fees, including without limitation, fees for attorneys or expert witnesses. You must reimburse Celsius any Arbitration Fees if (i) Celsius is the prevailing party in the arbitration or (ii) you withdraw the arbitration.
> 3. Opt-out . You may elect to opt-out (exclude yourself) from the final, binding individual arbitration procedure and waiver of class and representative proceedings specified in these Terms by sending a written letter to the Celsius Notice Address within thirty (30) days of your initial assent to these Terms (including your first use of your Celsius Account or the Celsius platform) that specifies: (i) your name; (ii) your mailing address; and (iii) your request to be excluded from the final, binding individual

arbitration procedure and waiver of class and representative proceedings specified in this Section. In the event that you opt-out consistent with the procedure set forth above, all other terms shall continue to apply.

4. Amendments to this Section . Notwithstanding any provision in these Terms to the contrary, you and Celsius agree that if Celsius makes any future amendments to the dispute resolution procedure and class action waiver provisions (other than a change to Celsius' address) in these Terms, Celsius will notify you and you will have thirty (30) days from the date of notice to affirmatively opt-out of any such amendments by sending a written letter to the Celsius Notice Address within thirty (30) days of Celsius' notification that specifies: (i) your name; (ii) your mailing address; and (iii) your request to opt-out of such amendments. If you affirmatively opt-out of any future amendments, you are agreeing that you will arbitrate any Dispute between us in accordance with the language of this Section as stated in these current Terms, without any of the proposed amendments governing. If you do not affirmatively opt-out of any future amendments, you will be deemed to have consented to any such future amendments.

5. Severability . If any provision in this Section is found to be unenforceable, that provision shall be severed with the remainder of these Terms remaining in full force and effect. The foregoing shall not apply to the prohibition against class or representative actions; if the prohibition against class or representative actions is found to be unenforceable, this entire Section shall be null and void. The terms of this Section shall otherwise survive any termination of these Terms.

6. Exclusive Venue for Proceedings in Connection with Arbitration . Celsius and you agree that any proceeding to compel arbitration, confirm an award, or to seek interim or other relief in aid of arbitration, may be filed only in the competent state or federal courts located in New York County, New York.

## 28. Our Ownership of the Services and Celsius' Intellectual Property (IP)

You agree and acknowledge that we own all right, title and interest to and in the Services, the associated software, technology tools and content, the Celsius Network website, any logos, identifying marks, images, illustrations, designs, icons, photographs, videos, text and other written and multimedia materials, the content displayed on the website or platform, and other materials produced by and related to Celsius (collectively, the "Celsius IP"). You acknowledge and agree that no proprietary rights are being transferred to you in such materials or information, and that you have no intention of using such materials or information inappropriately or to in any way harm Celsius or any of its affiliates, directors, officers or employees. You shall not prepare any derivative work based on the Celsius IP, nor shall you translate, reverse engineer, decompile or disassemble the Celsius IP.

## 29. Communications

We may record and monitor our telephone conversations with you and your electronic communications with us (chat, email, and other forms of electronic exchange). Unless the law requires otherwise, you consent in advance to such recording and monitoring and we do not need to remind you of these activities. You must promptly notify us of any change in your contact information, including residential post and email address. Failure to notify us in a timely fashion may result in delay or non-receipt of notices or correspondence.

## 30. Waiver

We may delay the exercise of any rights we have under these Terms, and any such delay shall not result in a waiver, relinquishment or modification of any of our rights. If we delay in any exercise of our rights, or if notwithstanding the foregoing Celsius somehow is deemed to have waived any of our rights, you are still obligated to pay us Obligations you may owe us, remove any violation of these Terms and/or otherwise follow our instructions (as applicable). Any delay or waiver of our rights applies only to the specific instance in which we decide to delay or waive the provision and does not affect our other or subsequent rights in any way.

## 31. Changes in Terms

Please be aware that the terms and conditions governing the Services can change over time. We reserve the right to discontinue or make changes to any of the Services. We may change these Terms, and we may add to or delete from these Terms, and the updated version will supersede all prior versions. We will provide notice of changes, additions, and deletions, as required by law. If we have provided advance notice and you do not agree with a change, you may close your Celsius Account(s) and demand repayment of outstanding loans before the effective date of the change, which shall be your sole remedy. The continued maintenance of your Celsius Account following the effective date of any change will constitute your acceptance of such change and subject your Celsius Account to the modified Terms.

## 32. Assignment

These Terms, or any of the rights and/or obligations provided hereunder, may not be assigned or otherwise transferred by you to any other person or Entity, whether by operation of law or otherwise, without Celsius' express written

consent, and any attempted assignment in violation of this prohibition shall be void ab initio and of no effect. Celsius may assign or transfer these Terms and/or any or all of its rights and/or obligations hereunder at any time to any Affiliate of Celsius, with or without providing you with prior notice of the same. Celsius may assign or transfer these Terms and/or any or all of its rights and/or obligations hereunder at any time to any third party by providing prior notice. Any permitted assignment or transfer of or under these Terms shall be binding upon, and inure to the benefit of the successors, executors, heirs, representatives, administrators and permitted assigns of the parties hereto.

## 33. Governing Law and Venue

The relationship between you and Celsius is governed exclusively by the laws of the state of New York, without regard to its conflict of law provisions (other than Sections 5-1401 and 5-1402 of the New York General Obligations Law). Any dispute arising out of, or related to, your Celsius Account or relationship with Celsius must be brought exclusively in the competent courts located in New York, NY and the US District Court located in the Borough of Manhattan; however, Celsius may bring equitable relief or collections actions in any applicable jurisdiction.

## 34. Force Majeure

We will not be liable for delays in processing or other non-performance caused by such events as fires, telecommunications, utility, or power failures, equipment failures, labor strife, riots, war, nonperformance of our vendors or suppliers, acts of God, pandemic or epidemic events, or other causes over which we have no reasonable control.

## 35. Survival

**The provisions of Sections 16 (Taxes), 25 (Indemnification), 26 (Disclaimer of Warranty), 27 (Disputes, Binding Individual Arbitration, and Class Actions and Class Arbitrations Waiver), 28 (Our Ownership of the Services and Celsius IP), 30 (Waiver) and 33 (Governing Law and Venue) shall survive the termination of these Terms.**

**\*\*\*\***

Appendix A

Binance Coin (BNB)

Ripple (XRP)

Tether Gold (XAUT)

WDGLD

**Get Celsius.
Unbank yourself.**

## Exhibit G:

 **Nash, Patrick J.** <patrick.nash@kirkland.com>                                        Mon, Jul 18, 7:51 PM   

to jsussberg@kirckland.com, ross.kwastenient@kirkland.com, info@kirkland.com, Heidi, Alison, me

Daniel –

Thank you for your email. I apologize for K&E's apparent untimely responsiveness up top this point. Please send us a copy of the lawsuit that you filed if not too much trouble. While I am not giving you legal advice, your lawsuit is subject to the automatic stay on account of Celsius' chapter 11 filing, and any action in furtherance of your lawsuit, absent bankruptcy court authorization to take such action, puts you at risk of having been found to have violated the automatic stay. I am sorry that you are caught up in this. If you send us the suit that you filed, happy to discuss our perspective on next steps.

Patrick J. Nash Jr. P.C.
Kirkland & Ellis LLP
300 N. LaSalle
Chicago IL 60654
Ph: (312) 862-2290
M: (773) 343-3842

...

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.